Page 1

1  IN THE UNITED STATES DISTRICT COURT FOR THE
2      MIDDLE DISTRICT OF TENNESSEE
    NASHVILLE DIVISIONS
3
4  EMPLOYERS INSURANCE COMPANY  )
    OF WAUSAU           )
5                    )
    Plaintiff,    )
6                    )
7  vs.        ) Case No. 3:06-cv-00611
                  )
8  MEDLINE INDUSTRIES, INC., &  ) Judge Wiseman
    CREATIVE BEDDING TECHNOLOGIES, ) Magistrate Judge Bryant
9  INC.      ) Jury Demand
                  )
10      Defendants.    )
11
12      Video Deposition of:
13
    ROBERT JOSEPH HOLLMAN
14
15      Taken on behalf of the Defendants
16
17      February 22, 2007
18
19
20
21
22
23
24
25

---

Page 2

1
2      A P P E A R A N C E S
3  For the Plaintiff:  MS. SANDRA COCKRAN LISER
    MR. GEORGE GRANT LISER, III
4      Brown, Dean, Wiseman, Liser,
    Proctor & Hart, LLP
5      306 W. Seventh Street, Ste. 200
    Fort Worth, TX 76102-4905
6
7      MR. RAYMOND G. PRINCE
    Prince & Hellinger, P.C.
    150 Second Avenue, North, Ste. 300
8      Nashville, TN 37201-1920
9  For the Defendant  MR. JEFFREY SINGER
    Medline Industries: MR. BRIAN H. ELDRIDGE
10      Segal, McCambridge, Singer &
    Mahoney, Ltd.
11      330 N. Wabash Ave., Ste. 200
    Chicago, IL 60611-3514
12
    MR. CHRISTOPHER M. JONES
13      MR. MARK S. LEVAN
    LeVan Sprader, Patton &
14      McCaskill, PLLC
    150 Fourth Ave., N., Ste. 1020
15      Nashville, TN 37219
16  For the Defendant  MR. GREGORY JAMES McKENNA
17  Creative Bedding    Cremer, Kopon, Shaughnessy
18  Technologies    & Spina
19      180 N. LaSalle St., Ste. 3300
20      Chicago, IL 60601
21
22
23  Also Present:    Mr. McCall, Videographer
24
25

---

Page 3

1      I N D E X
2          PAGE
3  Examination by Mr. Singer    6
    Examination by Mr. McKenna    159
4  Examination by Mr. Singer    179
    Examination by Ms. Liser    182
5  Examination by Mr. Singer    222
    Examination by Mr. McKenna    235
6  Examination by Ms. Liser    245
    Examination by Mr. Singer    249
7
8
9      E X H I B I T S
10
11
12  No. 150A - Medline Invoices    53
13  No. 151A - Copies of Photographs    66
14  No. 152A - Copies of Photographs    68
15  No. 153A - Copies of Photographs    72
16  No. 154A - Room Diagram    76
17  No. 155A - Floor Plan for Second Floor    80
18  No. 156A - Copy of Nylex II Tag    201
19  No. 157A - Floor Plan for Second Floor    209
20  No. 158A - Patient Care Plan    212
21  No. 159A - Skin Assessment Records    226
22  No. 160A - Documents    231
23  No. 161A - Patient Care Plan Documents    239
24
25

---

Page 4

1      S T I P U L A T I O N S
2
3      The video deposition of ROBERT JOSEPH HOLLMAN
4  was taken by counsel for the Defendant, at the Law Offices
5  of Bass, Berry & Sims, Nashville, Tennessee, on February
6  22, 2007, for all purposes under Federal Rules of Civil
7  Procedure. The formalities as to notice, caption,
8  certificate, et cetera, are waived. All objections, except
9  as to form of the question, are waived.
10      It is agreed that Helen K. Stephens, RPR, and
11  Notary Public at Large for the State of Tennessee, may
12  swear the witness. The reading and signing of the
13  completed deposition by the witness is not waived.
14
15
16
17
18
19
20
21
22

1 (Pages 1 to 4)

Page 5

1      THE VIDEOGRAPHER: This deposition is
2 being videotaped by Allen McCall of Nashville's Media
3 Services, 526-B Third Avenue South, Nashville, Tennessee.
4 Today's date is February 22nd, 2007. The time is 9:02 a.m.
5 The location is the Law Offices of Bass, Berry & Sims in
6 Nashville, Tennessee. The caption of the case, In the
7 United States District Court for the Middle District of
8 Tennessee, Nashville, Division, Employers Insurance Company
9 of Wausau, Plaintiff, versus Medline Industries, Inc., and
10 Creative Bedding Technologies, Incorporated, Defendants,
11 Case Number 3:06-cv-00611, Judge Wiseman, Magistrate Judge
12 Bryant, Jury Demand.
13      The deponent is Bob Hollman. This
14 deposition is taken on behalf of the plaintiff (sic). Will
15 the attorneys please make voice introductions.
16      MS. LISER: Sandra Liser for Employers
17 Insurance of Wausau.
18      MR. PRINCE: Ray Prince for Employers
19 Insurance of Wausau.
20      MR. SINGER: Jeffrey Singer on behalf of
21 Defendant Medline Industries.
22      MR. JONES: Chris Jones for Medline
23 Industries.
24      MR. McKENNA: And Greg McKenna on behalf
25 of Creative Bedding Technology.

Page 6

1      THE VIDEOGRAPHER: The court reporter is
2 Helen Stephens. Would you please swear the witness.
3      (The witness was sworn at this time.)
4      * * *
5      ROBERT JOSEPH HOLLMAN
6 was called as a witness, and after having been first duly
7 sworn, testified as follows:
8      EXAMINATION
9 QUESTIONS BY MR. SINGER:
10 Q.   Mr. Hollman, I just want to reintroduce myself.
11 My name is Jeff Singer and I'm an attorney.
12 A.   Okay.
13 Q.   And I represent Medline Industries. I'm going
14 to be asking you a number of questions this morning.
15 A.   Okay.
16 Q.   I would like you to listen closely to each
17 question before you give each of your answers.
18 A.   Okay.
19 Q.   If you hear -- if you don't believe you've
20 heard all the question, you don't understand it, you want
21 it repeated or rephrased, let us know and we'll do that for
22 you; okay?
23 A.   Okay.
24 Q.   I understand you've given a deposition before.
25 You're generally familiar with the procedures, but I just

Page 7

1 want to go through that especially with you. Also, we ask
2 that you verbalize or vocalize your answers cause that's
3 the only way our court reporter can take down what you
4 really mean to say.
5 A.   Okay.
6 Q.   So shaking of the head or shrugging the
7 shoulders, that's not gonna be enough.
8 A.   Okay.
9 Q.   Okay?
10 A.   All right.
11 Q.   Last, we ask that you speak somewhat more
12 loudly than you are right now, if at all possible, so all
13 of us in the room can hear what you have to say.
14 A.   Okay.
15 Q.   Okay. How old are you today, sir?
16 A.   Fifty-five years old.
17 Q.   And are you employed at the present time?
18 A.   Yes, I am.
19 Q.   By whom are you employed?
20 A.   NHC Healthcare, Richland Place.
21 Q.   NHC Healthcare?
22 A.   Richland Place, yes.
23 Q.   Richland Place. Where is that located, the
24 Richland Place facility?
25 A.   504 Elmington Avenue, Nashville, Tennessee.

Page 8

1 Q.   And how long have you been assigned to Richland
2 Place?
3 A.   Approximately four years.
4 Q.   Fair to say it would have been soon after the
5 fire which is the subject of this -- this lawsuit?
6 A.   October.
7 Q.   So October 2003 you began at Richland Place?
8 A.   Yes, sir.
9 Q.   Okay. And before you were working at the
10 Richland Place facility, you were assigned to the Patterson
11 Street address?
12 A.   Yes. Yes, sir.
13 Q.   And is that called NHC Healthcare, Patterson
14 Street?
15 A.   NHC Healthcare, Nashville.
16 Q.   So if we refer to that facility as NHC
17 Nashville, you would -- we would know -- we're talking
18 about the Patterson Street facility; correct?
19 A.   Yes, sir.
20 Q.   And how many years did you work at that
21 facility?
22 A.   From 1992 to 2003.
23 Q.   So approximately 11 years?
24 A.   Right.
25 Q.   And your duties at that facility, could you

2 (Pages 5 to 8)

Page 9

1  summarize that for us?
2  A.     Central supply, particularly ordering all the
3  supplies and stocking the floors, any special equipment
4  that we needed, I took care of that too.
5  Q.     Did anyone assist you in those -- with those
6  duties or responsibilities?
7  A.     No.
8  Q.     So during the 11 years you were working at NHC
9  Nashville, you were the person primarily responsible for
10  ordering the supplies and stocking the supplies on the
11  different floors of the facility. Is that a fair
12  statement?
13  A.     Right.
14  Q.     Now, it's our understanding that as part of
15  your duties at NHC Nashville, you were the one that was
16  exclusively responsible for ordering mattresses. Is that a
17  fair statement?
18  A.     That's a fair statement.
19  Q.     Now, how -- what was the chain of command or
20  the -- the procedure that permitted you to decide how many
21  mattresses and which ones to -- order and -- with
22  respect to budgets and authority and things of that nature?
23  Can you tell us?
24  A.     Tom Lester was the administrator. He said he
25  wanted to replace all the old mattresses because they'd

Page 10

1  been there for a long time. I told him we needed
2  approximately 125, and he said, Get us a price on different
3  vendors and we'll go with the best mattress with the best
4  price.
5  Q.     Okay. And that administrator's name is Tom
6  Lester?
7  A.     Yes, sir.
8  Q.     And how -- when did Mr. Lester leave the NHC
9  Nashville facility?
10  A.     95, I believe.
11  Q.     Okay. So when you and Mr. Lester had this
12  conversation about ordering mattresses for the facility,
13  and I believe you said 125 in number --
14  A.     Right.
15  Q.     -- when would that conversation have ensued, in
16  1994?
17  A.     1994, yes, sir.
18  Q.     Any greater detail or specifics as to when in
19  94 you had that conversation with Mr. Lester?
20  A.     No, I don't remember.
21  Q.     Can you tell us whether it was the summer or
22  the spring or the fall?
23  A.     Seems like it was -- it may have been in the
24  fall.
25  Q.     Okay. Your best recollection would have been

Page 11

1  the fall of 94?
2  A.     Right.
3  Q.     Is that right?
4  A.     Right.
5  Q.     Now, before the fall of 94, had you ordered
6  mattresses during your employment at NHC Nashville?
7  A.     I don't remember ordering any.
8  Q.     Okay. What was the procedure you implemented
9  then after Mr. Lester gave you essentially the go-ahead to
10  order 125 mattresses for the NHC Nashville facility?
11  A.     I went downstairs and called Metro Medical. I
12  called another one, but I don't know what the name of it
13  was. And then I called -- I think Tonia came by from
14  Medline. I don't know. I can't remember if I called her
15  or she came by. And we talked about the mattresses and she
16  came up with a price. And I told her I wanted to meet
17  California standards and she said, Okay. I went back and
18  told Mr. Lester that that's what we -- what we had a price
19  on, and he said, Order em.
20  Q.     Okay. Let's back up a little bit. You say you
21  talked with the people at Metro?
22  A.     Talked to the people at Metro.
23  Q.     And who was it at Metro you talked --
24  A.     Bobby King.
25  Q.     And can you spell Bobby's last name for the --

Page 12

1  A.     K-I-N-G.
2  Q.     And when did you talk to Bobby King about
3  mattresses?
4  A.     Shortly after Tom Lester and I had finished our
5  conversation.
6  Q.     And when --
7  A.     Probably the same day.
8  Q.     Was Metro your primary vendor?
9  A.     No. Gulf South and Metro were combination of
10  vendors.
11  Q.     Okay. So Metro and Gulf South were together --
12  A.     Right.
13  Q.     -- a combination?
14  A.     Right. Right.
15  Q.     So Gulf South would be your primary vendor
16  through Metro?
17  A.     Were my primary vendor, yes.
18  Q.     Okay. What did you and Bobby King talk about?
19  A.     About the mattresses and about the prices. And
20  then he told me that I needed to make sure that they met
21  California fire standards, when we was talking price, he
22  said, Because the prices would be a little bit higher.
23  Q.     Okay. And what else did he say to you about
24  California fire standards?
25  A.     That's all he said.

Page 13

1   Q.   And did you ask him what are California fire
2 standards?
3   A.   I don't remember.
4   Q.   Well, what did he tell you about California
5 fire standards?
6   A.   Just that it should meet California fire
7 standards.
8   Q.   Okay. And you said -- and that conversation
9 with Bobby King would have been in the fall of 94?
10   A.   Fall of 94.
11   Q.   Did you do any research or reading about
12 California fire standards after you talked with Mr. King?
13   A.   No, I didn't.
14   Q.   Okay. Did you ask anybody about California
15 fire standards after --
16   A.   No.
17   Q.   -- you talked with Bobby King?
18   A.   No.
19   Q.   Okay. You say you talked to another vendor
20 other than Medline?
21   A.   Yeah, but I don't remember who it was.
22   Q.   Well, how do you know that you talked with
23 another vendor?
24   A.   Cause I always called three vendors when I was
25 getting pricing.

Page 14

1   Q.   Who else were -- can you describe other vendors
2 that you had at the time at NHC Nashville other than Metro
3 or Medline?
4   A.   No.
5   Q.   Was there a company called Pioneer that you
6 bought from?
7   A.   We didn't buy beds from Pioneer.
8   Q.   Beds?
9   A.   We didn't buy beds from Pioneer; mattresses
10 from Pioneer.
11   Q.   Okay. Would you have contacted anyone from
12 Pioneer regarding mattresses?
13   A.   Possible, but I don't remember.
14   Q.   Who was the sales rep for Pioneer?
15   A.   His last name was Smith, but I don't remember
16 what his first name was. David is the owner. David Smith
17 is the owner, but also was -- the sales rep was a Smith
18 too.
19   Q.   I'm sorry. I kind of lost you on that.
20   A.   David Smith is the owner, and he also had a
21 sales rep named -- his last name's Smith.
22   Q.   All right. So the owner of Pioneer was David
23 Smith?
24   A.   Right.
25   Q.   And he had salesman with the name of -- last

Page 15

1 name of Smith --
2   A.   Right.
3   Q.   -- but you don't recall his first name?
4   A.   I don't recall his first name.
5   Q.   Is Pioneer still in business today?
6   A.   Yes, sir.
7   Q.   Where are they located?
8   A.   Here in Nashville.
9   Q.   Do you know what street they're on?
10   A.   No.
11   Q.   Okay. Now, the third vendor you called was
12 Medline, you say; right?
13   A.   I'm not sure if I called Medline or if she came
14 by my office.
15   Q.   "She" being Tonia Lee?
16   A.   Tonia Lee, right.
17   Q.   Okay. And when would that have occurred?
18   A.   That same day or a day or two before or a day
19 or two after.
20   Q.   As when Tom Lester gave you authority to buy
21 mattresses?
22   A.   Right. Right.
23   Q.   Had you contacted Ms. Lee to tell you (sic)
24 that you were in the market for mattresses?
25   A.   No, I don't think so. I think she came by the

Page 16

1 office.
2   Q.   But this would have been in the fall of 94?
3   A.   Right.
4   Q.   Absolutely, positively remember that?
5   A.   I know it was in the fall.
6   Q.   Of 94?
7   A.   Right.
8   Q.   Okay. So she just happened to come by your
9 office?
10   A.   Well, she came by periodically to see if I
11 needed anything, we wanted to order anything. And I
12 ordered stuff from her too.
13   Q.   Now, how many years had you been ordering
14 product from Tonia Lee?
15   A.   I don't know. Quite a few years though.
16   Q.   More than five or less than five?
17   A.   More than five.
18   Q.   And what kind of products were you generally
19 buying from Medline through her?
20   A.   The spray perineal wash.
21       THE COURT REPORTER: I'm sorry?
22       THE WITNESS: Spray perineal wash.
23 BY MR. SINGER:
24   Q.   Spray perineal wash.
25   A.   Baby wipes, gloves.

4 (Pages 13 to 16)

**Page 17**

1   Q.   Like latex gloves, you mean?
2   A.   Latex gloves, yeah. A few other different
3 items.
4   Q.   Would you say that the vast percentage though
5 of supplies you were buying for your facility back in the
6 94 era would have been from Gulf South, Metro?
7   A.   Metro Medical.
8   Q.   Okay. Metro Medical. But what's the
9 relationship with Metro Medical and Gulf South?
10   A.   There's no relationship at all. It's two
11 different companies.
12   Q.   Okay. I thought before you said that there was
13 some interrelationship of the two companies. No?
14   A.   No. I was just buying from both companies.
15   Q.   I understand.
16   A.   Gulf South being the primary vendor.
17   Q.   Why is that? Do you know?
18   A.   That's what NHC said to do.
19   Q.   It's your understanding they had a group
20 discount, a purchasing contract?
21   A.   Right. Right, exactly.
22   Q.   Okay. Who was your sales rep with Gulf South
23 back then in 94?
24   A.   I don't remember his name.
25   Q.   Was he from Nashville?

**Page 18**

1   A.   He lived here in Nashville. Greg Watson was
2 one of the sales reps.
3   Q.   Is he in Nashville?
4   A.   No. I don't know where he's at now.
5   Q.   But he was -- Gulf South --
6   A.   Lived here in Nashville, down in Franklin or
7 Nashville.
8   Q.   He was a Gulf South . . .
9   A.   Sales rep.
10   Q.   In that era --
11   A.   Right.
12   Q.   -- in the mid- 90s?
13   A.   In the 90s, yes.
14   Q.   Okay.
15   A.   Had a couple during that time frame.
16   Q.   Did you talk with him or any other sales rep of
17 Gulf South regarding mattresses at --
18   A.   No.
19   Q.   Let me finish my question so the record's
20 clear. After Tom Lester gave you authority to order 125
21 mattresses, did you contact Gulf South with respect to the
22 mattresses and their product line?
23   A.   I don't remember.
24   Q.   Is there any particular reason why you would or
25 would not contact them?

**Page 19**

1   A.   No, sir.
2   Q.   It's your understanding that they had the best
3 pricing program for your facility back then?
4   A.   That's what they said, but it's not always the
5 case.
6   Q.   I understand. Did you check it out, what their
7 prices were for mattresses before you ordered the ones from
8 Medline?
9   A.   I don't remember, but I'm sure I did.
10   Q.   Did you call any of their sales reps regarding
11 California standards?
12   A.   Don't remember.
13   Q.   Other than Greg Watson, can you give us the
14 name of any other sales reps with Gulf South that --
15   A.   I don't --
16   Q.   -- you had contacted?
17   A.   -- remember their names.
18   Q.   Over the 90s or any -- any -- any names at
19 all.
20   A.   One of the sales reps is with Gulf South, takes
21 care of the Medicare Part B billing. He's in charge of it
22 down there, but I don't remember what his name was.
23   Q.   Okay. Other than Greg Watson, is there -- are
24 there any other Gulf South sales reps that you can recall
25 by name?

**Page 20**

1   A.   No.
2   Q.   Okay. Let's get back to the time in the fall
3 of 94 when you talked to Ms. Lee at Medline.
4   A.   Right.
5   Q.   Okay. Fair to say you had a positive
6 professional relationship with her?
7   A.   Yes, sir.
8   Q.   So she happened to come to your office one day,
9 and you brought up the idea of buying beds -- excuse me,
10 buying mattresses; correct?
11   A.   As I said, I don't remember if she came by or I
12 called her.
13   Q.   Okay. One of the two.
14   A.   One of the two, yeah.
15   Q.   But in any event, she came by to your office
16 one day to talk about mattresses with you?
17   A.   Right.
18   Q.   Was there anyone else present during that
19 conversation?
20   A.   No, sir, not as I remember.
21   Q.   Okay. And had you already talked to Bobby King
22 about mattresses before you talked to Tonia Lee?
23   A.   I don't remember if I talked to him before or
24 after.
25   Q.   Okay. In any event, what's -- if you can, give

1  us as detailed a description of the conversation you had
2  with Tonia Lee when she came by your office one day and you
3  started talking to her about mattresses.
4  A.    I wanted to buy 125 mattresses, I wanted good
5  pricing, and they met California fire standards.
6  Q.    Anything else?
7  A.    She got -- she got back with me with a price of
8  a hundred -- I think it was $126.
9  Q.    How soon was that?
10  A.    Within the same day or a couple of days.
11  Q.    And that was for all 125 mattresses?
12  A.    The pricing was based on us buying 125
13  mattresses.
14  Q.    And do you recall anything else about your
15  conversation with her?
16  A.    I told her I'd get back -- I'd get back with
17  Tom Lester and I'd let her know what to do.
18  Q.    Okay. Does -- do you have any kind of calendar
19  or anything that would identify the specific date that you
20  and Ms. Lee had this conversation during the fall of 94?
21  A.    No, sir.
22  Q.    You don't have any notes or anything that
23  summarizes --
24  A.    No.
25  Q.    -- your conversation with her. Is that a fair

1  statement?
2  A.    That's a fair statement.
3  Q.    Okay. So in any event, you told her you
4  wanted to buy 125 mattresses, you wanted a really good
5  price, and you wanted to meet the California fire
6  standards.
7  A.    Right.
8  Q.    Okay. And I think you told us you don't know
9  what the California fire standards said, correct?
10  A.    No, I don't.
11  Q.    And you don't recall whether your learned about
12  the California fire standards from Mr. Bobby King before or
13  after you met with Ms. Lee about the mattresses; correct?
14  A.    I had saw a program on TV about California fire
15  standards for mattresses because they ran it on 60 Minutes
16  or 48 Hours. Talked about California fire standards.
17  Q.    When was that?
18  A.    This was in 93 or 94.
19  Q.    And that would have been 60 Minutes or what
20  else?
21  A.    48 Hours. It was on one of the newscasts.
22  Q.    And it would have been 93 or 94?
23  A.    93 or 94, yes.
24  Q.    Anything else you recall about your
25  conversation with Ms. Lee?

1  A.    That we wanted them shipped in increments.
2  Like -- I don't remember if it was monthly or quarterly,
3  however we did it. We shipped on different invoices,
4  different amounts.
5  Q.    Why is that?
6  A.    So we could pay for them as they came in.
7  Q.    Do you recall anything else about your contacts
8  with Ms. Lee regarding the mattresses that day?
9  A.    No.
10  Q.    And you say that within that -- either that
11  same or within a few days thereafter she gave you the price
12  of $126 a mattress?
13  A.    Right.
14  Q.    Now, how is it you remember after all these
15  years that the price of the mattress is $126?
16  A.    I guess because I bought so many of them from
17  her.
18  Q.    Now, did you have any later conversations with
19  Ms. Lee about mattresses other than that one day?
20  A.    I don't remember.
21  Q.    Now, when was the first mattress order placed
22  with Medline?
23  A.    I'm not sure. I'd have to look at the invoice
24  date to see about that.
25  Q.    Okay. Now, was Medline's price better than

1  Metro's?
2  A.    Yes.
3  Q.    What was Metro's price?
4  A.    I don't remember the price.
5  Q.    Do you recall anything about the nature of the
6  mattress that Metro wanted to offer you to purchase?
7  A.    No, not now; I don't remember that anymore.
8  Q.    Did Mr. King tell you that he had a mattress
9  that met California fire standards?
10  A.    I don't remember.
11  Q.    Did Ms. Lee say to you explicitly that she had
12  a mattress that met California fire --
13  A.    No, sir. We never discussed it.
14  Q.    Let me finish. Did Ms. Lee ever tell you
15  explicitly that there was a mattress which Medline offered
16  that met California fire standards?
17  A.    No, sir.
18  Q.    And did you ever attempt to investigate whether
19  the mattress that Medline was selling you met any
20  California fire standards?
21  A.    No, because the tag on it says flame retarder
22  or flame resistant.
23  Q.    Okay. Since the fire at the facility in
24  September 2003, have you engaged in any research to
25  determine whether or not the mattress that Medline sold to

Page 25

1  your company met any California fire standards?
2  A.  No.
3  Q.  So if I understand your testimony, Ms. Lee
4  never made any representations or statements to you about
5  California fire standards. Fair statement?
6  A.  Fair statement, sir.
7  Q.  Okay. Now, do you recall what the increments
8  of purchases of the mattresses were?
9  A.  I think the first order was 25 and each
10  following order was 25 or 26.
11  Q.  Okay. You know, I was able to accumulate some
12  -- the parties -- the attorneys here were able to
13  accumulate some invoices, and we've marked some of them as
14  exhibits before, so I want tender them to you.
15  A.  Okay.
16  Q.  And see whether they do their job in telling
17  you when the invoices -- when the mattresses were ordered
18  by you from Medline; okay?
19  A.  Okay.
20  Q.  I want to show you Exhibit 47A, which is an
21  invoice from Creative Bedding Technologies.
22       MR. SINGER: Pass this around and keep one
23  for me. Hold on.
24  BY MR. SINGER:
25  Q.  Here we go, sir. I want to keep one here. And

Page 26

1  that's -- it's an invoice from Creative Bedding to -- to
2  Medline that shows a date of March 11, 95 of six
3  mattresses. See that?
4  A.  Right.
5  Q.  Okay. And it shows NHC Center, Nashville,
6  Tennessee is where it's to be shipped. That'd be your
7  facility?
8  A.  Right.
9  Q.  I want to show you Exhibit 48A, which
10  you'll note, sir, is an invoice -- excuse me, a purchase
11  order from Medline to Creative Bedding showing that your
12  facility was to receive six mattresses. And the date on
13  that is February 4, 1995. See that in the right corner?
14  A.  Right.
15  Q.  Okay. I'll tell you from our investigation,
16  all of the attorneys, that seems to be the earliest date
17  that we can find of any mattresses being purchased, or at
18  least to be shipped to your facility. Does that sound
19  right to you, that it would be sometime in early 95 that
20  you would have received the first Medline mattresses?
21  A.  It's possible.
22  Q.  Okay. I want to show you Exhibit 50A. And 50A
23  is another invoice from Creative Bedding to Medline that
24  shows that 23 mattresses were shipped to your facility on
25  Patterson Street in approximately March of 97. Does that

Page 27

1  sound right to you?
2  A.  Yes, it does.
3  Q.  So that the initial purchases would have been
4  in -- in maybe increments of six or -- and then sometimes
5  it'd be much bigger. It could be as many as 23 mattresses
6  that were ordered; correct?
7  A.  Right.
8  Q.  Okay. I want to show you that which is marked
9  as Exhibit 51A, which is a purchase order from Medline to
10  Creative Bedding. That shows 23 more mattresses were to be
11  shipped in about February 97 to your facility on Patterson
12  Street. Does that sound right to you?
13  A.  Yes, it does.
14  Q.  And it's all the same -- same model number
15  mattress, correct, that you ordered from Medline?
16  A.  Yes.
17  Q.  I'm going to show you 52A. It shows a purchase
18  order -- or, excuse me, a confirmation of an order made by
19  Medline to Creative Bedding Technologies, shipped to your
20  facility in May of 97, 23 more of the same mattresses;
21  right?
22  A.  Right.
23  Q.  And then the last one of these -- did I give
24  you that one? Yes, I think so. This is 49A, sir, which
25  shows invoices and purchases orders in March through --

Page 28

1  well, throughout pretty much the spring and summer of 1995.
2  Would you agree with that, sir? Same mattresses being
3  ordered for your facility on Patterson Street.
4  A.  Right.
5  Q.  In fact, it goes all the way through, that I
6  see here, November 95, at least invoicing.
7  A.  Right.
8  Q.  Are you aware of any other mattresses being
9  purchased by your company from Medline?
10  A.  Not as I remember.
11  Q.  Okay. So the latest ones I think that we see
12  here would be the spring of 97. Does that sound right?
13  A.  Sounds right, yes, sir.
14  Q.  Okay. Now, when you would order in increments,
15  that's the word you used before, how would you communicate
16  that you want another six or another twenty-three? How --
17  how would that happen?
18  A.  I don't remember communicating but one time,
19  but one time for 125.
20  Q.  And that was it?
21  A.  And then they shipped them periodically after
22  that.
23  Q.  Well, did you have any further conversations
24  with Ms. Lee regarding mattresses, other than the one that
25  you described to us in fall 94?

Page 29

1    A.      I don't remember having any conversations with
2    her other than that.
3    Q.      So how was a scheduled determined as to when
4    the mattresses were supposed to be shipped to your
5    facility? Do you know? Was that Ms. Lee's discretion or
6    your own?
7    A.      No, that was -- that was Tom Lester's decision
8    about how he wanted them shipped. In increments.
9    Q.      Maybe you can be a little more helpful to us.
10   What do you mean by that, it was his decision as to when
11   they were to be shipped?
12   A.      It was his decision on how many to ship each
13   time so we had the money to pay for 'em when they came in.
14   Q.      Okay. Well, how would Ms. Lee -- how would it
15   have ben communicated to Ms. Lee as to when more mattresses
16   should be shipped? Do you know?
17   A.      After I talked to Tom Lester, and he gave me an
18   amount and a date to ship 'em each day, I went back and
19   told her that.
20   Q.      Well, it appears from these invoices and these
21   purchase orders and things like that, that it's over a two-
22   year period that these were shipped. Was Ms. Lee given a
23   schedule of a two-year period when you first ordered these?
24   A.      I don't remember.
25   Q.      Do you recall having any other conversations or

Page 30

1    over the phone or during the visits that she paid to your
2    office ordering another six or another twenty-three or
3    whatever number?
4    A.      I don't remember that. We may have, but I
5    don't remember.
6    Q.      Okay. As you sit here today, the only
7    conversation that you really recall having with Ms. Lee
8    with respect to mattresses is when you first asked her to
9    price them out for you in the fall of '94. Is that a fair
10   statement?
11   A.      Right. And then when I got back with her about
12   we would -- we would buy 'em from her, or from Medline, and
13   we would -- we needed 'em shipped, this amount shipped on
14   each month, or whatever date we told her to ship them.
15   Q.      Okay. So it's fair to say then, based on your
16   best memory, that you talked with her the fall of '94 about
17   your interest in buying mattresses?
18   A.      Right.
19   Q.      And then she got back to you with a price
20   quote.
21   A.      Right.
22   Q.      Right. And was it during that same
23   conversation when she gave you your price quote that you
24   told her, Okay, we'll buy them from you and we need them
25   over a certain period --

Page 31

1    A.      Period, yes, sir.
2    Q.      -- of time. Correct?
3    A.      Yes, sir.
4    Q.      During that second conversation you had with
5    her, how many days after you first told her of your
6    interest to buy mattresses that you told her, Okay,
7    Medline, you've got the order and I want them shipped into
8    increments?
9    A.      It was probably sometime in January or February
10   of 95 cause we was waiting for the budget to come in.
11   Q.      Okay. So she met with you in the fall of 94.
12   A.      Right.
13   Q.      I think you told us she gave you a price quote
14   within a -- that day or within a few days thereafter;
15   correct?
16   A.      Correct. Right.
17   Q.      And then you called her some months later,
18   probably like January or February, to actually place the
19   first order.
20   A.      Right.
21   Q.      Okay. Now, during -- can you give us your best
22   recollection of the substance of any conversation you had
23   with Ms. Lee about mattresses during any of these three
24   times: When you first told her you wanted to buy
25   mattresses, when she got back to you with a price quote,

Page 32

1    and the third time you contact her that you want to order
2    them?
3            MS. LISER: Object to the form. You can
4    answer, Bob.
5            THE WITNESS: I don't remember.
6    BY MR. SINGER:
7    Q.      Okay. Fair to say that you've been giving us
8    as detailed a description of your conversations that you
9    recall having with Ms. Lee that you can give us today?
10   A.      Yes, sir.
11   Q.      Okay. And I think you told me before, you
12   don't have any notes whatsoever summarizing the
13   conversation you had with Ms. Lee?
14   A.      No.
15   Q.      Or any of the conversations; correct?
16   A.      No, because all that paperwork was destroyed in
17   two years after the purchase of the last mattresses.
18   Q.      Okay. Just so the record's clear, what you
19   mean is that your paperwork with respect to ordering
20   mattresses and when it comes to purchase orders or paying
21   of those mattresses, those records at your facility would
22   be destroyed after a two-year period?
23   A.      Two-year period, yes.
24   Q.      And those records were not destroyed in the
25   fire?

8 (Pages 29 to 32)

Page 33

1    A.    No, it was not.
2    Q.    Okay.  They were just --
3    A.    Destroyed prior to the fire.
4    Q.    Right.  And as -- as an ordinary course of your
5    company's business; right?
6    A.    Right.
7    Q.    After two years, they would be put in storage
8    and then someone --
9    A.    At the end of the year they'd be put in
10    storage, and then two years later they would be destroyed.
11    Q.    So it's like a three-year time period?
12    A.    Right.
13    Q.    Okay.  Now, when the mattresses were delivered,
14    were you responsible for storing them?
15    A.    Responsible for putting 'em in the basement,
16    yes.
17    Q.    Okay.  And your office was in the basement --
18    A.    Right.
19    Q.    -- correct?
20    A.    Right.
21    Q.    Now, other than this first conversation you had
22    with Ms. Lee about mattresses in the fall of 94 in which
23    you said you wanted 125 mattresses, you wanted the best
24    price, and you wanted to meet California fire standards,
25    that would be the only time you talked about those three

Page 34

1    elements with Ms. Lee; correct?
2    A.    No, sir.  I'm sure we discussed them mattresses
3    several different times over the course of -- from the time
4    we started talking about ordering 'em till the time they
5    came in, all of 'em came in, I'm sure we talked several
6    different times about it, but I just don't remember it.
7    Q.    Oh, I understand that, but I'm really talking
8    about those three things: 125, good price, and California
9    standards.  The only time those three things would have
10    been talked about with Ms. Lee was that first conversation
11    in the fall of --
12    A.    I'm not sure.  I'm sure I brought the subject
13    up probably several different times during our
14    conversations.
15    Q.    And what did she say?
16    A.    She said, They meet standards.
17    Q.    Okay.  Do you know -- do you know when she said
18    that?
19    A.    During the first conversation she said that.
20    Q.    Oh, okay.  And that'd be the only time that she
21    made any comment to you about standards; correct?
22    A.    Right.  And I think she misrepresented Medline
23    and the mattress company when she didn't tell me or show me
24    that they had better mattresses for a little bit higher
25    that would have met the California fire standards and would

Page 35

1    have been safe for our patients.
2    Q.    All right.  Are you aware of whether in fact
3    there were better mattresses than Medline ordered --
4    A.    I wasn't aware of that, no, not until I seen
5    the handout she had.
6    Q.    I'm talking about in 94 when you first talked
7    to her, do you know whether Medline had any better
8    mattresses when it comes to fire --
9    A.    I have no idea.  I have no idea.
10    Q.    Did you ask her?
11    A.    I don't recall.
12    Q.    Okay.  Now -- now, when you have ordered --
13    you've ordered mattresses from other vendors --
14    A.    Right.
15    Q.    -- over the years; correct?
16    A.    Right.
17    Q.    After you first ordered the Medline mattresses
18    in early 95; correct?
19    A.    Right.
20    Q.    And it's always been, since the fire, your
21    practice to order mattresses with fire barrier; correct?
22    A.    Right.
23    Q.    Now, after the fire at the Patterson Street
24    facility, you ordered mattresses from Gulf South, did you
25    not?

Page 36

1    A.    (No response.)
2    Q.    Sir?
3    A.    For Nashville?
4    Q.    No, for Richland Place.
5    A.    Yes, sir.
6    Q.    And the fire was in September 2003; correct?
7    A.    Right.
8    Q.    And who was your sales rep after the fire at
9    Patterson Street when you were transferred to Richland
10    Place?
11    A.    At Gulf South?
12    Q.    Yes, sir.
13    A.    Greg Watson.
14    Q.    And did you talk about California standards
15    with Greg Watson?
16    A.    I don't recall.
17    Q.    Well, when you were transferred to Richland
18    Place, it was after a fire at Patterson Street that led to,
19    amongst other things, deaths of many people; correct?
20    A.    Correct, but Richland Place is a whole
21    different facility than Nashville.  Richland's completely
22    sprinkled, every room.
23    Q.    I understand, sir.
24    A.    We're not required to order fire barrier --
25    fire retardant mattresses from them, so I don't -- I can't

Page 37

1   say if I did or didn't.
2   Q.   Well, did you ever order a fire barrier
3   mattress for Richland Place since you've been there?
4   A.   I didn't specify that type mattress, no.
5   Q.   Well, sir, just in November 2006, for the first
6   time since you've been at Richland Place, you ordered a
7   fire barrier mattress just weeks before your deposition for
8   this case; right? For the first time, correct, from Gulf
9   South?
10   A.   May -- it's possible.
11   Q.   Well, in October 2003 you were ordering the Geo
12   mattress from Rich -- from Gulf South that did not have a
13   fire barrier within weeks after the fire at Patterson
14   Street; correct?
15   A.   I may have.
16   Q.   And in March of 2004 you ordered additional
17   mattresses from Gulf South that did not have a fire
18   barrier, isn't that right, for Richland Place?
19   A.   Yes, sir.
20   Q.   A Span America mattress?
21   A.   Span America, yes.
22   Q.   On November -- in early November 2006 from Gulf
23   South you ordered mattresses without fire barrier; correct?
24   A.   Yes.
25   Q.   In January of 2005 you ordered mattresses from

Page 38

1   Gulf South without fire barrier; correct?
2   A.   Yes, sir.
3   Q.   Now, when you talked to Ms. Lee, you said it
4   was in the fall of 2004, and you talked about California --
5   A.   No.
6   Q.   -- fire standards; correct?
7      MR. McKENNA: Object to the form of the
8   question.
9      THE WITNESS: Not 2004.
10      MR. SINGER: I'm sorry. My apologies.
11   BY MR. SINGER:
12   Q.   It was in the fall of 1994 that you talked with
13   her about California standards; correct?
14   A.   Right.
15   Q.   But at Richland Place in December of 2004, you
16   ordered mattresses 10 years later without a fire barrier;
17   correct?
18      MS. LISER: Objection to form. You can
19   answer if you can.
20   BY MR. SINGER:
21   Q.   Correct?
22   A.   I didn't ask em if they met California fire
23   standards because I figured if Gulf South -- the sales rep,
24   that they automatically met the standards that was provided
25   by the -- that were required by the State of Tennessee.

Page 39

1   Q.   You ordered a non-fire barrier mattress from
2   Gulf South.
3   A.   I did not know that.
4   Q.   Did you ask?
5   A.   I don't recall.
6   Q.   Fair to say, at least based on your
7   recollection that the first time -- let me back up a little
8   bit. When you were at NHC Nashville on Patterson Street,
9   you were ordering from Gulf South mattresses in 2001 after
10   you first talked to -- supposedly talked to Ms. Lee in 94
11   about California standards and fire barriers. You were
12   ordering from Gulf South for the Patterson Street facility
13   mattresses without fire barriers, specifically in May 2001,
14   is that right?
15   A.   I'm sure I ordered them, but I don't know if I
16   asked em about fire barrier or not.
17   Q.   Fair to say that the first time that you
18   ordered mattresses for any NHC facility which had a fire
19   barrier was in November 2006 --
20   A.   Right.
21   Q.   -- for the Richland Place facility?
22   A.   That's after I got a letter from Span America
23   saying that fire barriers were -- were available for the
24   mattress we already had, and that the state laws had
25   changed, or was changing effective, I think, by July.

Page 40

1   Every center that's not sprinkled has gotta have those fire
2   barrier mattresses in place.
3   Q.   Now, when the fire occurred at the Patterson
4   Street address in September 2003, soon after that fire
5   occurred you contacted Ms. Lee to try to get information
6   about mattress purchases; correct?
7   A.   About getting copies of invoices --
8   Q.   Right.
9   A.   -- because we already -- ours had been
10   destroyed.
11   Q.   And did you talk to her at all about California
12   standards and mattresses and fire barriers when you called
13   her on the phone that day after the fire?
14   A.   I don't recall that.
15   Q.   You never did, did you?
16   A.   I don't think so.
17   Q.   Did you accuse her of misrepresenting or any
18   words of that effect during your conversations with her in
19   94 --
20   A.   No, sir.
21   Q.   -- regarding mattresses?
22   A.   No, sir.
23   Q.   Have you ever in your conversations with Ms.
24   Lee, since the fire at the Patterson Street address, ever
25   made any kind of statement to her or any criticism, any

Case 3:06-cv-00611  Document 125-5  Filed 08/23/07  Page 10 of 33 PageID #: 578

Page 41

1  question, anything, about fire barriers, California
2  standards, anything with respect to the mattresses that she
3  sold to Medline -- through Medline?
4  A.     No, because I thought it would have been a
5  legal challenge and let them handle it.
6  Q.     I'm sorry?
7  A.     I thought it was in a legal challenge --
8  everything was tied up in a legal court battle, so I let
9  them handle it. I didn't get involved in it.
10 Q.     Okay. But you were even calling Ms. Lee months
11 after the fire at the Patterson Street address asking why
12 she wouldn't come over to Richland for -- for you to buy
13 more supplies from her as opposed to some other Medline
14 salesperson; correct?
15 A.     The last time I recall talking to Tonia Lee, I
16 asked her about why she -- why she didn't come back. She
17 said she was no longer a Medline rep, that some other lady
18 was. And then I got a card that had some lady's name on
19 it. I don't remember. I think I still got the card in my
20 desk drawer.
21 Q.     For the region where Richland Place was, wasn't
22 her territory; correct?
23 A.     But I had no idea there was an investigation
24 going on about the mattresses.
25 Q.     Okay. In any event, you called Ms. Lee --

Page 42

1  A.     I needed something. I can't remember what it
2  was.
3  Q.     Well, let me just back up a little bit with my
4  question. You called Ms. Lee months after the fire --
5  A.     Yes, I did.
6  Q.     -- and there was some controversy regarding the
7  mattresses; correct? And you asked her why she wasn't
8  coming to visit you to sell product to you anymore. Isn't
9  that right?
10 A.     I had no idea there was anything going on with
11 the mattresses.
12 Q.     Well, when did you first learn there was
13 something going on with mattresses?
14 A.     Probably about a month or so before I had to
15 give my deposition for the fire.
16 Q.     Okay.
17 A.     Which was last year.
18 Q.     Okay. Now, how many times have you purchased
19 mattresses -- strike that. How many times have you made
20 purchases from Medline since the fire?
21 A.     I don't recall. I don't know if I have
22 purchased anything from them since then.
23 Q.     Okay.
24 A.     But you weren't under the impression at any
25 time that Ms. Lee had made any misrepresentations to you.

Page 43

1  Is that a fair statement?
2  A.     Not that I knew about till I saw the other type
3  of mattresses I could have gotten.
4  Q.     Not until the lawyers came to you and talked to
5  you about it?
6  A.     Right. That's when I knew I could have got a
7  better mattress.
8  Q.     How many times have you met with Ms. Liser
9  before today?
10 A.     We've had conversations couple -- about three
11 or four times.
12 Q.     How many times have you met with her?
13 A.     Twice; yesterday and today.
14 Q.     Well, how about before your first deposition
15 last May? You met with Ms. Liser back then too; right?
16 A.     We might have met briefly.
17 Q.     She even attended your deposition with you,
18 didn't she?
19         MS. LISER: Objection, form.
20 BY MR. SINGER:
21 Q.     Did she attend the deposition with you when you
22 gave your deposition in May of 2006?
23         MS. LISER: Objection, form.
24         THE WITNESS: I think she may have been
25 present.

Page 44

1  BY MR. SINGER:
2  Q.     Okay. You met -- you had met with Ms. Liser
3  before the day of your deposition; correct?
4  A.     Yes.
5  Q.     How many times?
6  A.     One or two times.
7  Q.     Before your deposition in May of 2006; correct?
8  A.     Right.
9  Q.     And the first time, was that here in Nashville?
10 A.     Yes.
11 Q.     And how many times -- how many hours did you
12 spend with her the first time?
13 A.     I don't remember.
14 Q.     More than three hours or less than three hours?
15 A.     Less than three hours.
16 Q.     Okay. Was anyone else present --
17 A.     Yeah.
18 Q.     -- when you met with her?
19 A.     Yeah, there was other people present.
20 Q.     Who was that?
21 A.     Andrea, I think, was one of them, and I don't
22 know who the other people were now.
23 Q.     Andrea is one of the lawyers for the nursing
24 home, for NHC Nashville?
25 A.     Right.

Page 45

1     Q.     Okay. And how many weeks or months before your
2     deposition May 2006 did you have this first meeting with
3     Ms. Liser and lawyers for the nursing home?
4     A.     I don't remember.
5     Q.     Was it in 2006, was it 2005, 2004? Do you
6     know?
7     A.     I don't remember the date.
8     Q.     Do you know what year?
9     A.     Probably 2005 or 2006.
10    Q.     Okay. Now, the second time you visited with
11    Ms. Liser, when would that have been, before your
12    deposition in May of 2006?
13    A.     I think it was about identifying the mattresses
14    -- mattress.
15    Q.     And when would that have been?
16    A.     I don't remember the date.
17    Q.     2005?
18    A.     2006, probably.
19    Q.     Okay. And how many hours did you spend with
20    her that time?
21    A.     I don't remember.
22    Q.     Were there other lawyers there present?
23    A.     Yes.
24    Q.     Who were they?
25    A.     I don't remember.

Page 46

1     Q.     Do you remember how many there were?
2     A.     No, I don't.
3     Q.     And --
4     A.     Andrea was present at every conversation we
5     had.
6     Q.     Andrea McKellar?
7     A.     Right.
8     Q.     Okay. And you don't recall how many hours you
9     spent with Ms. Liser that second time?
10    A.     No.
11    Q.     Okay. And you said you were identifying
12    mattresses?
13    A.     Right.
14    Q.     What do you mean by that?
15    A.     That it was a Nylex II and the color that was
16    on Ms. Tolston's bed.
17    Q.     Okay. What else --
18    A.     That's all I remember.
19    Q.     -- was discussed?
20    A.     That's all I remember.
21    Q.     Okay. Did you look at mattresses -- go to the
22    warehouse or something like that to take look at them?
23    A.     Wherever we had them stored at.
24    Q.     Okay. And how many other occasions did you
25    have meetings with Ms. Liser, whether it was in person here

Page 47

1     in Nashville or over the phone before you gave your
2     deposition in May of 2006 in the other case?
3     A.     I don't remember how many times we met, but
4     Andrea was always present.
5     Q.     But how many times did you meet with Ms. Liser
6     even if assuming Andrea was present with you? How many
7     times did you meet with Ms. Liser before you gave your
8     deposition in May 2006?
9     A.     I don't recall.
10    Q.     More than two times though, correct?
11    A.     I don't know, but --
12    Q.     Well, on the day -- the day before your
13    deposition, was Ms. Liser present with you going over the
14    questions that could be asked of you by the attorneys?
15    A.     I don't remember. I know Andrea was there and
16    Lee Barfield was there, but I don't remember about whether
17    she was there or not.
18    Q.     Okay. But you've read your deposition
19    transcript since May 2006 --
20    A.     Right. I got it right here.
21    Q.     You have it right in front of you.
22    A.     Yes, sir.
23    Q.     You want to pull that out for us for a second?
24    A.     (Witness complies with request of counsel.)
25    Q.     And on the first page, the cover page, it says

Page 48

1     at the bottom there on Page 1 -- I'm sorry, page 1, the
2     next page.
3     A.     That's Page 2.
4     Q.     Okay. Page 2, it says right at the bottom of
5     the page Ms. Liser was there with you during the course of
6     your deposition.
7           MS. LISER: Objection to form.
8     BY MR. SINGER:
9     Q.     On May 9, 2006; correct?
10    A.     I don't see that on here anywhere.
11    Q.     May I, if I could just use my right index
12    finger and point?
13    A.     Yes, sir.
14    Q.     Ms. Sandra Liser, right?
15    A.     Right. She was there during the dep --
16    Q.     During the deposition?
17    A.     Yes.
18    Q.     Yes, sir. Now, before the day of your
19    deposition, you had met with Ms. Liser and some of the
20    other attorneys about what was going to be asked of you
21    during your deposition that day; right?
22          MS. LISER: Objection to form.
23    BY MR. SINGER:
24    Q.     You can answer.
25    A.     I don't remember.

12 (Pages 45 to 48)

Page 49

1    Q.    Well, how many days before your deposition did
2    you meet with Andrea and some of the other lawyers and Ms.
3    Liser?
4    A.    I think it was the day before.
5    Q.    Okay. And how long -- how many hours did you
6    spend with her that day before of your deposition?
7    A.    Probably a couple of -- maybe two hours.
8    Q.    Okay. So there'd be at least three times you
9    met with Ms. Liser in person before you gave your
10   deposition in May 2006; right?
11         MS. LISER: Objection to form.
12         THE WITNESS: I don't remember.
13   BY MR. SINGER:
14   Q.    Now, since your deposition on May 9 -- excuse
15   me, on May --
16   A.    Nine.
17   Q.    -- 9, 2006.
18   A.    Right.
19   Q.    Have you met with Ms. Liser or Grant -- Sandra
20   Liser or Grant Liser before today?
21   A.    Met with Sandra when we went over to cut the
22   mattress open.
23   Q.    Okay. And that would have been when?
24   A.    Oh, I don't know when that was now.
25   Q.    What year was that?

Page 50

1    A.    2006.
2    Q.    Who else was present?
3    A.    Bunch of lawyers and fire experts.
4    Q.    Okay. And how many hours did you spend with
5    Ms. Liser that day?
6    A.    Probably not an hour altogether.
7    Q.    Okay. And since that day you've met with her
8    as well to talk about this deposition?
9    A.    We had one meeting since that -- right.
10   Q.    Last fall you had a meeting with her; right?
11   A.    Right.
12   Q.    Was her husband Grant with you?
13   A.    I don't remember him being with her.
14   Q.    Okay. And who else was present beside you and
15   Ms. Liser last -- last fall, 2006?
16   A.    NHC attorneys and there was -- that's all I
17   remember. Andrea McKellar was there, I think.
18   Q.    Okay. And how many hours did you spend with
19   Ms. Liser that day?
20   A.    I don't remember.
21   Q.    Was it an afternoon or a morning or . . .
22   A.    Afternoon, I think.
23   Q.    Okay. So it would have been a whole afternoon?
24   A.    Not all afternoon, but it was in the afternoon.
25   Q.    Three or four hours?

Page 51

1    A.    I'm not sure. I can't say how long it was.
2    Q.    Okay. And any other times since the fall of
3    2006 that you met with Ms. Liser?
4    A.    Yesterday.
5    Q.    Okay. And Ms. Liser's not your lawyer, is she?
6    She's the insurance company's lawyer.
7    A.    I have the option of retaining her.
8    Q.    Did you retain her?
9    A.    I'm not gonna answer that question.
10   Q.    Okay. So you met with Ms. Liser yesterday?
11   A.    Yes, sir.
12   Q.    And for how many hours?
13   A.    It was probably an hour, hour and-a-half.
14   Q.    That's all?
15   A.    Right.
16   Q.    Anyone else present?
17   A.    Her -- the lawyer from her firm was present.
18   Q.    Grant Liser? A man?
19   A.    Right. Is that Grant?
20         MS. LISER: Yes.
21         THE WITNESS: Oh, okay. Yeah.
22   BY MR. SINGER:
23   Q.    Okay. And the three of you talked about Ms.
24   Lee and her --
25   A.    We talked about --

Page 52

1    Q.    -- misrepresentations and things like that with
2    you; right?
3    A.    We talked about the deposition.
4    Q.    Okay. And Ms. Lee and how Ms. Lee
5    misrepresented things to you?
6    A.    We talked about the deposition.
7    Q.    Okay. Anything else?
8    A.    No, sir.
9    Q.    Okay. Now, you did call Ms. Lee after the
10   fire, and I believe it was in October 2003, asking for
11   invoices regarding mattresses?
12   A.    Yes, I did.
13   Q.    Why?
14   A.    We didn't have copies of 'em and they wanted
15   copies of 'em.
16   Q.    Who wanted copies of them? The insurance
17   company did, right?
18   A.    Not the insurance company, the NHC -- NHC
19   wanted the copies.
20   Q.    Okay. Did you call other vendors looking for
21   invoices for things?
22   A.    I'm sure we did, but I don't remember.
23   Q.    Did you?
24   A.    I don't recall.
25   Q.    And did you ask anybody, Why do you want

13 (Pages 49 to 52)

Page 53

1   mattress invoices?
2   A.      No, I didn't because Mary Ellen told me she
3   wanted em and that's why I got em for her. She didn't
4   tell me who they was for.
5   Q.      Mary Ellen is --
6   A.      Is the administrator at that time.
7   Q.      Right. Her last name is?
8   A.      Mayfield.
9   Q.      Okay.
10          MR. SINGER: I want to mark this as a
11  group exhibit. Make this 150A.
12          (WHEREUPON, the Invoices were marked
13  Collective Exhibit 150A at this time.)
14  BY MR. SINGER:
15  Q.      Now, how many times do you think you've talked
16  to Ms. Lee since the fire at the Patterson Street address?
17  A.      Last time I remember talking to her about it
18  with her -- about Nashville Place I was called her after
19  the fire.
20  Q.      Back in October?
21  A.      The invoices, that's the last time I remember
22  talking to her there.
23  Q.      In October 2003?
24  A.      Right.
25  Q.      Okay.

Page 54

1   A.      The next conversation I had was when we needed
2   something, and I was calling Medline to see if they had it
3   and she said wasn't the sales rep no more, that she worked
4   for, I think, the hospital part of it now and her office
5   was at St. Thomas and she would give me the name of the
6   lady -- lady that took her place.
7   Q.      And any other conversation you had with her?
8   A.      I don't -- no, not that I recall.
9   Q.      But you haven't seen her at all since --
10  A.      I haven't seen her since before the fire, that
11  I remember.
12  Q.      She's never visited you at the Richland Place
13  facility?
14  A.      I don't recall her.
15  Q.      She's never talked with you while you were
16  working at the Richland Place facility?
17  A.      Yes, when I called to ask her about whatever
18  that special item -- I can't remember what it was we
19  needed.
20  Q.      And do you recall how long ago that was?
21  A.      It's been a long time.
22  Q.      In 2003?
23  A.      It may have -- I don't know if it was 2003 or
24  2004 I talked to her about that.
25  Q.      Okay. And it's your testimony that you have

Page 55

1   not ordered any other product from Ms. Lee since the fire,
2   whether you were at Patterson Street or Richland Place. Is
3   that correct?
4   A.      I don't remember if I ordered it after I got a
5   hold of her or not.
6   Q.      Well, what have you ordered from Medline since
7   you came to Richland Place?
8   A.      I don't remember -- I don't recall if I ordered
9   anything.
10  Q.      Fair to say your duties and responsibilities at
11  Richland Place when it comes to ordering supplies are
12  consistent with the way it was at Patterson Street?
13  A.      Yes, sir.
14  Q.      There's no one else that orders supplies at
15  Richland Place but you?
16  A.      DON orders supplies sometimes.
17  Q.      I'm sorry?
18  A.      DON does sometimes. Something special she
19  needs, she'll call it in to the dealer or whoever.
20  Q.      Through you?
21  A.      She just lets me know about it, but she does it
22  on her own sometimes.
23  Q.      Now, during your conversations with the people
24  at Metro or Gulf South or Pioneer since the fire, have you
25  ever talked about California fire standards and mattresses

Page 56

1   with any of those people?
2   A.      Bobby King and I discussed it several times.
3   Q.      After the fire?
4   A.      Right.
5   Q.      And when would that have been?
6   A.      When I needed some mattresses, I called him to
7   -- because they sell the same mattresses at Span America
8   that Gulf South sells.
9   Q.      What did you tell em?
10  A.      Just said I needed mattresses.
11  Q.      What else?
12  A.      And I wanted them to meet California standards.
13  Q.      And what did he say?
14  A.      I don't recall what he said.
15  Q.      And when would that have been, those
16  conversations with Mr. Bobby King?
17  A.      Probably in the last year.
18  Q.      2006?
19  A.      Right.
20  Q.      And does he sell the Gulf South mattresses or
21  Metro mattresses?
22  A.      He sells Span America.
23  Q.      Through Metro or Gulf South?
24  A.      Through -- both. Through Metro and Gulf South
25  both.

14 (Pages 53 to 56)

Page 57

1    Q.     Now, he hasn't made any misrepresentations to
2 you; correct?
3          MS. LISER: Objection to form.
4 BY MR. SINGER:
5    Q.     With respect to mattresses; correct?
6    A.     I don't think so.
7    Q.     Have you ever read any of the California --
8    A.     No.
9    Q.     -- fire standards?
10    A.     No.
11    Q.     Have you ever sought to read any of them?
12    A.     No, cause I think the FDA or somebody says the
13 meaning of that word, fire retarder or fire resistant or
14 flame resistant is a vague -- vague thing.
15    Q.     My question was, have you ever sought to read
16 any of the California standards?
17    A.     No.
18    Q.     And do you know how many California standards
19 there are?
20    A.     I don't recall how many there are, but I know
21 they're the most stringent in the United States.
22    Q.     Who told you that? Mrs. Liser?
23    A.     No.
24    Q.     Who told you that?
25    A.     It was on the news when they was talking about

Page 58

1 having to put mattresses in those hosp -- those nursing
2 homes and hospitals that would not burn.
3    Q.     Okay.
4    A.     I think that was a 60 Minutes program or some
5 48 Hours.
6    Q.     So if I understand your testimony, other than
7 watching a TV show, you've not done any kind of research
8 with respect to fire safety and mattresses and healthcare
9 facilities. Fair statement?
10    A.     Right.
11    Q.     Now, when you met with Ms. Lee, it was in your
12 basement office; correct?
13    A.     Yes, sir.
14    Q.     Did you ever meet with her in other areas of
15 the -- of the building?
16    A.     I believe I met with her in the dining room a
17 couple of times cause --
18    Q.     On the first floor there?
19    A.     Right.
20    Q.     How about on the floors, the patient floors?
21    A.     No.
22    Q.     Did you ever talk about overhead sprinklers
23 with her?
24    A.     Never. Never discussed it.
25    Q.     Ever talk about smoke detectors with her?

Page 59

1    A.     No.
2    Q.     Are you aware whether she was aware if it was a
3 sprinkler building or not on Patterson Street?
4    A.     That I'm not aware of.
5    Q.     Or whether there's smoke detectors in each
6 patient room? Did you ever talk to her about that?
7    A.     I'm not aware of that.
8    Q.     Now, maybe you can give us some help. When you
9 -- the mattress you were ordering from Medline was an
10 innerspring steel coil mattress; correct?
11    A.     Right.
12    Q.     With foam?
13    A.     Right.
14    Q.     And you knew that before they were ordered;
15 correct?
16    A.     Yes, I knew that.
17    Q.     Okay. And Medline was not the only provider of
18 mattresses to your facility before the fire at Patterson
19 Street; correct?
20    A.     No. We ordered some from Span America.
21    Q.     Was that through Metro or through Gulf South
22 directly?
23    A.     I don't recall. It was through one of those
24 vendors though.
25    Q.     Okay. And do you recall asking the

Page 60

1 salespersons for Span America or for the Span America
2 mattress, whether it was Metro or Gulf South, that they
3 must comply with California standards?
4    A.     Don't remember.
5    Q.     Are you aware that the Span America mattresses
6 that you had in the Patterson Street facility did not have
7 fire barrier?
8    A.     I wasn't aware of that until I got that letter
9 in 2006 from Span America saying that the fire barriers
10 were available to put on them.
11    Q.     First time they had it available was 2006. Is
12 that what they say?
13    A.     I'm not saying that's what they said.
14 They said they were available. The letter was dated 2006.
15    Q.     The -- but you didn't ask any salesman for the
16 Span America mattresses you were buying for Patterson
17 Street about California standards; correct?
18    A.     I don't recall.
19    Q.     Now, you were present when -- with Ms. Liser
20 and some other people when they cut open one of these Nylex
21 mattresses; right?
22    A.     Yes, sir.
23    Q.     And when they cut them open, you saw that there
24 was an innerspring steel coil --
25    A.     Right.

15 (Pages 57 to 60)

Page 61

1   Q.   Correct? In the center or the middle of the
2   mattress; correct?
3   A.   Somewhere in that area.
4   Q.   Right. And there was about an inch and-a-half
5   of foam on the top and an inch and-a-half of foam about on
6   the either sides of the spring coils; correct?
7   A.   Right.
8   Q.   And on the ends as well there's like an inch
9   and-a-half of foam, whatever, of thickness for the base of
10   each side of the spring coils; correct?
11   A.   Right
12   Q.   Let me see if I can get some --
13       THE VIDEOGRAPHER: Can we go off the
14   record just for a moment for an audio problem?
15       MR. SINGER: Why don't we take a break.
16       THE VIDEOGRAPHER: We are off the record
17   at 9:59.
18       (WHEREUPON, there was a brief recess taken
19   at this time.)
20       THE VIDEOGRAPHER: We are back on the
21   record at 10:11.
22   BY MR. SINGER:
23   Q.   Mr. Hollman, you said that your supervisor back
24   in 94 was Mr. Lester?
25   A.   Tom Lester.

Page 62

1   Q.   Tom Lester?
2   A.   Yes, sir.
3   Q.   And did he tell you that there was a max amount
4   of money you could spend per mattress?
5   A.   No, he didn't tell me that.
6   Q.   Well, did he give any kind of certain budget
7   that you could spend?
8   A.   No. He just told me to get the best price I
9   could get.
10   Q.   Best price you can get.
11   A.   Best mattress for the best price.
12   Q.   And that was the most that -- the dialogue you
13   had with him?
14   A.   Right. And I came back with a hundred and
15   twenty-five dollars or twenty-six dollars, he said, Okay,
16   but we'll have to wait till I get the new budget in --
17   Q.   Okay.
18   A.   -- in January.
19   Q.   All right. And did you recommend a more
20   expensive mattress?
21   A.   I don't recall.
22   Q.   Well, was it only the Medline mattress you
23   recommended to him?
24   A.   No. I -- I -- I got three quotes, so I
25   recommended three different ones to him.

Page 63

1   Q.   And was the Medline mattress the least
2   expensive of the three?
3   A.   I don't recall that, the least expensive.
4   Q.   Well, why did you choose the Medline mattress?
5   A.   Because we thought at the time it was the best
6   mattress for the price.
7   Q.   Let me show you that which has been marked as
8   Exhibit 150A, which is a group exhibit, which for the
9   record consists of four pages, I believe.
10       Okay. The first page is an invoice issued by
11   Medline to Richland Place Health Center in Nashville, March
12   12, 2005.
13   A.   Yeah.
14   Q.   That's a two-page invoice. Another one, May
15   12th, 2005, an invoice from Nash -- from Medline to
16   Richland Place Health Center on Elmington Avenue.
17   A.   Right.
18   Q.   And a third one on, I believe that's June 26,
19   2005 or is that in May? I believe it's May --
20   A.   5-12-2005.
21   Q.   Yes.
22   A.   The last one is 5-12-2005.
23   Q.   Okay. And these are invoices issued by Medline
24   --
25   A.   Right. I remember that -- that one is a glass

Page 64

1   that you use to crush up pills with.
2   Q.   Okay. But let me, just so the record's clear,
3   these are three different invoices for supplies that you
4   ordered from Medline --
5   A.   Right.
6   Q.   -- since the fire at the Patterson Street
7   address; correct?
8   A.   Yes, sir.
9   Q.   And -- and this is almost as much as a year
10   and-a-half after the fire, some of them.
11   A.   When I ordered these supplies, I didn't know we
12   were having -- we were in any type of legal problem with
13   Medline.
14   Q.   Wasn't until Ms. Liser told you about that;
15   right?
16       MS. LISER: Objection to form.
17       THE WITNESS: I don't know who told me,
18   but --
19   BY MR. SINGER:
20   Q.   Okay. But these are supplies that you ordered
21   from Medline?
22   A.   Right.
23   Q.   And it was from Tonia Lee that you ordered
24   these; right?
25   A.   I don't remember who I gave the order to.

16 (Pages 61 to 64)

Page 65

1   Q.   And how many times do you think you called her
2 after the fire?
3   A.   Probably getting the invoices and then when I
4 ordered these supplies.
5   Q.   Okay. You've had three, four, maybe five
6 conversations with her --
7   A.   Right.
8   Q.   -- since the fire?
9   A.   Right.
10   Q.   And you never brought up California standards
11 in any of those conversations with her about mattresses or
12 anything
13   A.   I didn't know anything about the legality going
14 on with these mattresses we had.
15   Q.   So the answer is, no, you never brought up
16 anything about California --
17   A.   No.
18   Q.   -- standards; right?
19   A.   No. Not during those conversations, no, sir.
20   Q.   And you and she have always gotten along very
21 well; correct?
22   A.   I think she's a good sales rep.
23   Q.   And since you learned about all this legal
24 stuff involving mattresses that -- in this case, why you're
25 here for a deposition today, have you called Ms. Lee at

Page 66

1 all?
2   A.   No.
3   Q.   Did anyone tell you not to call her?
4   A.   No.
5   Q.   Okay. Let's go to -- by the way, do -- did you
6 ever receive any kind of order or any kind of instruction
7 from NHC corporate that you have to buy fire barrier
8 mattresses for any facility?
9   A.   Personally, I haven't. The administrator may
10 have, but I haven't been.
11   Q.   Okay. No one's ever told you that?
12   A.   Not until we got that letter from Span America
13 to buy all fire barrier mattresses.
14       MR. SINGER: Okay. I want to show you
15 that which we are marking as Exhibit 151A, which is a group
16 exhibit, which for the record I'm providing you with copies
17 of.
18       (WHEREUPON, the Copies of Photographs were
19 marked Collective Exhibit 151A at this time.)
20       MR. McKENNA: Jeff, can I make one point
21 of clarification? In response to the last question, the
22 witness indicated until we received the letter. Could you
23 please indicate to me who the "we" that received the letter
24 regarding --
25       THE WITNESS: The administrator got the

Page 67

1 letter. He gave it to me.
2       MR. McKENNA: Who is that?
3       THE WITNESS: The administrator.
4       MR. McKENNA: The administrator of what
5 company?
6       THE WITNESS: Richland Place.
7       MR. McKENNA: Okay.
8 BY MR. SINGER:
9   Q.   Group Exhibit 151A is a series of laser photo
10 print -- photo prints of what appears to be an exemplar
11 mattress. Now, fair to say, Mr. Hollman, you haven't seen
12 these photographs before today; correct?
13   A.   Saw 'em when we were taking pictures of them.
14   Q.   All right. Were you there that day when they
15 were cutting open one of these mattresses?
16   A.   Yes, sir.
17   Q.   Okay. Now, fair to say that this appears to be
18 the Nylex II mattress?
19   A.   Yes, sir.
20   Q.   That you acquired from Medline?
21   A.   Right.
22   Q.   Beginning in 95 through maybe, what, 97;
23 correct?
24   A.   Yes, sir.
25   Q.   And you see that some of these photographs show

Page 68

1 someone had cut open the foam and you see the steel
2 coils
3   A.   Yes, sir.
4   Q.   -- in the inner section, for lack of a better
5 description
6   A.   Yes, sir.
7   Q.   -- of the mattress; correct?
8   A.   Yes, sir.
9   Q.   And there's several photographs depicting these
10 coils of the mattress; correct?
11   A.   Right.
12   Q.   Now, has Ms. Liser ever showed you any
13 photographs of the bed that Ms. Tolston's body was found in
14 after the fire?
15   A.   No, sir.
16       MR. SINGER: I want to show you that which
17 we'll mark as 162A, group exhibit.
18       MS. LISER: Do you mean 52?
19       MR. SINGER: I'm sorry. Did I say --
20       MS. LISER: You said --
21       MR. SINGER: I said 162 and that was my
22 error. 152A. Thank you, Sandra.
23       MS. LISER: You're welcome.
24       (WHEREUPON, the Copies of Photographs were
25 marked as Collective Exhibit 152A at this time.)

Case 3:06-cv-00611    Document 125-5    Filed 08/23/07    Page 17 of 33 PageID #: 585

Page 69

1   BY MR. SINGER:
2      Q.   Now, Mr. Hollman, I'd like you to take a look
3   at these photos.
4           MR. SINGER:  And for the record -- someone
5   have a paperclip so I can keep this handy for Mr. Hollman?
6   Thank you.
7   BY MR. SINGER:
8      Q.   For the record, these relate to Bates numbered
9   laser color photo prints produced by Employers of Wausau
10  with these Bates numbers.  Wausau 000570, -577, -578, -579,
11  -580, -583, -588 and -591.
12     A.   Okay.
13     Q.   Now, what I'd like you to do, Mr. Hollman, is
14  I'd like you to take a look at each of those photographs
15  and tell us, other than bedsprings for the bed, whether you
16  see any innerspring steel coils that replicate, look at all
17  close, to the kind of coil, spring coils you see in the
18  exemplar Medline mattress made a part of group Exhibit
19  151A.
20          MS. LISER:  Objection to form.
21          THE WITNESS:  Well, I'm not a
22  criminologist, so I can't --
23  BY MR. SINGER:
24     Q.   Well, just take a look at the photographs.  And
25  whether you're a criminologist or not, tell me if you see

Page 70

1   any -- any remnants of steel coils that look at all close
2   to what is in these photographs of an exemplar mattress
3   that was split apart in your presence within the past year
4   or so?
5      A.   I can't identify, because it was so hot in that
6   room that everything melted nearly.  Those coils could have
7   been there and could have melted.
8      Q.   Okay.  But the question I'm asking is, do you
9   see in any of those photographs taken at the scene any
10  remnants of coils other than bed springs from an underlying
11  bed?
12          MS. LISER:  Objection to form.
13          THE WITNESS:  The clump of stuff could be
14  coils.
15          THE COURT REPORTER:  I'm sorry.  I didn't
16  understand you.
17          THE WITNESS:  The clumps of stuff that's
18  in there could be coils.
19  BY MR. SINGER:
20     Q.   Do you see any coils, yes or no?
21     A.   No.
22     Q.   Now, was it -- you do see an aerosol can in
23  there, though, the remnants of an aerosol can on Bates
24  number 533; right?  Excuse me, not 533; 583.
25     A.   It could be -- it could be the tube from the

Page 71

1   bed frame.
2      Q.   Okay.  I'm going to circle something right now.
3   Okay.  And I'm using a black pen, just so the record is
4   clear.  That cylinder there appears to be an aerosol can.
5   Do you agree?
6          MS. LISER:  Objection to form.
7          THE WITNESS:  It appears but also that
8   could -- it resembles those other pieces of metal up here
9   which is a tubular for the bed frame.
10  BY MR. SINGER:
11     Q.   But whatever that cylinder is, you wouldn't
12  expect that to be part of the bed, would you --
13          MS. LISER:  Object --
14          MR. LISER:  -- that I circled?
15          MS. LISER:  Objection to form.
16  BY MR. SINGER:
17     Q.   Correct?  That's not part of the bed?
18     A.   Looks similar to the rest of the bed tubulars
19  on there.
20     Q.   Now, at the NHC facility, there were other
21  mattresses than Medline Nylex II mattresses; correct?
22     A.   Yes.  There was probably three or four
23  different -- three or four Span American mattresses.
24     Q.   And there were Span American mattresses that did
25  not have coil springs; correct?

Page 72

1      A.   Yes, sir.
2      Q.   They were 100 percent foam; correct?
3      A.   Right.
4      Q.   No springs?
5      A.   I don't recall.
6      Q.   Now I want to show you, which we'll mark as
7   Exhibit 153A.
8           (WHEREUPON, the Copies of Photographs were
9   marked Collective Exhibit 153A at this time.)
10          MR. SINGER:  There you go, sir.  And for
11  the record, Group Exhibit 153A have Bates numbers on the
12  bottom right side.  I'm just gonna read those numbers out
13  loud for the record.  Medline 01036, -1037, -1040, -1042, -
14  1044, -1045, -1051, -1053, -1056, -1057, -1058.  There is
15  one that doesn't have a Bates number on it, which is
16  between -1058 and -1061.
17  BY MR. SINGER:
18     Q.   And I'd like you to take a look at those
19  photos, sir.
20     A.   (Witness complies with request of counsel.)
21  Okay.
22     Q.   Fair to say that the facility that -- at least
23  what you can tell from these photographs, it appears that
24  the mattresses or beds that are photographed here were at
25  the Patterson Street address; correct?

18 (Pages 69 to 72)

Page 73

1   A.    Right.
2   Q.    All right. And there -- by the way, the
3 covering for the Span America mattress was blue; correct?
4   A.    Dark blue.
5   Q.    Now, and the covering for the Nylex Medline
6 mattress was dark blue.
7   A.    It was a different color.
8   Q.    But they're both blue?
9   A.    Both blue, but they're both two different
10 colors, two distinctive different colors of blue.
11   Q.    Okay. Now, the -- fair to say that the
12 mattresses depicted in this group exhibit are not Medline
13 mattresses?
14   A.    Right.
15   Q.    Now, you were kind enough to tell us that there
16 were mattresses at the facility that did not have coil
17 springs in them; correct?
18         MS. LISER: Objection to form.
19         THE WITNESS: We had some Span American
20 mattresses, three or four.
21 BY MR. SINGER:
22   Q.    And were there any other mattress accessories
23 that you had at the facility other than the three or four
24 Span America ones that were without springs?
25         MS. LISER: Objection to form.

Page 74

1         THE WITNESS: I don't recall.
2 BY MR. SINGER:
3   Q.    Now, what patient population was provided the
4 mattresses without.springs?
5         MS. LISER: Objection to form.
6        ·THE WITNESS: I have no idea.
7 BY MR. SINGER:
8   Q.    Why did you order mattresses without springs?
9         MS. LISER: Objection to form.
10         THE WITNESS: I don't have no idea.
11 BY MR. SINGER:
12   Q.    Now, were there some patients at the facility
13 who were at risk of pressure sores or bed sores?
14   A.    Yes. That's why we ordered those mattresses
15 from Medline, cause they were pressure reduction
16 mattresses.
17   Q.    Were the patients who were suffering from bed
18 sores provided with air mattresses or mattresses without
19 coil springs, to your knowledge?
20   A.    Yes, sir.
21   Q.    Would it be fair to say that those people that
22 were at risk of pressure sores or bed sores, also called
23 decubitus ulcers, were patients who were provided
24 mattresses without coil springs?
25         MS. LISER: Objection to form.

Page 75

1         THE WITNESS: Ms. Tolston had a Nylex II
2 mattress, blue, on her bed. I put it on there and I seen
3 it every day when I went by there, because my supply room's
4 right there beside of it.
5         MR. SINGER: I'm gonna have to, for the
6 record, move to strike the answer. Can you read the
7 question back to the witness?
8         (WHEREUPON, the court reporter read back
9 the question: Is it fair to say that those people that
10 were at risk of pressure sores or ulcers, also called
11 decubitus ulcers, were patients provided mattresses without
12 coil springs?)
13         THE WITNESS: I don't know.
14 BY MR. SINGER:
15   Q.    You weren't involved in making those decisions?
16   A.    No, sir.
17   Q.    That was a clinical judgment made by nursing
18 personnel?
19   A.    Right.
20   Q.    Or doctors who were tending to the patients?
21   A.    Right.
22   Q.    And do you know whether Ms. Tolston -- do you
23 know what a Braden score is?
24   A.    I know about the Braden score, yeah.
25   Q.    Do you know what Ms. Tolston's Braden score

Page 76

1 was?
2   A.    No, I don't.
3   Q.    Who would substitute mattresses or relocate
4 mattresses in the environment at the Patterson Street
5 address?
6         MS. LISER: Objection·to form.
7         THE WITNESS: When they called for a
8 special mattress, I'd take it up.
9 BY MR. SINGER:
10   Q.    But who would change mattresses on a bed? Was
11 it always you or was it some of the nurses that did that or
12 orderlies?
13   A.    I was the one that always changed the
14 mattresses out. If they needed a special mattress, I took
15 it up, put it on the bed.
16   Q.    Okay. But I'm saying --
17   A.    Put the old one downstairs.
18   Q.    -- was there anyone else at the facility that
19 would change mattresses?
20   A.    That, I can't say. I don't know.
21   Q.    Okay. Now, I'd like to show you that which
22 we'll mark as Exhibit 154A.
23         (WHEREUPON, the Room Diagram was marked
24 Exhibit 154A at this time.)
25 BY MR. SINGER:

19 (Pages 73 to 76)

Page 77

1   Q.     Now, sir, have you ever seen this exhibit
2   before today?
3   A.     No, sir.
4   Q.     I just want to represent to you that this
5   drawing, or diagram, on Mrs. Tolston's room was prepared by
6   her daughter, Ruth Smith.
7   A.     This -- first, I'd like to say this photograph
8   picture is misleading because the room is not near the size
9   as depicted on this photograph.
10  Q.     Okay. Well, I'm not validating or anything.
11  I'm just telling you this is what was provided us by --
12  A.     Right.
13  Q.     -- Ms. -- by the attorneys in the other case.
14  A.     Okay.
15  Q.     Okay. Now, from your review of this diagram,
16  other than the fact that it may not be entirely accurate on
17  the size of the room, would you agree that Ms. Tolston's
18  bed was Bed B and Ms. Askew was in Bed A?
19  A.     Yes.
20  Q.     And the way the door swings open is as depicted
21  in this exhibit, Exhibit 154A?
22  A.     The door swings open like this.
23  Q.     Okay. And your supply closet was located
24  where?
25  A.     Right there where you got Exhibit A.

Page 78

1   Q.     Where Exhibit 154A is --
2   A.     Right.
3   Q.     -- is where your closet is?
4   A.     Right there. Yeah, right there. Standing
5   outside the door you -- at the supply closet, you could see
6   right in the room.
7   Q.     Okay. And the closet would be on this -- on
8   the -- on the wall on the other side of the doorway?
9   A.     Other side of -- right on the other side, past
10  the doorways was the closet.
11  Q.     Was it --
12  A.     Right there.
13  Q.     Okay. Can you put an X where the supply closet
14  would be.
15  A.     (Witness draws on diagram.)
16  Q.     So you're drawing over the exhibit sticker and
17  -
18  A.     Right there.
19  Q.     Very good. So you got kind of a box that
20  you've got that goes over the exhibit sticker.
21  A.     Right.
22  Q.     And that's when you want -- can you write
23  "supply closet" in that box?
24  A.     (Witness writes on diagram.)
25  Q.     Very good.

Page 79

1   A.     That's approximately where the supply room was
2   located at.
3   Q.     Okay. Now, you'll note that there's a
4   description in handwriting near Mrs. Tolston's bed, and I'm
5   just gonna read these out loud. Okay? It says, "air
6   freshener, gloves, TV remote and telephone, comb and brush,
7   dining table, overhead light, outlet electric, call button,
8   night stand, lamp, stuffed animals, box, curtains, plant
9   hanger, chair." See all -- see where I've just read all
10  those, those entries there?
11  A.     Yeah, I see you read all that.
12  Q.     Okay. Does that refresh your memory about the
13  different items that were in -- at Mrs. Tolston's side of
14  the room before the day of the incident?
15  A.     They were on her -- they were on her table. I
16  don't recall anything except her wheelchair being there
17  beside the bed where you've got all that other stuff
18  written down.
19  Q.     Okay. But how about these other items, comb
20  and brush and things like --
21  A.     I don't remember --
22  Q.     You don't remember that stuff?
23  A.     No.
24  Q.     Okay. How about Mrs. Askew's side of the room?
25  What was -- you'll see here it says, "dining table, night

Page 80

1   table, overhead light." What is it you recall seeing
2   commonly in Ms. Askew's side of the room?
3   A.     The night table, the over bed table, and the
4   overhead light.
5   Q.     Well, how about personal contents?
6   A.     Wheelchair. I don't recall.
7   Q.     Do you recall anything that's described here
8   with respect to Mrs. Tolston's bed, other than what's -- I
9   mean, does it refresh your memory that there were gloves
10  and remote control and -- do you remember all those things?
11  A.     They'd been on the floor if they was.
12  Q.     Okay.
13  A.     No room to put --
14  Q.     What else do you recall in their room?
15  A.     Ms. Tolston had a wheelchair and she had that
16  dining room table and she had the over the bed headlight.
17  Q.     You don't remember any -- any pictures or
18  paintings or anything --
19  A.     Pictures, but I don't recall what they were.
20  Q.     Do you recall -- let me show you that which
21  we'll mark as Exhibit 155A.
22        MR. SINGER: And for the record, this has
23  Wausau Bates number 00013.
24        (WHEREUPON, the Floor Plan for the Second
25  Floor was marked Exhibit 155A at this time.)

20 (Pages 77 to 80)

Page 81

BY MR. SINGER:

1 Q. And Ms. Liser and her firm has provided us with
2 a copy of this exhibit which appears to be the floor plan
3 for the second floor; correct?
4
5 A. Right.
6 Q. Okay. Maybe you can on this exhibit -- here's
7 my pen again -- draw where your supply closet would be
8 located.
9 A. She was in Room 206; right? Which room was she
10 in?
11 Q. That's your -- the question I'm asking you.
12 Where is her -- where is your supply closet and where is
13 her room?
14 A. This doesn't appear to be a correct drawing.
15 Q. Do you know what room she was in?
16 A. No, I don't.
17 Q. I'm talking Ms. Tolston. Do you know what --
18 A. I don't recall the room number no more.
19 Q. Do you know what wing that she -- her room was
20 in?
21 A. (Witness reviewing diagram.)
22 Q. You thought it was 206?
23  MS. LISER: Objection, form.
24  THE WITNESS: If I knew which room she was
25 in, I can tell you where the closet was at.

Page 82

BY MR. SINGER:

1
2 Q. Well, do you recall the room she was in?
3 A. Either 208 or 207.
4 Q. Okay. Can you circle 208 and 207 on this
5 diagram? It's up here; right?
6 A. None of these look -- look like the right place
7 though.
8 Q. Okay. Do you want me to circle them for you?
9 A. This is confuse -- is this a bathroom here?
10 Ms. Tolston was on this hallway, but I don't remember what
11 the room number was. My closet was right there like that
12 right there. (Witness drawing.) The wall of my closet was
13 part of her -- part of her room was that wall coming out
14 where the door was at.
15 I'm not -- I'm not good at reading drawings. I
16 could show you -- I could show you where the room was at,
17 but I don't know cause that -- these look like bathrooms to
18 me here. I can't identify it.
19 Q. That's the best you can do, what you've drawn
20 here?
21 A. Unless I know what room number she's in, I
22 don't know. I can -- I can identify if I've got her room
23 number.
24 Q. Okay. May I take my pen back, sir?
25 A. Yes, sir.

Page 83

1 Q. Thank you. Now, after the fire -- excuse me.
2 After the mattresses were first ordered from Medline --
3 A. Right.
4 Q. -- which you said would have been probably
5 early, like, January, you said, or maybe February 95?
6 A. Sometime around that time.
7 Q. Okay. Did Ms. Lee come and pay sales calls to
8 -- to you at the Patterson Street facility?
9 A. Yes.
10 Q. And would she bring brochures by, catalogs,
11 things like that?
12 A. I don't recall.
13 Q. Well, did you recall -- strike that. Did you
14 read the materials that she provided you?
15 A. If she gave me materials, I looked at 'em, yes.
16 Q. And if you were to order the mattresses in
17 early 95 -- well, strike that. Ms. Lee was your sales rep
18 from the time you first ordered the mattresses in early 95
19 throughout the remaining period of time that you worked at
20 Patterson Street, which was until late September 2003;
21 correct?
22 A. Right.
23 Q. And how often would she come by your office?
24 A. It varied from anywhere from 30 days or more.
25 Q. Plus or minus some period of time --

Page 84

1 A. Right.
2 Q. -- more than 30 days?
3 A. Right.
4 Q. More or less than 30 days?
5 A. Right.
6 Q. Fair to say, you would see her eight, nine, ten
7 times a year? Is that a fair estimate?
8 A. I'd say more like six, probably.
9 Q. Okay. Approximately six times a year --
10 A. Right.
11 Q. -- beginning in early 95 until the fire in
12 September 2003?
13 A. Right.
14 Q. Correct? So it's fair to say you saw her 35,
15 40 times from the time you first talked with her about
16 mattresses in late -- in the fall of 94; right?
17 A. Approximately, yes.
18 Q. Now, she would come to your office and ask if
19 you want to buy any -- any supplies; right?
20 A. Right.
21 Q. And she would provide you with information
22 about special sales or special purchase programs and things
23 of that nature; right?
24 A. Yeah, she'd -- I'd order something and she'd
25 say, Well, I'm glad you ordered that because this is on a

21 (Pages 81 to 84)

Page 85

1    special pricing for now. I'm doing a promotion on this.
2    If I sell so much of it I get a free trip or something like
3    that.
4        Q.    Okay. So -- and you were price sensitive as
5    well when it comes to the --
6        A.    Right.
7        Q.    -- supplies you wanted to buy?
8        A.    Right.
9        Q.    That was a -- frankly, part of your job
10   description and what was told you by the administration of
11   the -- of the facility to keep costs under control;
12   correct?
13       A.    I never was told nothing directly like that,
14   but always look for the best prices.
15       Q.    Okay.
16       A.    Same quality, get it for the same price or
17   cheaper price.
18       Q.    And -- and you were a price sensitive
19   purchaser?
20       A.    Right.
21       Q.    Now, when Ms. Lee would come to your office,
22   she would provide you with literature with respect to
23   special programs on new products; correct?
24       A.    No.
25       Q.    Never?

Page 86

1        A.    No. I don't remember her providing me with
2    programs. She'd tell me -- when she would look it up on
3    the computer to put the order in, she'd say, This is a
4    special item, we're on a special deal now, special pricing.
5    Like gloves might be 10 or 15 cents cheaper per box.
6        Q.    But when you would -- she would bring a new
7    catalog to replace your old catalog?
8        A.    No. Medline would mail me one.
9        Q.    Okay. Do you recall ever getting any
10   literature at all at any time during those 35 or so visits?
11   Or are you saying you do know or you have no recollection
12   or --
13       A.    I have no recollection.
14       Q.    You don't know one way or the other?
15       A.    No.
16       Q.    Okay. Did you read the materials that she gave
17   you, assuming she did give you material.
18       A.    If she gave them to me, I would have looked at
19   em. I don't know how in depth a reading I would have done
20   on em.
21       Q.    Okay. And do you recall reading anything
22   either on Medline's website, in their catalog, or any of
23   the brochures she gave you about mattresses?
24           MS. LISER: Objection to form.
25           THE WITNESS: I don't recall.

Page 87

1    BY MR. SINGER:
2        Q.    Well, did you ask her at any time, after you
3    began ordering mattresses in early '95, about other
4    mattress products that Medline had?
5        A.    Don't recall.
6        Q.    You don't recall?
7        A.    No.
8        Q.    Well, what you had ordered was the same model
9    mattress throughout those years --
10       A.    Right.
11       Q.    -- correct? You never asked her for something
12   different?
13       A.    No.
14       Q.    She -- and you really, I think you told me
15   before, had no other dialogue regarding mattresses after
16   the initial price was agreed upon; correct?
17       A.    I'm sure we discussed those mattresses several
18   times after that. When they were coming, I'm sure she --
19   she either brought up the conversation or I brought it up,
20   one, you know, I received this many mattresses on this date
21   and . . .
22       Q.    More about delivery issues then; right?
23       A.    Right. Right.
24       Q.    And payment issues and processing of the orders
25   and things like that?

Page 88

1        A.    Processing the order.
2        Q.    Okay. Now, I read through your deposition that
3    Ms. Liser attended with you on May 9, 2006.
4            MS. LISER: Objection to form.
5    BY MR. SINGER:
6        Q.    And it's your testimony that the mattress on
7    Ms. Tolston's bed was a Nylex II mattress?
8        A.    Exactly.
9        Q.    But you don't remember when you put that
10   mattress on her bed; right?
11       A.    No. I don't remember. Probably when they came
12   in.
13       Q.    When they first came in, in '95.
14       A.    Another reason for why we bought those
15   mattresses, cause you could flip em.
16       Q.    Okay.
17       A.    Lay on one side for so long and then you flip
18   it over on the other side and it would form itself back.
19       Q.    You don't recall what year you first put a
20   Nylex II mattress on her bed; correct?
21       A.    Well, it was one of the ones that came in last,
22   and that was the blue ones.
23       Q.    Well, do you recall when you gave your
24   deposition on May 9, 2006 --
25           MR. PRINCE: Page and line?

Page 89

1     MR. SINGER: Let me finish it; okay?
2   BY MR. SINGER:
3   Q.    On May 9, 2006, you gave an oath to tell the
4   truth like you did this morning; correct?
5   A.    Right.
6   Q.    And you had your attorneys for the nursing home
7   with you, Mr. King, Ms. Kellar, Mr. Barfield; correct?
8   A.    Right.
9   Q.    And Ms. Liser was present as well at your
10  deposition on May 9, 2006?
11  A.    Right.
12  Q.    Page 5, Line 14. Now, Mr. Hollman, do you
13  recall telling the people that attended your deposition on
14  May 9, 2006, that you don't recall what year you put a
15  Nylex II mattress on Ms. Tolston's bed? You don't have to
16  go to your transcript. Just right now, do you recall
17  telling them that you don't recall what year you put the
18  mattress on her bed?
19  A.    I don't recall what year, but I know it was
20  after the blue ones came in.
21  Q.    Well, let me ask you this. Was this question
22  asked of you, and did you give this answer? Line 17, Page
23  5. Question: "When did you put it on her bed?" Answer:
24  "Don't remember the date." Question: "What year did you
25  put it on her bed?" Answer: "I don't remember that

Page 90

1   either." Question: "Can you give me a range of years?"
2   Answer: "No, I can't." "Was it before or after 1998?"
3   Answer: "I don't remember."
4        Were those questions asked of you and --
5   A.    Yes, sir.
6   Q.    -- did you give those answers?
7   A.    Yes, sir. It's not on Page 5 though.
8        MS. LISER: It's not on Page 5.
9        MR. SINGER: On my Page 5, it is. Oh, I'm
10  sorry. It would be Page 12 under this, under your . . .
11  BY MR. SINGER:
12  Q.    Look at Page 12, sir. Were those questions
13  asked of you? Did you give those answers, that you didn't
14  recall --
15       MS. LISER: It's not Page 12 either.
16       MR. McKENNA: It's gonna be 11.
17       MR. SINGER: It's Page 11? This format is
18  really different for an old guy like me.
19  BY MR. SINGER:
20  Q.    So Page 11, Line 15, I guess? Would that be
21  what it is on your copies?
22  A.    My Line 15 is Nylex II mattresses.
23  Q.    Okay. Now, we'll just go over this and make
24  sure we're on the same page when it comes to the questions
25  I'm asking you and your answers.

Page 91

1        Isn't it true that when you gave your
2   deposition on May 9, 2006, you didn't recall the date, you
3   didn't recall the year, and you couldn't even say whether
4   it was before or after 1998 that you put a Nylex II
5   mattress on Ms. Tolston's bed?
6   A.    Those same answers still apply.
7   Q.    Okay. So the fire was in September 2003?
8   A.    Right.
9   Q.    Now, it's fair to say that you didn't know
10  whether some other mattress was swapped with her mattress,
11  isn't that right?
12       MS. LISER: Objection to form.
13       THE WITNESS: I have no idea.
14  BY MR. SINGER:
15  Q.    I'm sorry?
16  A.    I have no idea.
17  Q.    And you wouldn't know when mattresses would
18  have been swapped from her bed; correct?
19  A.    Right.
20  Q.    Now, I want to -- you don't have to have your
21  transcript in front of you. I'm going to ask you some other
22  questions of you. And if there's --
23       MS. LISER: Mr. Hollman, you can look at
24  your transcript if you want.
25  BY MR. SINGER:

Page 92

1   Q.    You can if you want; I'm saying you don't have
2   to during this next line of questioning I'm going to ask of
3   you.
4   A.    Right.
5   Q.    Now, it's fair to say you don't recall what Ms.
6   Tonia Lee told you as far as the California fire standard.
7   Isn't that true?
8        MS. LISER: Objection to form.
9        MR. PRINCE: Objection; asked and
10  answered.
11       THE WITNESS: No, sir. I know what she
12  told me.
13  BY MR. SINGER:
14  Q.    Okay. I'd like you to look at Page 16 or your
15  deposition given on May 9, 2006. And, specifically, Line
16  19. And was this question asked -- these questions asked
17  of you, and did you give these answers: "And what did the
18  Medline rep tell you as far as the California fire standard
19  was concerned?" Answer: "I don't remember."
20  A.    I don't remember what she said about that.
21  Q.    Question: "Did she tell you the mattress that
22  she was selling met the California fire standard or do you
23  know?" Answer: "I don't remember that either." Were
24  those questions asked of you at your deposition? Did you
25  give those answers on May 9, 2006?

23 (Pages 89 to 92)

Page 93

1  A.    Yes. Those answers still stand as of that
2  date.
3  Q.    Now, when you ordered Medline's mattresses, did
4  you order those mattresses with a fire barrier? Do you
5  remember?
6  A.    I don't remember. What does "flame retardant"
7  mean?
8  Q.    Unfortunately, it's not my deposition. It's
9  gonna have to be your -- I'm supposed to ask you the
10 questions; you give me the answers. Well, let me ask you
11 this. What does "flame retardant" mean?
12 A.    In my opinion, that it won't burn; it'll melt.
13 Q.    Okay. What's "flame resistant" mean?
14 A.    It resists the flame.
15 Q.    What's "fireproof" mean?
16 A.    Means it won't burn.
17 Q.    Okay. Now, did you read that anyplace?
18 A.    Pardon me?
19 Q.    Now, did you read that anyplace, what those
20 definitions were?
21 A.    No, cause they're vague.
22 Q.    Did you ask Ms. Lee or anyone else about what
23 any of the representations were on the tags or anything
24 else with respect to Medline mattresses?
25 A.    I don't recall.

Page 94

1  Q.    When you worked at NHC Nashville, the Patterson
2  Street address, were you party to any discussions involving
3  overhead sprinkler systems?
4  A.    No, I wasn't.
5  Q.    Did you ever bring it up to anybody during any
6  of the committee meetings that you attended?
7  A.    It's possible, but I don't remember.
8  Q.    Well, what committees were you on at NHC
9  Nashville?
10 A.    Several different ones, but I don't recall them
11 now.
12 Q.    How about the patient care committee?
13 A.    Patient committee, I was on that one.
14 Q.    Well, you say you don't recall if you brought
15 up overhead sprinklers as a topic of discussion during any
16 of the meetings?
17 A.    I don't remember that. I don't remember.
18 Q.    Well, how about in-room fire smoke detectors?
19 Strike that. How about in-room smoke detectors?
20 A.    I don't recall.
21 Q.    Did that ever come up in any of the committee
22 meetings you attended?
23 A.    It may have, but I don't remember.
24 Q.    Now, would it have been within your authority
25 as a person who's buying supplies for the NHC Nashville

Page 95

1  facility on Patterson Street to go out and buy in-room
2  smoke detectors?
3  A.    No. That's handled by the maintenance
4  department.
5  Q.    Who was in charge of the maintenance
6  department?
7  A.    Scott Hansen.
8  Q.    Do you have any smoke detectors at your home?
9  A.    Yes.
10 Q.    Did you buy them?
11 A.    No, they came in the home -- they was in the
12 home when I bought the home.
13 Q.    Okay. Have you ever bought a smoke detector?
14 A.    Several years ago.
15 Q.    Like at a Wal-Mart or a Target or something
16 like that?
17 A.    Kmart, I think it was.
18 Q.    Yeah. What'd it cost, about five, ten bucks,
19 maybe?
20 A.    Somewhere in that neighborhood.
21 Q.    Did you, during your years at NHC Nashville,
22 ever recommend to anybody that in-room smoke detectors be
23 purchased and attached?
24 A.    I don't recall.
25 Q.    And you were on the patient care committee;

Page 96

1  correct?
2  A.    Right.
3  Q.    And do you recall any other committees that you
4  were on?
5  A.    No.
6  Q.    Did you ever have a discussion with anyone
7  before the fire that it would be worthwhile getting smoke
8  detectors in each patient room?
9  A.    I don't remember.
10 Q.    Do you recall any discussion with anyone that
11 worked at NHC with you in which the topic of discussion
12 included in-room smoke detectors?
13 A.    It could have been brought up in some meetings,
14 but I don't remember.
15 Q.    Why do you think it could have been brought up
16 in some meetings?
17 A.    Cause safety is an issue all the time.
18 Q.    Okay.
19 A.    Always discussing different things. That's one
20 of the things I had no control over, so I don't remember,
21 don't recall it.
22 Q.    Well, I may have asked you this a few moments
23 ago, and, if I did, my apologies. Did you ever recommend
24 to anyone in management at NHC Nashville on Patterson
25 Street that in-room smoke detectors be acquired for patient

24 (Pages 93 to 96)

Page 97

1   rooms?
2           MS. LISER: Objection; asked and answered.
3           THE WITNESS: I don't remember.
4   BY MR. SINGER:
5   Q.      Now, when -- apparently, there was a therapy
6   room or a wing that was added on to the main building.
7   A.      Right.
8   Q.      And do you recall approximately how many years
9   before the fire that therapy room was added?
10  A.      I don't remember how many years, but -- I don't
11  remember how many years it was.
12  Q.      More than five years or less than five years?
13  A.      Probably close to five years.
14  Q.      In any event, you were working there when that
15  structure was -- was being constructed?
16  A.      Right.
17  Q.      Right. Now, as a therapy room, were overhead
18  sprinkler system equipped in the therapy room?
19  A.      In the new one, yes, it had overhead
20  sprinklers.
21  Q.      It did?
22  A.      Yes.
23  Q.      All right. Now, when overhead sprinklers were
24  being equipped in the new structure attached to the main
25  building, did you have any discussion with anyone at NHC

Page 98

1   Nashville about overhead sprinkler systems for the main
2   building, the older structure?
3   A.      Not as I recall.
4   Q.      Did you ever bring it up as a topic of
5   discussion, that it would enhance safety for the patients
6   if there was?
7   A.      I didn't bring it up, but I recall em bring --
8   other people in the meeting bringing up that issue.
9   Q.      And -- at some of the committee meetings you
10  attended?
11  A.      Right.
12  Q.      And what was said about -- well, strike that.
13  Who else was present when this was brought up? Do you
14  remember?
15  A.      I don't remember.
16  Q.      Do you recall what was said?
17  A.      Just that -- the only thing I vaguely remember
18  is when they was building that new building, they was
19  talking about maybe sprinkling the whole building.
20  Q.      Okay. And who was saying that maybe we should
21  sprinkle the -- sprinkle the whole building?
22  A.      Seems like Scott Hansen said it.
23  Q.      He was a facility manager?
24  A.      He was the maintenance man.
25  Q.      Maintenance manager?

Page 99

1   A.      Maintenance manager, yes.
2   Q.      And it would be under his authority to also
3   acquire --
4   A.      No.
5   Q.      Let mem finish. -- acquire and attach in-
6   patient-room smoke detectors?
7   A.      No.
8   Q.      Whose responsibility would that be?
9   A.      I don't have no idea.
10  Q.      It wasn't yours?
11  A.      Not my responsibility, no.
12  Q.      Not your job?
13  A.      No.
14  Q.      Well, you'd been there for -- you'd been there
15  like 10 or 11 years. Whose job would it have been to
16  decide we should put in in-room patient -- some smoke
17  detectors for patients?
18  A.      Corporate would make those decisions, the final
19  decision.
20  Q.      Okay. Who would make recommendations to
21  corporate?
22  A.      I don't know. Probably the administrator would
23  be the one that would make the recommendation.
24  Q.      Ms. Mayfield?
25  A.      No, it'd been Mr. Lester.

Page 100

1   Q.      Mr. Lester. Did Ms. Mayfield replace Mr.
2   Lester sometime?
3   A.      She'd be the last administrator before the
4   fire.
5   Q.      All right. How many months or years before the
6   fire did Ms. Mayfield take over for Mr. Lester?
7   A.      She's been there for about a year. She didn't
8   take over for Mr. Lester. We had two administrators prior
9   to Ms. Mayfield.
10  Q.      Okay. And it'd be their responsibility to make
11  recommendations on buying these smoke detectors similar to
12  the kind you bought at Kmart some years ago?
13  A.      I can't say that.
14  Q.      Well, who would be making that decision or
15  recommendation?
16  A.      I have no idea.
17  Q.      But you don't recall ever making the
18  recommendation?
19  A.      No.
20  Q.      Is that correct?
21  A.      No.
22  Q.      You did not make that recommendation?
23  A.      No.
24  Q.      And you knew there were not smoke detectors in
25  the patient rooms; right?

25 (Pages 97 to 100)

Page 101

1    A.    Yes, sir.
2    Q.    And you'd be able to tell just by looking and
3    seeing that they weren't there; right?
4    A.    I could have, yeah, if I had looked for them.
5    I wasn't looking for em.
6    Q.    Now, let's get back to Ms. Tolston for a
7    second. Can you give us a description as to what
8    limitations she had, physical limitations?
9    A.    She was bound to a wheelchair.
10   Q.    What else?
11   A.    She couldn't stand alone.
12   Q.    What else?
13   A.    And her -- one of her arms was paralyzed.
14   Q.    Her whole left side -- whole -- whole left side
15   was paralyzed; right?
16   A.    Right. I think so. I'm not sure about that.
17   I didn't check her medical records.
18   Q.    Do you recall that she was bowel and urinary
19   incontinent?
20   A.    I don't recall that. I didn't get into that
21   part of it.
22   Q.    Just -- you know what I mean when I say that;
23   she could not control her bowel movements or urination?
24   A.    I didn't know anything about that.
25   Q.    Okay. Would you agree that patients who are

Page 102

1    bowel or urinary incontinent are higher risk of developing
2    bedsores or pressure sores also called decubitus ulcers?
3    A.    I'm not a medical expert, so I don't know that.
4    Q.    Okay. Did it ever occur to you that the
5    building would be safer with sprinklers in the patient
6    rooms or smoke detectors in the patient rooms?
7          MS. LISER: Objection to form.
8          THE WITNESS: That was something that was
9    not in my control, so I had -- I don't have an answer for
10   that.
11   BY MR. SINGER:
12   Q.    I know it wasn't in your control, but did you
13   ever feel, did it ever occur to you that the building would
14   be safer with sprinklers in patient rooms or smoke
15   detectors in patient rooms?
16   A.    I can't answer that question.
17   Q.    Well, as you sit here today, do you feel it
18   would have been safer for the residents at the NHC
19   Nashville facility on Patterson Street if, in fact,
20   overhead sprinklers and/or smoke detectors would have been
21   in the patient rooms?
22         MS. LISER: Objection to form.
23         THE WITNESS: I don't know.
24   BY MR. SINGER:
25   Q.    Would it be fair to say that it was everyone's

Page 103

1    responsibility to make sure that the building at NHC
2    Nashville on Patterson Street was safe?
3    A.    Yes. We did that.
4    Q.    Now, I think a committee you were on was called
5    the patient care committee?
6    A.    Right.
7    Q.    What did the patient care committee deal with?
8    What was its duty or responsibilities?
9    A.    Make sure the patient was getting the right
10   care, right type of medical supplies was being used on em,
11   and taking precautions like making sure they were turned
12   from side to side and back, making sure the bed stayed dry.
13   Q.    To prevent bedsores?
14   A.    To prevent bedsores or skin breakdown.
15   Q.    And how many years were you on the patient care
16   committee?
17   A.    I don't remember.
18   Q.    Can you give us a range, an estimate?
19   A.    No, I don't remember that either.
20   Q.    Do you know who else was on the committee?
21   A.    No.
22   Q.    Was Mr. Lester or Ms. Mayfield on that
23   committee?
24   A.    They attended some of them.
25   Q.    Now, there were security cameras for the

Page 104

1    building; right?
2    A.    Right.
3    Q.    Where were they located?
4    A.    Outside the building.
5    Q.    And do you know what the purpose of the
6    security cameras were?
7    A.    To prevent some -- prevent theft and somebody
8    being robbed or . . .
9    Q.    Whose responsibility was it to make sure those
10   cameras were working?
11   A.    I'm not sure, because I didn't deal lin
12   personnel.
13   Q.    You didn't deal in -- I'm sorry?
14   A.    I didn't deal with personnel, so I don't know
15   whose responsibility it was. It wasn't mine.
16   Q.    Okay. Was it Mr. Hansen's, the maintenance
17   person, or his department?
18   A.    I can't answer that question.
19   Q.    Is it your understanding that on the night of
20   the fire those security cameras were not operating?
21   A.    I didn't know anything about that.
22   Q.    So when I'm saying this to you is the first
23   time you heard that?
24   A.    I've heard of it before, but I don't know
25   anything about whether they were or were not working.

26 (Pages 101 to 104)

Page 105

1  Q.  Was there a period of time over the years you
2  worked there that those security cameras were not
3  functioning?
4  A.  I'm not -- I can't answer that question.  I
5  don't know.
6  Q.  But you've heard before I just mentioned
7  security cameras to you that there were occasions when they
8  were not working?
9  A.  I think it was on the news or in the paper
10 where I heard that.
11 Q.  Did you do anything with those cameras to keep
12 them optional -- operational?
13 A.  I didn't, no.
14 Q.  Now, would you attend fire in-service training
15 sessions?
16 A.  Yes, sir.
17 Q.  How often would those be held?
18 A.  Usually about every month, best I can
19 recollect.
20 Q.  Okay.  And where were those sessions held?
21 A.  In-services were held in the dining room and in
22 the -- in the classroom.  All new personnel come in had to
23 go through one before they went to work there, orientation.
24 Q.  And then after that, there'd be -- everybody
25 would have to submit to one once a month --

Page 106

1  A.  Probably was once a year when they attended.
2  Q.  Once a year?
3  A.  Right.
4  Q.  So how many times did you attend those things?
5  One time?
6  A.  Went to a bunch of em.
7  Q.  If you'd already been working there for 10, 11
8  years, why would you be attending more than once?
9  A.  Because they scheduled them on pay -- on payday
10 when we had all staff meeting and if you were in that all
11 staff meeting, you just attended that training.
12 Q.  So all three shifts had to be there at the
13 staff meeting?
14 A.  It was required to be there.
15 Q.  Were all -- all person -- personnel there?
16 A.  I have no idea cause I didn't keep those
17 records.
18 Q.  Did you sign in?
19 A.  Yes, I signed in.
20 Q.  Okay.  How about fire drills?  You participate
21 in those?
22 A.  Yes.
23 Q.  And if I recall, your role was to make sure the
24 people got into the dining room on the main floor of the
25 building?

Page 107

1  A.  I'd come to the main floor and make sure
2  everybody was out of the hallways and all the stuff was out
3  of the hallway, either in a room or -- and have the
4  patients in the dining room.
5  Q.  For the main floor of the building?
6  A.  Main floor, right.
7  Q.  And your office was in the basement?
8  A.  It was in the basement, right.
9  Q.  Okay.  What was your usual workday hours?
10 A.  7:00 to 3:30.
11 Q.  7:00 a.m. to 3:30 p.m.?
12 A.  Right.
13 Q.  Okay.  Did you ever participate in a fire drill
14 on any floor other than the first floor or main floor of
15 the building?
16 A.  On occasions when they'd go -- when we'd have a
17 fire alarm, I would be on the floor stocking and I'd have
18 to stay up on that floor.
19 Q.  I'm talking about for the fire drills.
20 A.  That's what I'm saying, for the fire drills,
21 yeah.
22 Q.  Yeah.
23 A.  The fire drill, I'd be up on the floor stocking
24 and I'd stay on the floor, or take something up for a
25 patient, because elevators automatically stop and go back

Page 108

1  to the base -- bottom floor.
2  Q.  Were you ever on the second floor during a fire
3  drill?
4  A.  Yeah.
5  Q.  I'd like you to take a look at your deposition
6  again.  Look at Page 32.  Do you recall during your
7  deposition on May 9, 2006, that you don't recall -- you
8  said you didn't remember ever participating in a fire drill
9  on any floor other than the first floor?  Isn't that what
10 you told the lawyers with Ms. Liser present on May 9, 2006?
11 MS. LISER:  Objection to form.
12 THE WITNESS:  What I said in my deposition
13 in May still stands.
14 BY MR. SINGER:
15 Q.  You don't remember there ever being any fire
16 drills when you were on any floor other than the first
17 floor.  Isn't that right?
18 A.  I don't remember.  I'm sure I did, but I don't
19 remember.
20 Q.  Okay.
21 MR. SINGER:  Let's take a break.
22 THE VIDEOGRAPHER:  We are off the record at
23 11:06.
24 (WHEREUPON, a brief recess was taken at
25 this time, after which time the court reporter read back

Case 3:06-cv-00611   Document 125-5   Filed 08/23/07   Page 27 of 33 PageID #: 595

Page 109

1   the last question and answer before the break.)
2      THE VIDEOGRAPHER: This is Tape Number 2
3   in the deposition of Bob Hollman. We are back on the
4   record at 11:15.
5   BY MR. SINGER:
6   Q.   Now, Mr. Hollman, before we took our break, we
7   were answering some questions about fire drills.
8   A.   Right.
9   Q.   Do you recall during any of the fire drills
10   that you participated in where there was an evacuation of
11   any of the patients who were non-ambulatory?
12      MS. LISER: Objection to form.
13      THE WITNESS: I don't remember.
14   BY MR. SINGER:
15   Q.   Let me see if I can be more direct. Do you
16   recall during any of the fire drills and anyone who was
17   wheelchair bound that were taken during the fire drill out
18   of their room down to the first floor?
19   A.   I don't remember that.
20   Q.   During the 11 or so years you worked there, do
21   you recall ever seeing that happen, where there was
22   evacuation of non-ambulatory patients?
23   A.   I don't remember.
24   Q.   Now, when you ordered mattresses from Medline,
25   or Span American, through Metro or Gulf South --

Page 110

1   A.   Right.
2   Q.   -- isn't it true that what you specified, the
3   type of mattress, was merely to meet the fire and safety
4   standards for the State of Tennessee?
5      MS. LISER: Objection to form.
6      THE WITNESS: No, I -- I distinctly
7   remember California fire standards.
8   BY MR. SINGER:
9   Q.   Okay. I'd like you to take a look at Page 8 of
10   your deposition that you gave on May 8, 2006. A deposition
11   that the nursing home's lawyers were at and Ms. Liser was
12   also in attendance. And I'd like you to ask whether -- I'd
13   like you to tell us whether this question was asked of you,
14   and whether you gave this answer at your deposition on May
15   9, 2006.
16      Page 8, Line 19. Let's try again. Line 9.
17   Question: "Where would you order the mattresses?" Answer:
18   "Mattresses were ordered from Medline." Question: "Always
19   Medline?" Answer: "Span American, ordered some from them
20   too." Question: "What was that?" Answer: "Span
21   American." Question: "Can you spell that?" Answer:
22   "S-P-A-N A-M-E-R-I-C-A-N." Question: And would you order
23   them here locally or --" Answer: "From a local vendor,
24   yes, sir." Question: "Would you specify the type of
25   mattress you wanted?" Answer: "Just met fire and safety

Page 111

1   standards for Tennessee."
2      Were those questions asked of you and did you
3   give those answers?
4   A.   Yes, I was replying directly to Span America on
5   that.
6   Q.   Those questions were asked of you and you gave
7   those answers; correct?
8   A.   Yes, sir.
9   Q.   Now, is there a particular reason why you would
10   talk about Tennessee standards for Span American and so-
11   called California standards for Medline?
12   A.   I don't know. There must have been a reason
13   why because at the time, I was told -- California standards
14   is what I knew was the safest in the country.
15   Q.   Well, why would you want to ask for Tennessee
16   standards if you didn't feel they were the safest in the
17   country when you would order mattresses from Span American?
18   A.   Because I didn't know anything about mattresses
19   at that time.
20   Q.   Well, you bought Span American mattresses
21   before and after the Medline mattresses; right?
22      MS. LISER: Objection to form.
23      THE WITNESS: I don't remember, sir.
24   BY MR. SINGER:
25   Q.   Well, it's a true statement, sir, that you've

Page 112

1   ordered Span American mattresses before the fire in
2   September 2003; correct?
3   A.   Yes, sir.
4   Q.   And when you gave your deposition in May 2006,
5   what you really meant was you told Tonia Lee and the sales
6   rep for Span American that you wanted the mattresses to
7   comply with Tennessee standards; correct?
8      MS. LISER: Objection to form.
9      THE WITNESS: I can't answer that
10   question.
11   BY MR. SINGER:
12   Q.   You don't know?
13      MS. LISER: Objection to form.
14      THE WITNESS: I can't -- I can't answer
15   the question.
16   BY MR. SINGER:
17   Q.   Well, that was the testimony you gave in your
18   deposition on May --
19   A.   I was talking about Span America only, and I
20   was talking about mattresses we ordered after -- after --
21   in the later years, not the early years.
22   Q.   Well, you ordered mattresses from Span American
23   before the fire and after the fire; right?
24   A.   Right.
25   Q.   Now, do you recall any oxygen tanks in the room

28 (Pages 109 to 112)

Page 113

1 that Ms. Tolston and Ms. Askew were in?
2 A.   No, I don't.
3 Q.   You don't?
4 A.   No.
5 Q.   Do you recall any kind of oxygen equipment in
6 their room before the fire?
7 A.   Not that I remember, no.
8 Q.   Do you recall whether an aerosol can, such as
9 an air freshener, was in their room before the day of the
10 fire?
11 A.   I didn't see one in there.
12 Q.   Were aerosol cans banned from patient rooms?
13 A.   I'm not sure about that policy, sir.
14 Q.   Do you -- are you aware whether Ms. Tolston had
15 air freshener in light of the incontinence that she was
16 suffering from?
17 A.   I don't know.
18 Q.   Now, what special measures were employed when
19 it comes to the mattresses and bedding of incontinent
20 patients?
21 A.   Use same mattresses, just use pads on them.
22 Q.   I'm sorry?
23 A.   You said incontinent?
24 Q.   For incontinent patients.
25 A.   Just use bed pads.

Page 114

1 Q.   Were plastic sheets used?
2 A.   No plastic sheets.
3 Q.   Okay. And when you say a "bed pad", what do
4 you mean by a "bed pad"?
5 A.   Twenty-four by thirty-six pad that's on the
6 bottom that's got some kind of material so it won't let the
7 urine leak through, catches the urine.
8 Q.   What else was there for incontinent patients
9 other than bed pads?
10 A.   There was lotions, perineal foam, creams that
11 we used to keep the skin from chapping.
12 Q.   What else was provided to help prevent
13 bedsores?
14 A.   Lotions.
15 Q.   Lotions, yes.
16 A.   Wound treatment cream, other things of that
17 nature, medical --
18 Q.   How about -- other than the bed pads, was there
19 anything else provided for incontinent patients on the bed
20 itself?
21 A.   No.
22 Q.   Okay. Were incontinent patients more likely to
23 have electric beds than -- than non-electric beds?
24 A.   I don't -- I can't -- I don't know that answer.
25 Q.   Well, what percentage of the beds were electric

Page 115

1 beds --
2 A.   I don't know.
3 Q.   -- at the facility as opposed to non-electric?
4 A.   I don't know. I didn't take care of that.
5 That was maintenance.
6 Q.   Okay. Did you -- can you -- was there a
7 predominance of electric beds over non-electric beds at the
8 place?
9 A.   There was more electric than there was non-
10 electric.
11 Q.   But you don't know what the percentage would
12 be?
13 A.   No.
14 Q.   Okay. Are you aware of any history of problems
15 in the operation of the electric bed for Mrs. Tolston's bed
16 --
17 A.   No.
18 Q.   -- before the fire?
19 A.   No.
20 Q.   Okay. Now, there were curtains separating
21 patients' beds in rooms?
22 A.   Yes, there was a privacy curtain in each room
23 --
24 Q.   Okay.
25 A.   -- that you pulled. Each one goes around one

Page 116

1 bed and one goes around the other bed.
2 Q.   Okay. And that -- including Mrs. Askew's and
3 Tolston's room?
4 A.   Right.
5 Q.   Right. Now, let's just talk about what would
6 be common for any patient's bed for a second; okay? There
7 would be the bed itself, the bed frame --
8 A.   Right.
9 Q.   -- and box spring; right?
10 A.   Right.
11 Q.   There would be the mattress; correct?
12 A.   Just the mattress on top of the springs of the
13 bed.
14 Q.   Yes, sir. Oh, just on the springs of the bed?
15 A.   Right.
16 Q.   There was not a box spring itself?
17 A.   No.
18 Q.   So there'd be the mattress on top of the
19 springs that's part of the bed frame?
20 A.   Right.
21 Q.   All right. And there was a headboard and a
22 footboard --
23 A.   Right.
24 Q.   -- for each bed; correct?
25 A.   Right.

29 (Pages 113 to 116)

Page 117

1   Q.   Made of wood?
2   A.   Made of wood, yes.
3   Q.   And what would be on this -- would there be
4 wood on the side of the bed as well?
5   A.   No.
6   Q.   Okay. And then there would be -- on each --
7 for each patient bed, there'd be a mattress pad whether
8 they're incontinent or not; right?
9   A.   Right. We used pads on all the patients.
10   Q.   Okay. So there'd be a mattress pad, and then
11 for incontinent patients there'd be a special --
12   A.   A sheet and then a pad.
13   Q.   Okay. Let's back up a little bit so we don't
14 leave a -- I think we have an understanding, but I'm not
15 sure the record is. If you had a bare mattress and you're
16 gonna put a new patient in the bed, you would then put a
17 mattress pad over the mattress; correct?
18   A.   No.
19   Q.   No?
20   A.   Between the mattress, we put a sheet over it
21 and then put a incontinent pad under -- on top of the
22 sheet.
23   Q.   Okay. And the -- it was a bed sheet?
24   A.   Right, bed sheet, form fitted sheet.
25   Q.   And then there'd be a mattress pad for the

Page 118

1 incontinent patient --
2   A.   Yeah.
3   Q.   -- correct? And then there'd be another sheet
4 for the patient?
5   A.   To cover up with, yeah.
6   Q.   Okay. And then there'd be a blanket?
7   A.   Blanket. Spread or blanket.
8   Q.   Okay. When you say a bedspread, like a bed
9 cover or bedspread?
10   A.   We call em bedspreads, but they're blankets.
11   Q.   Okay. And were the blankets provided by the
12 facility or did each patient have to provide it?
13   A.   The facility provided em.
14   Q.   And how frequent were the -- was the
15 bedding changed?
16   A.   As often as needed.
17   Q.   Well, is that once a month, once a week?
18   A.   I'm not sure the protocol on that. For
19 incontinent patients it was probably four and five times a
20 day.
21   Q.   For the incontinent ones?
22   A.   Right.
23   Q.   Okay. And it'd be fair to say that you would
24 go up to the floors to restack the supply cabinets.
25   A.   Right.

Page 119

1   Q.   Would there be other reasons why you'd be up on
2 the floors?
3   A.   Like if they needed any special mattress, I'd
4 take it up, put it on the bed --
5   Q.   Okay.
6   A.   -- and take the old mattress off. Concentrate,
7 take concentrators up, oxygen if they needed it.
8   Q.   Oxygen concentrators?
9   A.   Right.
10   Q.   For people that --
11   A.   I.V. pumps and poles, tube feeding pumps and
12 poles.
13   Q.   Okay. Now, I saw from some of those
14 photographs of the Span America mattress that those were
15 kind of like dipped in the center. Is that right?
16   A.   Those are those low air -- low -- contoured for
17 low beds so the patient can't roll out.
18   Q.   Right.
19   A.   They're like that.
20   Q.   So patients -- some patients would
21 spontaneously roll out of bed?
22   A.   Right. We had patients that -- there was ones
23 that had mobility.
24   Q.   Problems?
25   A.   Try to get up and walk or something and they'd

Page 120

1 be falling, so we used those on the low beds. That way
2 they couldn't roll out of bed.
3   Q.   Okay. And there'd also be side panels as well?
4   A.   No. No side panels.
5   Q.   Did you ever have any kind of foam --
6   A.   We had --
7   Q.   -- arms or, you know --
8   A.   We had padded rail cover.
9   Q.   Padded rail covers?
10   A.   Right.
11   Q.   Made of foam?
12   A.   I guess it was foam inside of em. They were
13 plastic on the outside.
14   Q.   Okay.
15   A.   Plastic-like material.
16   Q.   Do you recall anything about the contour of the
17 mattresses that would have some kind of side panels as part
18 of the mattress?
19   A.   No. That is the mattress. That was the
20 mattress.
21   Q.   It'd be the mattress itself?
22   A.   Right.
23   Q.   Okay. And -- now, how -- and there also were
24 air mattresses, right, at the facility?
25   A.   Pressure reduction mattresses, yes.

**Page 121**

1   Q.   Okay. Can you give us a description of those
2 mattresses?
3   A.   They're kind of like an air mattress except
4 they got a cover on 'em. They've got -- I guess it's a
5 little bit of foam around the sides of it, and then the air
6 valves or bags are inside of it.
7   Q.   And so you could adjust the --
8   A.   That replaces the mattress -- that replaces the
9 mattress.
10   Q.   Right. So instead of having a Nylex mattress,
11 you would have the air mattress on the bed --
12   A.   Right.
13   Q.   And with respect to the 100 percent foam Span
14 American mattress, that wouldn't replace the Nylex
15 mattress?
16   A.   It was pressure reduction.
17   Q.   Right.
18   A.   Low air --
19   Q.   So the pressure reduction mattress would be the
20 air mattress or the Span American 100 percent foam
21 contoured mattress?
22   A.   Right.
23   Q.   And the -- would that be the entirety of the
24 pressure reduction mattresses that were available?
25   A.   Pressure -- the air mattresses was -- were from

**Page 122**

1 Span America.
2   Q.   Okay. So you would get the air mattresses as
3 well as the 100 percent contoured mattress from Span
4 American as opposed to Medline?
5   A.   I can't say that we got all of them from Span
6 American. We got some of them.
7   Q.   Well, who else would you have gotten them from?
8   A.   I don't remember.
9   Q.   But none from Medline; right?
10   A.   I -- I can't say that. I don't remember.
11   Q.   You don't remember. So there also would be bed
12 rails up for some patients that could roll out of bed?
13   A.   Yes. If it was care plan, there would be some
14 patients that would have bed rails.
15   Q.   Okay. And for -- and those patients would have
16 those cushions, those side -- side --
17   A.   Not all of them; just the ones that was -- that
18 would fall out of bed.
19   Q.   Okay. Were stroke victims more prone to fall
20 out of bed or not --
21   A.   No.
22   Q.   -- do you know?
23   A.   I don't know. I don't know -- have no idea.
24   Q.   You wouldn't know?
25   A.   Wouldn't know what . . .

**Page 123**

1   Q.   I think you told us that Ms. Tolston was
2 wheelchair bound?
3   A.   Yes.
4   Q.   Okay. She needed assistance to go to the
5 bathroom?
6   A.   She needed assistance to go to the bathroom, to
7 get her up.
8   Q.   To get dressed?
9   A.   She could feed herself, yeah. She needed
10 assistance to get dressed. She was total care except for
11 feeding herself. She could feed herself.
12   Q.   Okay. And do they engage in procedures to
13 reduce her risk of pressure sores? Do you know?
14   A.   Supposed to do that with every patient.
15   Q.   Okay. Well, especially with her. She was
16 incontinent I think you told us; right?
17   A.   Right.
18   Q.   Would she be more at risk for pressure sores
19 than . . .
20   A.   I'm not sure.
21   Q.   Okay.
22   A.   A lot of it depends on how well the patients
23 eat.
24   Q.   Right. Well, why -- why would that be a
25 difference?

**Page 124**

1   A.   I'm not sure, but it just seems like a patient
2 that eats and drinks plenty of fluids don't have breakdown.
3   Q.   As much?
4   A.   Right.
5   Q.   But you still have to engage in maneuvers to
6 prevent them --
7   A.   Right. We always do that. We do that from day
8 one, when they first come in a nursing home till the time
9 they either die or leave.
10   Q.   Do you know who was in the -- what patients
11 were in the rooms adjacent to hers and Ms. Askew's at the
12 time of the fire?
13   A.   I don't recall their names. I -- if I see
14 their names, I'd know 'em.
15   Q.   How about down the hall? Do you recall the
16 patients' names --
17   A.   Ms. Webb was in one room 30 -- 313 or 315.
18   Q.   Do you know if any of those people had the
19 pressure reduction mattress, either the air mattress or the
20 100 percent foam?
21   A.   I don't recall. I don't recall now.
22   Q.   Was that wing where Ms. Tolston and Ms. Askew
23 were --
24   A.   They was -- they was throughout the building in
25 different rooms.

Case 3:06-cv-00611    Document 125-5    Filed 08/23/07    Page 31 of 33 PageID #: 599

Page 125

```
1    Q.    That had pressure reduction mattress?
2    A.    Right.
3    Q.    So it wasn't isolated in a certain wing?
4    A.    All of them had pressure reduction mattresses.
5    Every patient in that building had a pressure reduction
6    mattress, cause that's what we bought from Medline.
7    Q.    Okay. But I'm talking about the kind of
8    mattresses you described before as a pressure --
9    A.    Air mattress --
10   Q.    -- reduction mattress --
11   A.    Air mattress.
12   Q.    The air mattress or the 100 percent foam
13   contour mattress?
14   A.    They were on the patients that were either high
15   risk or had decubitus already.
16   Q.    Okay. You know, it's going to be really
17   helpful to the court reporter if you let me finish my
18   question before you answer. You and I are having a good
19   conversation --
20   A.    Okay.
21   Q.    -- but she can only take down one of us at a
22   time.
23   A.    Okay.
24   Q.    Very good. So what -- how -- how -- when you
25   said a high risk patient would be getting the air mattress
```

Page 126

```
1    or the contour Span American mattress, what do you mean by
2    high risk?
3    A.    They don't eat very good or didn't eat at all
4    or didn't take any -- didn't have a lot of intake of
5    fluids.
6    Q.    Okay. Any other factors?
7    A.    Braden's -- used the Braden's scale on a lot of
8    it to determine whether to put em on one of those low air
9    loss mattresses.
10   Q.    Right. So it's your understanding, the way the
11   clinical care was provided at that facility, that if the
12   Braden score was at a certain number that would require
13   high risk procedures being employed, the staff there would
14   employ those procedures; right?
15   A.    Right.
16   Q.    Do you recall what the number was, the Braden
17   score number is to require --
18   A.    I don't recall now.
19   Q.    -- either the -- let me finish my question.
20   That would require either the air mattress or the 100
21   percent foam mattress being applied?
22   A.    I didn't make those decisions.
23   Q.    Do you know -- do you know what the
24   criteria was?
25   A.    No, I didn't know what the criteria was.
```

Page 127

```
1    Q.    And specifically with respect to Ms. Tolston,
2    you don't know what her Braden score was. Is that correct?
3    A.    No, I don't know what it was.
4    Q.    And . . . Now, since the fire, did anyone have
5    a conversation with you about Ms. Tolston and her risk
6    potential for pressure sores?
7    A.    Nobody talked to me about it cause I wasn't in
8    that . . .
9    Q.    Cause you what?
10   A.    Cause I wasn't in the -- I didn't have a need
11   to know.
12   Q.    Okay. That would not be a judgment that you
13   would make, if someone needed a contour mattress or an air
14   mattress, that would be the --
15   A.    No.
16   Q.    -- clinical people?
17   A.    Nurses and clinical people made that decision.
18   Q.    Okay. They didn't have to go to you for
19   permission or --
20   A.    No.
21   Q.    -- even tell you about it; right?
22   A.    Whenever somebody made the decision to put it
23   on there, they'd tell me to bring it up.
24   Q.    Right. If there wasn't one already on the
25   floor?
```

Page 128

```
1    A.    Yeah, right.
2    Q.    Okay. At the time of the fire in September
3    2003, there were two, to your recollection, two brands of
4    mattresses that had blue covers; correct?
5    A.    Right.
6    Q.    The Medline and Span American?
7    A.    Right.
8    Q.    None others; correct?
9    A.    But the Span American had the blue covering and
10   the gray stuff on the bottom and the sides of it.
11   Q.    Okay.
12   A.    Halfway up the side and halfway -- all
13   underneath the bottom.
14   Q.    Now --
15   A.    Medline's was one color all the way around and
16   you could flip it over.
17   Q.    I understand.
18   A.    Span America's, you can't flip over.
19   Q.    Now, the -- but the Span American mattress did
20   not have innerspring steel coils; correct?
21   A.    I don't know.
22   Q.    Okay. I thought your testimony earlier was it
23   was 100 percent foam.
24   A.    No, you said that. I didn't say that.
25   Q.    Okay.
```

32 (Pages 125 to 128)

Page 129

1   A.   I don't know. I don't remember.
2   Q.   All right. So you don't recall as you sit here
3 today whether it was 100 percent foam or whether there were
4 springs in it?
5   A.   No.
6   Q.   Okay.
7   A.   I know the later models we bring in are 100
8 percent foam now.
9   Q.   Okay. How about before the fire?
10   A.   I don't remember.
11   Q.   You don't remember. Okay. But when did the --
12 strike that. The Medline mattresses that were delivered to
13 your facility, the first orders were brown in color. Is
14 that right?
15   A.   Right, brown.
16   Q.   Okay. And there came a period of time during
17 the deliveries of the Medline mattresses that they changed
18 to blue?
19   A.   Right.
20   Q.   You don't recall when that was?
21   A.   No, I don't remember when it was.
22   Q.   Now, the -- let's go back to the sheets on the
23 mattresses for a second that would go on patient beds. Was
24 the bed sheet, the one that would cover the mattress
25 itself, was that a fitted sheet?

Page 130

1   A.   Fitted sheet, yes.
2   Q.   Okay. And the fitting of the sheet would cover
3 the top, the sides, front and back?
4   A.   Underneath -- go underneath -- sheet underneath
5 the mattress all the way on both sides.
6   Q.   Okay. Now, did Opal Askew require a special
7 mattress?
8   A.   I don't remember; I don't think so.
9   Q.   Do you recall what kind of mattress she had on
10 her bed?
11   A.   No, because she moved from one room to another
12 room.
13   Q.   Well, as of September 2003, do you know what
14 kind of mattress was on her bed?
15   A.   No, I don't, cause they brought her down from
16 the third floor not too long before the fire. I mean, the
17 second floor not too long before.
18   Q.   From the third to the second floor?
19   A.   From the third floor, right.
20   Q.   Okay. Do you recall the residents or the
21 patients in the rooms adjacent to Ms. Askew and Ms.
22 Tolston's room, what mattresses were on their beds?
23   A.   No, I don't remember.
24   Q.   How about the patients in the rooms adjacent to
25 that?

Page 131

1   A.   I don't remember.
2   Q.   How about any patients in the building? Do you
3 recall what mattresses were on their beds?
4   A.   No.
5   Q.   Okay. Now, after the fire occurred, did anyone
6 before you first met Ms. Liser start asking you questions
7 about fire barriers and mattresses and things like that?
8   A.   No. Nobody ever asked me anything about em.
9   Q.   Now, did -- we've talked before about smoke
10 detectors in patient rooms and we talked before about
11 overhead sprinkler systems. Do you know if the building
12 had fire dampers or smoke dampers?
13   A.   I don't know. I know it had -- I'm not sure
14 because I didn't work in that area. That was Scott.
15   Q.   All right. So you don't know?
16   A.   Right.
17   Q.   That'd be Scott Hansen's, his responsibility?
18   A.   Scott Hansen, right.
19   Q.   Did you ever see an outside electrician make
20 repairs at NHC Nashville?
21   A.   No.
22   Q.   When there was failure of any of the electrical
23 beds or the motors for those beds, was any outside
24 maintenance person ever called in to fix the beds?
25   A.   I don't know.

Page 132

1   Q.   Was there a history of chronic problems of --
2 with the electric beds?
3   A.   Not that I can remember.
4   Q.   Okay. At any time during your years there?
5   A.   Not that I can remember.
6   Q.   Okay. Did you attend safety meetings?
7   A.   Yes.
8   Q.   How often?
9   A.   I don't recall how often.
10   Q.   Were you on the -- was that a committee?
11   A.   They had a committee, but I wasn't on the
12 safety committee.
13   Q.   Okay. Who was on the safety committee?
14   A.   Scott Hansen, the administrator.
15   Q.   The administrator would be Mr. Lester or Ms.
16 Mayfield?
17   A.   Mayfield, right.
18   Q.   Who else?
19   A.   I don't recall the rest of em.
20   Q.   What would be the circumstances that would
21 bring you to attend one of those meetings?
22   A.   I don't -- I don't know.
23   Q.   Well, do you recall how many of those safety
24 committee meetings you attended?
25   A.   Once a year. We had at least one once a year.

33 (Pages 129 to 132)