1  Volume:  I

2  Pages:  1 to 114

3  Exhibits:  See Index

4

5  IN THE UNITED STATES DISTRICT COURT

6  FOR THE MIDDLE DISTRICT OF TENNESSEE

7  Civil Action No. 3:06-0611

8  - - - - - - - - - - - - - - - - - - - x

9  EMPLOYERS INSURANCE COMPANY OF WAUSAU,

10             Plaintiff,

11     v.

12  MEDLINE INDUSTRIES, INC., and CREATIVE

13  BEDDING TECHNOLOGIES, INC.,

14             Defendants.

15  - - - - - - - - - - - - - - - - - - - x

16

17        DEPOSITION OF HARRI K. KYTOMAA, Ph.D.

18            Thursday, October 4, 2007

19             10:05 a.m. to 1:25 p.m.

20               Cornell & Gollub

21               75 Federal Street

22             Boston, Massachusetts

23

24     Reporter:  Lisa A. Moreira, RDR, CRR

25

Page 2

1  APPEARANCES
2
3  BROWN, DEAN, WISEMAN, LISER, PROCTOR & HART, L.L.P.
4  (BY: SANDRA LISER, ESQ.)
5  306 West 7th Street, Suite 200
6  Fort Worth, Texas 76102-4905
7  817.332.1391
8  Counsel for the Plaintiff
9
10 SEGAL, McCAMBRIDGE, SINGER & MAHONEY
11 (BY: JEFFREY SINGER, ESQ.)
12 233 South Wacker Drive, Suite 5500
13 Chicago, Illinois 60606
14 312.645.7800
15 Counsel for the Defendant, Medline Industries, Inc.
16
17 CREMER, KOPON, SHAUGHNESSY & SPINA, LLC
18 (BY: GREGORY J. McKENNA, ESQ.)
19 180 N. LaSalle Street, Suite 3300
20 Chicago, Illinois 60601
21 312.726.3800
22 Counsel for the Defendant, Creative Bedding
23 Technologies, Inc.
24
25

Page 3

1              INDEX
2  DEPONENT         DIRECT  CROSS  REDIRECT  RECROSS
3  HARRI K. KYTOMAA, Ph.D.
4    (By Ms. Liser)    5
5    (By Mr. Singer)         102
6    (By Mr. McKenna)              111
7
8           EXHIBITS
9  NO.     DESCRIPTION                      PAGE
10 162A  Affidavit                            8
11 163A  Notes of inspection in Georgia, 4/19/07  34
12 164A  Draft Protocol For Mattress Testing  34
13 165A  Notes of testing                     41
14 166A  Photo of innerspring array from burn test  55
15 167A  Photo of innerspring array from burn test  55
16 168A  Photo of another innerspring array   58
17 169A  Photo of another innerspring array   58
18 170A  Photo of Nylex II innerspring mattress  64
19 171A  Photo of Nylex II innerspring mattress  64
20 172A  Photo                                68
21 173A  Photo                                73
22 174A  Photo                                73
23 175A  Photo                                73
24 176A  Photo                                73
25 177A  Photo                                73

Page 4

1           EXHIBITS
2  NO.     DESCRIPTION                      PAGE
3  178A  Photo                                73
4  179A  Photo                                73
5  180A  Photo                                73
6  181A  Photo                                73
7  182A  Photo                                73
8  183A  Photo                                73
9  184A  Photo                                73
10 185A  Letter to Tom Long from Inter-Tek, 3/27  98
11 186A  Hollman deposition summary           99
12 187A  Span-America Web pages              100
13 188A  Printout from Invacare              102
14
15
16
17
18
19
20 * Original exhibits retained by Attorney Singer
21
22
23
24
25

Page 5

1           PROCEEDINGS
2      MS. LISER: Before we begin, I wanted to
3  put on the record our agreement with defendants,
4  that this deposition is limited to the issues raised
5  in defendant's motion for summary judgment, and that
6  if, in fact, Dr. Kytomaa -- did I say that right?
7      THE WITNESS: Sure.
8      MS. LISER: -- is designated later as an
9  expert in this lawsuit, that we would have the right
10 to depose him, if necessary.
11     MR. SINGER: So long as it's not
12 duplicative of what we're covering today.
13     Is that all right with you?
14     MR. McKENNA: Yes.
15     HARRI K. KYTOMAA, Ph.D.,
16 a witness called on behalf of the Plaintiff, having
17 been satisfactorily identified by the production of
18 his driver's license and duly sworn by the Notary
19 Public, was deposed and testified as follows:
20           DIRECT EXAMINATION
21 BY MS. LISER:
22   Q. Would you please state your name for the
23 record.
24   A. My first name is Harri, H-a-r-r-i; middle
25 name Kaarlo, K-a-a-r-l-o; last name, Kytomaa,

Page 6

1  K-y-t-o-m-a-a.
2  Q. Dr. Kytomaa, you have been hired by Medline
3  and Creative Bedding Technologies in a lawsuit filed
4  by National Healthcare. Do you understand that?
5  A. Yes.
6  Q. And do you understand that I represent
7  National Healthcare?
8  A. Yes. Just as a qualifier here, really I was
9  retained by the office of Attorney Jeff Singer. So
10  for my purposes, although it's a subtle distinction,
11  I deal directly with Jeff Singer and his office
12  rather than the corporate entities you mentioned.
13  MR. SINGER: And did you say that you
14  represent National Healthcare?
15  MS. LISER: Well, National Healthcare
16  and the insurance company, yes.
17  MR. SINGER: Well, I thought you
18  represented the insurance company and the beneficial
19  interest of National Healthcare.
20  MS. LISER: Sure. If you want to
21  clarify that on the record, go ahead.
22  MR. SINGER: That's fine. I just think
23  the record should be clear so Dr. Kytomaa is aware
24  of that, too, because it's really not part of his
25  involvement in this case as to who you represent or

Page 7

1  who I represent or who Mr. McKenna represents, but
2  just in his role as a --
3  MS. LISER: Normally I introduce myself
4  to the witness. I apologize if that bothers you.
5  Q. And Dr. Kytomaa, do you understand that your
6  deposition today is limited to issues of the
7  identity of the mattress involved in a fire at
8  National Healthcare in Nashville, Tennessee?
9  A. Generally speaking, that's correct, yes.
10  Q. Can you just briefly tell me what work
11  you've done that's helped you form any opinions on
12  identifying the mattress involved in the fire so I
13  can know what areas to question you on.
14  A. Sure. Probably the best way to summarize
15  my -- the area of my work is what appeared in my
16  affidavit.
17  Q. Okay.
18  A. And the summary of my work is that I've
19  performed a number of inspections and tests, and I
20  have also reviewed Mr. Hollman's deposition, based
21  on which I formed certain hypotheses, and I've
22  tested my hypotheses through my inspections and
23  testing.
24  MS. LISER: Jeff, is it all right if we
25  mark things out of this notebook as long as the

Page 8

1  original comes back?
2  MR. SINGER: Sure.
3  (Discussion off the record)
4  (Document marked as Kytomaa Exhibit 162A
5  for identification)
6  Q. Dr. Kytomaa, I've handed you what's been
7  marked Exhibit 162A. Is that the affidavit you just
8  referred to?
9  A. Yes.
10  Q. Who prepared that affidavit?
11  A. I prepared -- these are my words, and the
12  person who did the typing was Brian Eldridge.
13  Q. I noticed that about midway through that
14  affidavit there's a section where there's a bunch of
15  asterisks where something was left out and something
16  was added in.
17  A. Is that right?
18  MR. McKENNA: Object to the form.
19  MR. SINGER: Yes, I object to the form
20  of that.
21  A. I don't know of anything being left out.
22  Q. In Paragraph 17 --
23  A. Yes.
24  Q. -- there are three asterisks, then you begin
25  with Paragraph 18, and then there are three more

Page 9

1  asterisks after Paragraph 27. Do you know what
2  those are for?
3  A. Other than editorial beautification, I don't
4  know.
5  Q. Okay. When you say they're your words, what
6  do you mean?
7  A. What I mean by that is that the -- I had
8  long discussions with Brian Eldridge in creating
9  this document, but I didn't personally type the
10  document; he typed it. We discussed wording, and
11  essentially I instructed him as to what the wording
12  should be like.
13  Q. Did you dictate the affidavit, or merely
14  talk to Mr. Eldridge about your opinions and then
15  he'd type it up from that conversation?
16  A. Some parts may have been, let's say,
17  dictated in the sense that we were on the phone and
18  he was writing down what I was saying, and some
19  parts were back and forth.
20  Q. Were there then rewrites and edits of this
21  affidavit between you and Mr. Eldridge?
22  A. There were. Essentially it was a document
23  that evolved over some period of time.
24  Q. Do you have any of the draft affidavits?
25  A. No.

Page 10

1  Q. And where would they be?
2  A. There are none. We don't -- as a matter of
3  practice, I don't keep any such, let's say,
4  evolutionary stages of any document. The final
5  document is the document.
6  Q. Okay. Did Mr. Eldridge actually send you
7  drafts of what he prepared to make sure you were
8  happy with the language?
9  A. He may have, yes.
10 Q. And are those e-mails retained on your
11 computer system?
12 A. No. I wouldn't -- I would specifically not
13 keep any exchanges of documents that I know are not
14 in final form.
15 Q. So is it your personal practice or Exponent's
16 practice that documents -- drafts of reports or
17 affidavits get deleted?
18 A. Both.
19 Q. And the correspondence between you and Mr.
20 Eldridge, the actual e-mail itself, are those
21 deleted also?
22 A. To the extent that there is correspondence
23 that contains a document that is not in its final
24 form, yes, that would be deleted, too. But to the
25 extent that we have exchanges that don't involve

Page 11

1  documents that are not in their final form, I would
2  typically keep those.
3  Q. So if any of the e-mails between you and Mr.
4  Eldridge actually contained discussions about your
5  opinions and what should be put in the affidavit,
6  you're going to delete that e-mail because the
7  affidavit is not finalized yet?
8  A. Yes. If it's -- if we are talking about
9  issues that are sort of evolutionary in character, I
10 would not keep that, because I know that that is not
11 representative of what my final opinions will be and
12 so forth.
13 Q. Do you know whether or not any of the
14 e-mails you exchanged with Mr. Eldridge concerning
15 your affidavit contain any substantive discussions
16 in the e-mail body itself?
17 A. I would not really expect that to occur.
18 Q. But you don't know if it did or didn't?
19 A. The only, let's say, substance that may be
20 associated with such e-mails would be a possible
21 attachment of a sort of a version of the report as
22 it's being developed.
23 Q. And so the e-mail body itself is not going
24 to discuss the report?
25 A. I would not expect so.

Page 12

1  Q. You wouldn't expect it, but you don't know?
2  A. Well, put it this way, it's certainly not my
3  practice, and I don't believe it is Brian Eldridge's
4  practice either.
5  Q. To put substantive information in an e-mail?
6  A. Other than an attachment, which is the
7  document that we are developing.
8  Q. Okay. What about the other communications
9  you've had with Mr. Eldridge or his law firm? Have
10 any of those been via e-mail?
11 A. Yes.
12 Q. And are those e-mails destroyed, or do you
13 keep those?
14 A. I typically would keep those.
15 Q. Even if they're just transmittal e-mails?
16 A. If they're transmittal e-mails or things of
17 that nature, I would not necessarily, let's say,
18 delete them.
19     I'm sorry, let me be very clear.
20 Q. Okay.
21 A. If it's a transmittal or, for example, a
22 schedule of when we might meet, okay, something that
23 is factually accurate and not an evolving document,
24 I may well keep that. If it's a transmittal of a
25 document that is not in its final form, I would not

Page 13

1  keep that.
2  Q. Of the paragraphs in your affidavit, can you
3  tell me which of the 40 paragraphs were written by
4  you and which ones were written by Mr. Eldridge?
5  A. Well, all of these are in substance written
6  by me, but the physical typing was done by Mr.
7  Eldridge for all of them.
8  Q. Can you tell the court and jury what
9  revisions Mr. Eldridge asked you to make to any
10 portion of the affidavit?
11 A. Well, he didn't ask me to make; it was
12 really me asking him to make. So essentially the
13 way this went was Mr. Eldridge indicated that an
14 affidavit was necessary, and then we went about
15 developing this first based on a very long
16 discussion or, let's say, multiple discussions, and
17 he would essentially try to represent my opinions on
18 paper, and then I would, you know, essentially
19 correct them until I was satisfied that they were
20 representative of my opinions.
21 Q. Do you know about how long this process took
22 from the first conversation about the affidavit to
23 it being completed?
24 A. I don't really recall, but it probably would
25 have been something like on the order of maybe two

**Page 14**

1 to three weeks, something like that. Maybe a little
2 less. I don't have an accurate, let's say, timing
3 of it.
4 Q. Do you have any other written reports or
5 statements that you have made involving the
6 identification of the mattress involved in this
7 fire?
8 A. None other than what's in front of you here.
9 Q. And that's these two notebooks?
10 A. Yes.
11 Q. When were you first retained by Medline or
12 Creative -- excuse me, by Mr. Singer's law firm?
13 A. Let me see. I have a document that reflects
14 the date in one of my binders.
15   So we were first retained in March of
16 2007.
17 Q. Was the scope of your retention in March of
18 2007 limited to the identification of the mattress,
19 or was it a broader scope?
20 A. The scope of the retention actually, in my
21 understanding, has not changed throughout this
22 matter, and it was pretty much defined to the scope
23 of my affidavit.
24 Q. So if your affidavit does not deal with, for
25 example, the combustibility of the mattress or its

**Page 15**

1 flammability characteristics, the scope of your
2 retention doesn't include those items either; is
3 that right?
4 A. Well, let me just answer specifically. I
5 was not asked to look at the combustibility of some
6 materials, but I was asked to look at the
7 combustibility of other materials. So in the case
8 of the mattress, to make -- that's a difficult
9 question to answer just as you asked it.
10 Q. And I agree with you completely now that you
11 point out components as to the entire finished
12 mattress.
13   The scope, to your understanding, from
14 the moment you've been retained by Mr. Singer's law
15 firm to the present day, is limited to the issues
16 addressed in your affidavit; is that right?
17 A. Yes.
18 Q. And if your affidavit does not address the
19 flammability characteristics of the completed entire
20 mattress, then the scope of your retention doesn't
21 cover that either; is that right?
22 A. I'm not sure --
23 Q. Badly worded question again?
24 A. Yes.
25 Q. I'm sorry.

**Page 16**

1 A. I'm not sure I understand your question.
2 Q. I'm actually just trying to find out if
3 you've been retained to offer any opinions on
4 whether any of the Nylex II mattresses meet any of
5 the flammability characteristics or standards such
6 as California TB 129 or California TB 603 or any of
7 those?
8 A. I was not asked to address the issue as to
9 whether these mattresses in question meet any of the
10 standards you identified.
11 Q. Okay. Thank you. And thank you for making
12 sure I get a good question.
13   When you were first retained by Mr.
14 Singer's law firm, were you given the issue of
15 whether or not the mattress involved in this fire
16 was a Nylex II innerspring mattress, or was that an
17 issue that you raised from your investigation?
18 A. I think both. That is, this was presented
19 to me, but as a matter of practice I -- you know,
20 these are the types of things that I would seek to
21 confirm independently, which I did, and so yes.
22 Q. Let me back up a question. If I understand,
23 then, all of the work that you have done since you
24 were retained in March of 2007 to today has
25 involved, to some extent, the identity of the

**Page 17**

1 mattress involved in the fire at NHC?
2 A. Yes, and then related questions associated
3 with the identity, yes.
4 Q. What do you mean by "related questions
5 associated with the identity"?
6 A. Well, for example, you know, if it -- well,
7 let me be specific.
8   If it were a Nylex II innersprung
9 mattress, how would it behave in a fire? And if it
10 were a Nylex or, let's say, a foam mattress without
11 innersprings, how would it behave in the fire?
12 That's what I mean by "related questions."
13 Q. Okay. Any other related questions you have
14 worked to answer?
15 A. There may be, but none that I recall right
16 now. My suggestion is as those arise, I'd be happy
17 to point them out, you know, in the context of
18 questions that you ask.
19 Q. It's probably more efficient that way
20 anyway.
21   What was the first activity you
22 undertook to try to determine the identity of the
23 mattress involved in this fire?
24 A. The first activity. You know, I don't
25 really remember exactly. What I can do is tell you

Page 18

1  specifically about my inspections and testing
2  because I have dates for those.
3  Q. Okay.
4  A. As to exactly, you know, what I read and so
5  forth, it's difficult for me to recall when I did
6  what, so probably the easiest thing is to tell you
7  the dates which I have here, the dates of my various
8  inspections.
9      So I was retained in March of 2007, and
10 then in May -- actually, in April I performed the
11 inspection in Marietta, which I believe you were
12 present also.
13 Q. That's correct.
14 A. April 19th. Then in May I performed tests
15 of mattresses, burn tests of mattresses, and then in
16 June I performed a second inspection in Nashville,
17 Tennessee.
18 Q. What was significant, if anything, from your
19 inspection in Georgia in April of 2007 toward your
20 opinions on the identification of the mattress?
21 Sorry.
22 A. Toward the identification of the mattress,
23 the significance there was the absence of the
24 innerspring array in the materials that we looked
25 at. But in addition to that, I also wanted to

Page 19

1  understand the general configuration of the hospital
2  bed in question, which I documented and measured and
3  so forth.
4  Q. What was significant about the configuration
5  of the hospital bed on which the mattress was
6  resting?
7  A. A number of things. First, from the
8  photographs themselves, the absence of springs that
9  would have been associated with an innersprung
10 mattress, that's the first thing.
11     And the second thing really related to
12 tests that I wanted to do and to understand
13 essentially what the geometry of the hospital bed
14 was so that if I were to perform tests, it would be
15 testing on a bed, a hospital bed, that is
16 sufficiently similar.
17 Q. Were you involved in any way in the initial
18 investigation of this fire and the gathering of the
19 evidence?
20 A. I was not.
21 Q. Do you know if your employer, Exponent, was?
22 A. What I know is that Exponent at some stage
23 was involved. I don't know the nature of the scope
24 of our prior involvement.
25 Q. If I understood what you told me when you

Page 20

1  were in Georgia in April of 2007, you were already
2  devising the test protocol to do the mattress burn
3  test?
4  A. Well, your memory is perhaps keener than
5  mine. I don't recall the exact timing of, you know,
6  when I was doing that. I really honestly don't.
7  Q. Well, you just mentioned that one of the
8  things that was significant about the configuration
9  of the bed frame itself is that you wanted to make
10 sure you were using a bed frame that was similar in
11 your test.
12 A. Right.
13 Q. Which made it sound like you were already
14 considering the test.
15 A. Oh, I see what you mean. My normal practice
16 is to -- and I think in answer to your question,
17 there's really two elements.
18     One is my normal practice of
19 documentation in inspections, where I try to
20 document everything that may be relevant without
21 necessarily knowing exactly why it may be relevant
22 to at that time, but trying to think broadly in that
23 way.
24     And the second aspect of it is that I
25 then used the information that I associated with the

Page 21

1  documentation of that Marietta inspection later in
2  devising the protocol for tests.
3      So as to whether that's what I was
4  thinking at the time, I really don't know or recall
5  that, but I did use this information in that manner
6  at some later time.
7  Q. Have you discussed with anyone the steps
8  that were taken in the evidence-gathering initially
9  after the fire to make sure that all relevant
10 evidence was gathered, maintained, and documented?
11 A. I certainly had discussions with Brian
12 Eldridge and maybe with Attorney Singer regarding
13 what the collection of materials or evidence is that
14 exists in this case, but as to your question as to
15 how, I'm not sure I've had such discussions.
16 Q. If I understand your affidavit, you base
17 your opinion in large part upon the absence of
18 bedsprings in the remnants of the mattress that was
19 involved in the fire; is that correct?
20 A. Yes.
21 Q. And do you base the opinion that there were
22 no bedsprings solely upon the photograph you
23 reference of Ms. Tolston's remains in that bed?
24 A. No. I mean, I base it on a number of
25 things; Mr. Hollman's testimony, the photograph that

Page 22

1  there are no bedsprings, the fact that no bedsprings
2  were collected into any of the bodies of evidence,
3  if you can call them that, in Marietta or Nashville,
4  Tennessee. So there's -- and the fact that if there
5  had been bedsprings in a mattress that went through
6  these fires, the bedsprings would have survived.
7      So there are a number of things that I'd
8  say I base that opinion on.
9  Q. Let me make sure I've got the number
10 complete. The testimony of Bob Hollman, an employee
11 of NHC, correct?
12 A. Yes.
13 Q. The photographs of Ms. Tolston in the bed?
14 A. Yes.
15 Q. And then the gathering of evidence, and the
16 fact that you've looked at evidence in Nashville and
17 in Marietta, Georgia, and there are no bedsprings?
18 A. Yes. I've looked through all of the
19 materials that could have contained bedsprings and
20 there are no bedsprings.
21 Q. Okay. Does anything else compile that
22 number of things that support your opinion that
23 there were no bedsprings?
24 A. And also my testing that indicates that --
25 that is, I think, testing, personal experience,

Page 23

1  knowledge, and training that goes to the opinion
2  that I would not expect bedsprings to be destroyed
3  in the fire.
4  Q. And I probably haven't had enough coffee, so
5  I was asking a bad question.
6      It's your opinion that there were no
7  bedsprings in the mattress that Ms. Tolston was
8  resting on at the time of the fire, right? And
9  that's really all I'm looking at. What supports
10 that opinion, that the mattress she was on had no
11 bedsprings?
12 A. You lost me.
13 Q. Sure. Well, let me -- it's my understanding
14 that you believe that the mattress Ms. Tolston was
15 resting on did not have any innerspring component
16 because you see no evidence of an innerspring
17 component; is that right?
18 A. After the fire, that's correct.
19 Q. Okay. And the evidence that supports your
20 opinion that there was no innerspring in the
21 mattress being used by Ms. Tolston is the pictures
22 of her, Mr. Hollman's testimony, and the fact that
23 you've looked at the evidence that's been gathered
24 and stored and you found no burned innerspring unit?
25 A. So the thing that confuses your question for

Page 24

1  me is that Mr. Hollman testifies to the fact that
2  the mattresses, the Medline mattresses, were all
3  innersprung mattresses, okay? So there's
4  essentially information associated with what kind of
5  Medline mattresses he had purchased and knew about.
6  Q. Right.
7  A. That's one piece of information. And the
8  second piece of information is everything to do
9  with, you know, what was kept after the fire, what
10 did we see after the fire was put out and so forth,
11 okay?
12     So there are really two types of
13 information in the list of things that you mentioned
14 in your question that have a different type of
15 meaning in the context of my investigation.
16 Q. And I guess what I'm trying to understand
17 is, from the information that we've been provided --
18 and I believe Mr. Singer and Mr. Eldridge have, too
19 -- the Nashville Fire Department destroyed the fire
20 scene within five or six hours, gathered up all the
21 evidence, placed it in piles, and the remnants of
22 the mattress were taken by some investigator to his
23 home in a garage and was kept until it was released.
24 And I'm trying to find out if you know any of those
25 facts?

Page 25

1  A. I have not -- in fact, those facts I'm not
2  aware of, and I have not, let's say, studied the
3  background associated with that kind of information.
4      MR. SINGER: And I have to offer an
5  objection to the form of the question, because
6  there's no evidence as yet in this case that
7  supports the hypothetical that Ms. Liser has
8  provided on the record.
9      MR. McKENNA: I join in that objection,
10 please.
11     MS. LISER: You know, guys, if you want,
12 I don't mind saying that one objection is good for
13 both of you so you don't have to --
14     MR. McKENNA: Thank you.
15 Q. If, in fact, that was true, and the evidence
16 was not well-preserved, well-gathered, well-
17 documented, would that limit the reliability of the
18 fact that today or in 2007 there are no innerspring
19 bed units for you to look at in any of the two
20 places evidence is stored?
21     MR. SINGER: Object to the form of the
22 question.
23 A. I don't think so.
24 Q. Okay. You mean whether the evidence was
25 gathered correctly and documented correctly and not

Page 26

1 destroyed immediately after the fire would not
2 affect how much reliance you could place on what you
3 see today in 2007?
4     MR. SINGER: Same objection.
5     A. I think -- I mean, your question is a very
6 general one, so it's very difficult to answer a
7 general question of that character. And I think
8 generally, you know, yes, there may be problems, but
9 if we look specifically now at the evidence -- for
10 example, the fact that when Mrs. Tolston was on the
11 bed, photographs were taken at that time before,
12 let's say, clearing of evidence and the such.
13     Q. Okay.
14     A. And those photographs speak for themselves.
15     And if then, let's say, after those
16 photographs were taken, say things were done in such
17 a manner as to possibly not keep all of the evidence
18 or things of the kind that you spoke of in your
19 question, that would not influence the significance
20 of the photographs themselves.
21     Q. That's actually a much better made point
22 than I was trying to make -- than I was doing,
23 Doctor. Really the only thing that we have that is
24 not subject to either interpretation or spoliation
25 that tells us that there wasn't an innerspring unit

Page 27

1 in this mattress were the pictures of Ms. Tolston
2 when she's still on the bed?
3     MR. SINGER: Well, I'll object to that.
4 I believe it's argumentative. Object to the form of
5 the question, but you can answer.
6     A. Based on the information I have, I don't
7 think you are right.
8     Q. And why not?
9     A. I have no information that suggests that
10 there was improper handling of evidence.
11     Q. And if there was improper handling, then
12 that would raise some doubt about the evidence we
13 see today. You just don't know if that happened or
14 not.
15     A. Well, I don't know whether that's the case
16 either, because we'd have to take this hypothetical
17 handling of evidence that you talk about in the
18 context of what is not so hypothetical, and then
19 essentially make an interpretation as to whether it
20 has any influence on final opinions.
21     Q. You would, of course, Doctor, have to take
22 into consideration to some extent, even limited, how
23 the evidence was handled between the time it was
24 gathered and the time you saw it a number of years
25 later.

Page 28

1     A. Well, I mean, I've not taken it into
2 consideration other than having looked through all
3 of the materials that were kept as evidence, and
4 I've also reviewed the photographs that were taken
5 by the bomb and arson squad. And in light of the
6 scope of my work, I'm not sure that that's directly
7 relevant at this time.
8     Q. Aren't you making a presumption, Doctor,
9 that all of the relevant evidence was kept and made
10 available for you to examine in 2007?
11     A. So the presumption I'm making is that I've
12 looked at all of the evidence that's available, and
13 I didn't see innersprings in those materials, and
14 I've looked at the bomb and arson squad photographs,
15 and I see no innersprings, you know, of an array
16 that's actually substantive in the sense that you
17 wouldn't really miss it.
18     So I don't -- you know, in light of the
19 types of materials that were kept as evidence, it
20 seems to me that that would have been kept, had it
21 been there, and it would also have been obvious in
22 the photographs. Okay?
23     So all the information that I have right
24 now speaks to me with respect to the innerspring
25 specifically, that they're not there. They're not

Page 29

1 in the photographs. I don't think they were there,
2 and I don't think that improper handling of some
3 other evidence impacts the innersprings at this time
4 based on the information that I have.
5     Q. Surely mishandling of the remains of the
6 mattress would have some relevance to what was left
7 of the mattress, correct, if that occurred?
8     A. Not necessarily, because actually a
9 significant component of my opinions here really
10 rest on the least flammable component of the
11 innersprung mattress, namely the innerspring array,
12 all right? So if, let's say, ticking or foam
13 components did remain, and if they were, let's say,
14 mishandled, as you say, for which I don't have
15 independent confirmation, that would not influence
16 my opinions. I didn't really look at those types --
17 those components of the mattress, and I didn't
18 attempt to look at those components of the mattress.
19     Q. I just want to make sure I understand,
20 Doctor. I know we have the photographs. And I know
21 there may be disputes over what the photographs show
22 or don't show, but we have the photographs.
23     But as far as the fact that you have
24 looked at evidence being kept in Nashville and
25 evidence being kept in Georgia, you are presuming

8 (Pages 26 to 29)

Page 30

1 that if there were bedsprings as part of this
2 mattress, that those would have been kept and made
3 available at one of those two locations in order to
4 reach your opinion that the absence of any bedspring
5 unit means that there were no bedsprings in the
6 mattress; isn't that correct?
7  A. Well, not really, because I've reviewed many
8 photographs.
9  Q. We're taking the photographs out.
10  A. Right.
11  Q. I'm just asking -- just on the absence of
12 bedsprings being made available at one of those two
13 locations, you're presuming that had they been in
14 Ms. Tolston's mattress, they would have been kept
15 and stored?
16  A. Right. See, from a technical standpoint, I
17 can't make that leap. I can't now suddenly not look
18 at the photographs because it's really integral to
19 my investigation on this issue, right? So I can't
20 now -- I'll say I can't answer that question, and I
21 can only answer it in the context of what I've seen
22 through photographs because I've spent a lot of time
23 looking at photographs.
24  MR. SINGER: Can I just ask for the
25 record, when you're talking about photographs, we're

Page 31

1 talking about bomb and arson?
2  MS. LISER: That's what he's talking
3 about.
4  MR. SINGER: I'm not sure if anyone
5 reading the transcript will know exactly what
6 photographs are being referred to now. That's why I
7 bring that up. Thank you.
8  Q. Surely you'll admit, Doctor, that it is
9 possible that someone threw away an innerspring bed
10 unit before it was provided to any of the attorneys
11 or the investigators to keep?
12  A. Based on the information that I've reviewed,
13 I would say no.
14  Q. That it's impossible?
15  A. Yes, because it is a huge piece of evidence.
16 A lot of stuff that was kept was much smaller than
17 this. This is an enormous thing that almost is the
18 size of an entire mattress.
19  Q. Okay.
20  A. So I cannot imagine, based on what I've
21 reviewed so far, that that would have been done. I
22 just can't imagine it.
23  Q. Okay. So your testimony is that it is
24 impossible that someone would have discarded that or
25 not kept it?

Page 32

1  A. Based on what was kept, that's correct.
2  Q. Okay.
3  A. Yes.
4  Q. Was there anything else that you learned in
5 your investigation or examination of the evidence in
6 Georgia in April of 2007 that has supported your
7 opinions about the identity of the mattress being
8 used by Ms. Tolston?
9  MR. SINGER: I just want to offer an
10 objection. I don't believe his testimony is that
11 he's going to opine what mattress was on Ms.
12 Tolston's bed. I believe what his testimony's been
13 so far and what's in the affidavit is that he can
14 offer opinions that an innerspring coil Nylex II
15 mattress was not on that bed.
16  So maybe that's a semantic distinction,
17 but I object to the form of the question because I
18 think you're misstating what his opinions are.
19  MS. LISER: Let's figure out how we want
20 to call it, because if I use that -- we'll be here
21 for two days if I have to say that every time I ask
22 a question about the identity of the mattress.
23  MR. SINGER: That's fair. I just want
24 the record to be clear that I think you may be
25 inadvertently misstating the opinions he has formed

Page 33

1 in this case which are set out in his affidavit. So
2 why don't you reask your question.
3  MS. LISER: Yes, let me try again. I
4 understand your point. I'm trying to be a little
5 shorthand so we can all catch planes and go home.
6  Q. If I understand from what Mr. Singer said,
7 your opinion is going to be limited to the fact that
8 the mattress being used by Ms. Tolston at the time
9 of the fire did not include an innerspring unit; is
10 that correct?
11  A. That's correct.
12  Q. Are you offering any opinions about the
13 identity of the mattress that Ms. Tolston was using
14 other than it didn't have an innerspring unit?
15  A. No.
16  Q. Can, then, we have an agreement that when I
17 ask you about opinions on the identity of the
18 mattress, that I'll try to be better, but what we
19 are talking about is your opinion that the mattress
20 being used by Ms. Tolston did not have an
21 innerspring unit? Do you want me to try that one
22 again?
23  A. No, I agree with that.
24  Q. Okay.
25  (Recess taken)

Page 34

1  (Document marked as Kytomaa Exhibit 163A
2  for identification)
3  BY MS. LISER
4  Q. Dr. Kytomaa, I've handed you -- or the court
5  reporter has -- Exhibit 163A. Can you tell me what
6  that is?
7  A. These are my notes of the April 19, 2007
8  inspection in Marietta, Georgia.
9  Q. Okay. Looking at your notebook, that is the
10 only page of notes that I found that looks like they
11 reference that examination. Would that be correct?
12 A. That's correct.
13 Q. And you did take a series of photographs
14 during that evidence examination?
15 A. That's correct.
16 Q. Then if I went -- if I understood your
17 earlier testimony, the next major activity you
18 undertook was the testing of the mattresses; is that
19 right?
20 A. That's correct.
21 (Document marked as Kytomaa Exhibit 164A
22 for identification)
23 Q. Can you tell me what Exhibit 164A is?
24 A. This is the draft protocol for mattress
25 testing.

Page 35

1  Q. What protocol did you ultimately use? Your
2  affidavit references both TB 603 and CFR 1633.
3  A. Yes. I'm not sure I understand your
4  question.
5  Q. Sure. Did you use -- did you follow a
6  testing protocol that is set in one of the full-
7  scale fire tests for mattresses, like TB 603?
8  A. The test protocol that I used is what's
9  spelled out in my affidavit as well as this, being
10 the document entitled "Draft Protocol For Mattress
11 Testing," okay? So the only component of TB 603 is
12 as is spelled out in the draft protocol, which is
13 Exhibit 164A in Sections 5, 7, and 9. All of those
14 speak to the fact that we used a TB 603 burner.
15    So really it's in reference to a
16 component that was used -- sort of let's say a
17 component that was used to ignite the mattress. And
18 so when you -- in your question, when you
19 essentially imply that we followed a standard, we
20 didn't really follow a standard of testing, we
21 followed the draft protocol that we have here, which
22 is Exhibit 164A, but we then elected to use the
23 burner that is used in TB 603 as a means of a
24 condition of the mattress.
25 Q. Was there a reason why you decided not to

Page 36

1  follow the protocol set out in California Technical
2  Bulletin 603 in its entirety?
3  A. Right. I mean, two things essentially.
4  There was no reason to follow that standard or any
5  other standard; and the second reason really is that
6  the purpose of these tests was to determine how
7  innersprung mattresses and noninnersprung mattresses
8  would look after the mattress had burned, which is a
9  scope that is significantly different than Technical
10 Bulletin 603's scope.
11 Q. And for the jury, what is the scope of
12 Technical Bulletin 603?
13 A. Well, it's really a test associated with the
14 flammability of mattresses that primarily looks at
15 the heat release rate; that is, you know, how the
16 fire grows and spreads.
17 Q. Did you keep data of the heat release rate
18 during the testing that you did in May of 2007?
19 A. Not only did I not, let's say, keep notes of
20 it, I didn't measure it, because it wasn't the
21 purpose of the testing that I undertook.
22 Q. The lab at which you did the testing, did
23 they run their normal test protocol and keep records
24 of what the heat release rate was throughout that
25 test or throughout those tests?

Page 37

1  A. The lab that I used to perform these tests
2  did the tests in accordance with the protocol that I
3  provided to them, so they did what Exhibit 164A
4  says.
5  Q. So I'm not sure I made my question clear.
6  No matter what your protocol says, did the lab keep
7  records of the heat release rate of the mattresses
8  during the four tests you ran?
9  A. I'm not sure I understand your question
10 fully.
11 Q. Sure. I know that your protocol doesn't
12 require it, but did the lab keep it anyway, or did
13 they obtain that data during the tests?
14 A. So you're suggesting that the lab might have
15 done things other than what I asked them to do in
16 the protocol, I suppose, right?
17 Q. Gather data during a test, yes.
18 A. So no, the lab did only what I asked them to
19 do. They didn't go and do things -- we were
20 actually -- Attorney Singer's office was essentially
21 paying for the tests, so we only -- I wrote the
22 protocol for my purposes, and the way these labs
23 work is, they will charge you for what they do for
24 you, so they tend not to do extra things that they
25 will then charge you for.

10 (Pages 34 to 37)

Page 38

1  Q. Okay.
2  A. And if you're not paying for them, they
3  won't do them. So they did what we asked them to
4  do, and that's it.
5  Q. All right. So you can affirmatively state
6  that if I contact the lab down in Texas, they are
7  not going to have data showing what the heat release
8  rate was during the four tests that you ran?
9  A. That's correct.
10  Q. Other than the fact that it would have cost
11  Medline additional money to obtain -- excuse me, Mr.
12  Singer's firm to collect that data, was there any
13  other reason why you didn't collect the rate of heat
14  release during these tests?
15  A. Well, let me just say that the preface of
16  your question there is actually a misrepresentation
17  of what I said --
18  Q. I apologize.
19  A. -- in the sense that this is not a money
20  question. The money issue that I pointed out is
21  that labs don't voluntarily do things that you don't
22  ask them to do. That was the point I was trying to
23  make.
24      And so, I'm sorry, what was the
25  question?

Page 39

1  Q. Certainly. Why didn't you ask the lab to
2  record the data of the rate of heat release
3  throughout the four tests you ran?
4  A. Because that wasn't -- for the purpose of my
5  testing, I had no need for that information. Again,
6  the purpose of my testing was to determine what an
7  innersprung mattress looks like after it has burned
8  and what a foam mattress without an innerspring
9  array looks like after it has burned. So neither of
10  those questions have anything to do with the heat
11  release rate, so that would have been somewhat
12  irrelevant to my testing, if you will.
13  Q. Was that data that could have been gathered
14  during the test if you wanted it done?
15  A. Oh, absolutely. I mean, I think that, you
16  know, there are a lot -- in fact, this lab in
17  particular will do many things that they're capable
18  of doing if you want it done. But we don't randomly
19  ask them to do things; we ask them to do
20  specifically what we need.
21  Q. Have you used this lab before for full-scale
22  fire tests?
23  A. Personally in projects that I've directly
24  been involved with, no; but generally speaking, yes.
25  That is, Exponent has used Inter-Tek, and

Page 40

1  specifically this lab, for some other things.
2  Q. And do you know if when Exponent has used
3  Inter-Tek in the past for full-scale fire tests,
4  whether they have collected the rate of heat release
5  data during the test?
6      MR. SINGER: Let me offer an objection
7  to the form of the question, because he has not
8  testified that they've done full-scale fire tests
9  for Exponent.
10      MS. LISER: I'm sorry, I thought he said
11  his company had used Inter-Tek for those kind of
12  tests. I apologize.
13  A. What I said was that I had not used them,
14  and Exponent had used them for some other things.
15  The reason why I left it so vague is that I don't
16  know what those other things are other than, yes, we
17  have used that lab.
18      So I don't know that we have used Inter-
19  Tek for what you call full-scale tests, which is a
20  concept that I think could mean different things to
21  different people.
22  Q. Okay. Any other reason why you didn't
23  gather the rate of heat release of the four burning
24  mattresses?
25      MR. SINGER: Objection, asked and

Page 41

1  answered. If you have any additional reasons to
2  provide her, that's fine.
3  A. I think the answer is, I have no reason to
4  measure it. It's difficult for me to answer the
5  question the way you put it. I had no reasons to do
6  it.
7  Q. Did you collect any data during the tests
8  that you performed at Inter-Tek other than
9  photographic or videographic data?
10  A. Yes.
11  Q. What data did you report?
12  A. They're essentially the materials that I've
13  provided here today, so my notes of the testing,
14  yes.
15      (Document marked as Kytomaa Exhibit 165A
16      for identification)
17  Q. Is Exhibit 165A your notes of the testing?
18  A. Yes.
19  Q. Okay. And I didn't see any other data other
20  than photographs in your notebooks that you obtained
21  from the testing, so I may have to hand it to you to
22  let you tell me what else might be there.
23  A. That's all there is.
24  Q. If I then understand correctly, you do not
25  have data from these tests to offer any opinions on

Harri K. Kytomaa, Ph.D.

Page 42

1 whether any of these mattresses complied with TB 603
2 or CFR 1633; is that right?
3     A. Right. I didn't attempt to make that
4 determination, nor do I have data for that, such a
5 determination.
6     Q. Okay. And so if, in fact, you were ever
7 asked at a later date to render opinions on which
8 combustibility standards these mattresses met or
9 didn't meet, you'd have to do new tests?
10     A. Well, you'd have to do something that meets
11 -- addresses that question, right, which is not what
12 I set out to do in May of 2007.
13 *Q. It's my understanding -- and my
14 understanding could be wrong -- that California TB
15 603 utilizes standard bed clothes like Boston IX-11;
16 is that right?
17     MR. SINGER: I'm going to offer an
18 objection here. I thought the scope of this
19 deposition was going to be limited to the activity
20 he performed with respect to the product
21 identification issue. You are asking him questions
22 about technical bulletins, compliance and standards,
23 so I don't know where we're going here.
24     MS. LISER: Give me two questions, and
25 if you don't think I've gone anywhere, fine.

Page 43

1     MR. SINGER: I talked to Grant about
2 this -- we've had an e-mail exchange -- and I don't
3 want to go into technical bulletins and standards.
4 That's not the purpose of this deposition today.
5     MS. LISER: That's fine. The next
6 question would make sense, and we'll just skip the
7 follow-up.
8     Q. So you don't need to answer that question,
9 Doctor.
10     Do you agree with me, Doctor, that bed
11 clothes during a mattress fire test add to the fuel
12 load?
13     MR. SINGER: Again, same objection.
14     MS. LISER: Look, she had bed clothes on
15 her mattress, and you tested mattresses without bed
16 clothes, and bed clothes add to the fuel load.
17 That's relevant.
18     MR. SINGER: But this relates to product
19 identification, whether there was innerspring coil
20 or not.
21     MS. LISER: Right, and if there's a
22 higher fuel load, then there's going to be a hotter
23 fire and more heat released in Ms. Tolston's room,
24 and I think that's very relevant.
25     MR. SINGER: I understand what you're

Page 44

1 saying, but it has nothing to do with the product
2 identification issue at all.
3     MS. LISER: Okay. Well, then I'm just
4 going to ask him the questions, and you can instruct
5 him not to answer.
6     MR. SINGER: I'm not going to instruct
7 him not to answer because I don't think that's
8 ethically appropriate in this circumstance, but we
9 can always call the judge if there's going to be a
10 lot of questions according to issues that the
11 parties agreed before this deposition were not going
12 to be asked and he's not prepared to address.
13     MS. LISER: Well, I don't think that
14 finding whether or not his test protocol replicated
15 what was going on in Ms. Tolston's room is
16 irrelevant, because if your fire tests that showed
17 springs survived does not represent what happened to
18 Ms. Tolston, then it's not relevant to whether Ms.
19 Tolston's springs would have survived.
20     MR. SINGER: So if I understand what
21 you're saying, it's because Ms. Tolston was wearing
22 bed clothes -- was wearing pajamas and there was
23 bedding of some sort on the mattress that this would
24 have an impact, pursuant to a reasonable degree of
25 engineering certainty, on whether the steel coils

Page 45

1 would remain?
2     MS. LISER: I think I'm entitled to ask
3 the engineer that and not you.
4     MR. SINGER: Why don't you ask him that
5 question. I think that's a fair question for you to
6 ask him.
7     MS. LISER: Okay.
8     Q. Sorry, Dr. Kytomaa. Do you agree that
9 bedding on a bed adds to the fuel load?
10     A. Yes.
11     Q. And you agree that the furnishings in the
12 room can add to the fire load and can increase the
13 intensity of the fire?
14     MR. SINGER: That's totally different.
15     MS. LISER: All right. We'll just
16 follow up that.
17     Q. So additional fuel load can increase the
18 intensity of the fire; is that correct?
19     A. Generally speaking, yes.
20     Q. All right. And do you have any reason to
21 think Ms. Tolston was on a bed with no sheets,
22 mattresses or -- I mean, sheets, blankets or
23 pillows?
24     A. I would expect that there might have been
25 sheets, blankets or pillows or one of those on her

12 (Pages 42 to 45)

Page 46

1  bed.
2  Q. The tests that you ran at Inter-Tek did not
3  have any bed clothes on the mattress; is that
4  correct?
5  A. We didn't have any bed clothes on the bed,
6  but we used a burner that is designed to mimic the
7  presence of the bed clothes.
8  Q. In what way? I mean, how does the burner do
9  that?
10  A. The burner is actually specifically designed
11  to mimic ignition of bed clothes, yes.
12  Q. The 603 burner?
13  A. Yes, that's correct.
14  Q. What effect, if any, would it have on the
15  fuel load on your test to not have bed clothes?
16  A. Well, the tests that I performed used a
17  propane burner, so essentially you're introducing
18  propane that wasn't, if you will, in the fire room
19  for the purpose of essentially mimicking the
20  behavior of bed clothes in the early stages of
21  ignition. So on the one hand you're adding fuel,
22  and on the other hand you're taking away in the
23  sense that there were no sheets and blankets or
24  pillows on the tests that I performed.
25  Q. Did you allow the tests to go to flashover

Page 47

1  at Inter-Tek?
2  A. The tests that I performed did not cause
3  flashover.
4  Q. Do you know whether or not, from your review
5  of the fire marshal reports, the fire in Ms.
6  Tolston's room reached flashover?
7  A. I did not review the fire reports in this
8  case, and that really wasn't part of my scope. And
9  so I don't know specifically whether the room
10  flashed over or not, or I haven't really attempted
11  to address that question.
12  Q. What does it mean to go to flashover, so
13  I'll know that you and I are speaking on the same
14  page?
15  A. All right. So terminology of "going to
16  flashover" is typically associated with a condition
17  where the fire has progressed sufficiently that a
18  hot zone of hot gases and soot are formed in the
19  upper regions of the compartment in question, the
20  room in question, the fire room, that then radiate
21  heat downwards to other combustible materials, such
22  as furniture and carpets and other furnishings, that
23  then essentially ignite relatively quickly, burning
24  most of the combustibles in the room.
25  Q. So if Ms. Tolston's room -- or I'll say the

Page 48

1  fire in Ms. Tolston's room reached flashover, that
2  would have been a condition in her room that wasn't
3  present in the tests you ran at Inter-Tek?
4  A. Right. I mean, I don't know -- I haven't
5  addressed the question as to whether the room
6  reached flashover, but certainly in the Inter-Tek
7  tests we did not reach flashover of the compartment
8  fire.
9  Q. And can the presence of other combustibles
10  in the compartment where the fire is taking place
11  increase the intensity of the fire in the mattress?
12  MR. SINGER: That's been asked and
13  answered. I object.
14  A. I mean, it really depends. There are
15  situations, for example, where if something else is
16  burning and the smoke layer travels downwards
17  sufficiently quickly, that it can essentially put
18  out a fire. So it depends on the degree of
19  ventilation of the fire, and it depends on the
20  degree of, let's say, fuels that can be ignited or
21  the amount of fuels that can be ignited. And so
22  it's not -- without any further, let's say,
23  qualification or clarification, I don't think I can
24  answer that question.
25  Q. Let me see if I can give you a better

Page 49

1  question then.
2  If Ms. Tolston's room contained
3  flammable furniture, flammable draperies, curtains
4  around her bed, that type of item, could those types
5  of items add to the fuel load enough to cause the
6  fire in a mattress to be of greater intensity?
7  A. So like I said, it depends a great deal on
8  the availability of air, so ventilation of the fire.
9  So in some situations it could. In other
10  situations, maybe not.
11  Q. If, in fact, the door to the room was open
12  or the window was broken so that there was
13  availability of oxygen, would that help you answer
14  that question?
15  A. Well, it would help me, but I haven't looked
16  at the details associated with your question. So
17  generally speaking, I really can't answer it.
18  But I will say that, you know, things
19  like if the window might have been broken or if a
20  door is open but the door in the room next door that
21  sort of would provide air to the fire room is
22  closed, then maybe that door doesn't -- so there are
23  many -- I think that there are many questions. It's
24  a complicated question, and it's not something I can
25  answer right now.

Page 50

1  Q. So if I understand, there are many issues
2  you would have to look at to be able to tell me or
3  the court or the jury whether the presence of other
4  items in her room had any effect on the intensity of
5  the fire in the mattress, and that's not something
6  you can tell me today.
7  A. Right.
8  Q. What about the presence of medicinal oxygen
9  in the room? If someone was, either in that room or
10  the room next door, on oxygen, would that have -- or
11  can that have any effect on the intensity of the
12  fire in the mattress?
13  A. If you make oxygen, pure oxygen, of which
14  there is only about 21 percent in air, available to
15  a fire directly, that certainly can increase the
16  rate at which something is burning. The ability for
17  this to have any effect on a fire really depends on,
18  you know, what is the flow rate, what is the ability
19  for the oxygen to reach the area that is burning, is
20  it getting diluted significantly by air so that the
21  concentration of oxygen near the fire is really no
22  different, things of that nature.
23       So yes, it's something that can have an
24  effect, but it's also something that may not have an
25  effect at times.

Page 51

1  Q. And you don't have enough information, as
2  you sit here today, to be able to tell me or the
3  court whether there was the presence of pure oxygen
4  and whether it would have had any effect at all?
5  A. That's correct.
6  Q. And, of course, the tests that you did at
7  Inter-Tek didn't have any other combustibles in the
8  fire compartment. It had just the mattress and the
9  frame upon which the mattress was resting.
10  A. Correct, and the burner. The burner that
11  provided gas that burned.
12  Q. Where did you obtain the six mattresses that
13  Exponent has, including the four that were actually
14  burned?
15  A. So these were manufactured by -- these were
16  Medline mattresses that came from Medline and
17  Creative Bedding. These were manufactured and then
18  sent directly to Inter-Tek, and the arrangements
19  were made by Brian Eldridge's office for that to
20  happen.
21  Q. Do you know whether or not the four
22  mattresses that you burned at Inter-Tek were
23  actually manufactured by Creative Bedding?
24  A. I don't specifically know exactly where they
25  were manufactured other than what's on the labels

Page 52

1  that are documented and essentially representations
2  that can be made by others that were involved in
3  that process. I was not.
4  Q. Did you specifically request that the
5  mattresses be manufactured by Creative Bedding?
6  A. Well, what I requested was that we have
7  representative exemplars of innersprung mattresses.
8  Q. Did you request that of Mr. Eldridge?
9  A. Yes.
10  Q. So you cannot tell me if the mattresses you
11  burned at Inter-Tek were manufactured by Creative
12  Bedding unless it's revealed on the tags that you
13  documented?
14  A. Well, I believe that they were manufactured
15  by Creative Bedding, but I'd say -- that
16  representation was made to me by Brian Eldridge, but
17  I did not independently confirm that in any way.
18  Q. Do you know whether or not the mattresses
19  that you tested at Inter-Tek were specifically
20  manufactured for your test, or were they taken off a
21  run of normally manufactured mattresses?
22  A. I believe that they were manufactured for
23  our purposes.
24  Q. What work did you do to confirm that the
25  mattresses you tested at Inter-Tek met the same

Page 53

1  specifications as the mattresses which were
2  delivered to National Healthcare?
3  A. I did not, let's say, perform any
4  independent verification of that. I requested that
5  the innersprung mattresses be representative of the
6  ones that were delivered to NHC Nashville, and I
7  think that the -- well, the exercise of ensuring
8  that that was the case was overseen by Brian
9  Eldridge and other people at -- probably at Creative
10  Bedding.
11  Q. Was there anyone at Exponent, other than you,
12  that would have played a role in confirming that the
13  mattresses you tested at Inter-Tek met the same
14  specifications of the mattresses delivered to NHC?
15  A. No.
16  Q. Okay. So your statement in your -- well,
17  I'm not actually sure you even said that in your
18  affidavit, but any statement that you would make
19  that the mattresses you tested at Inter-Tek met the
20  same specifications of the mattresses that were
21  delivered to NHC were based upon information given
22  to you by Mr. Eldridge?
23  A. Yes.
24  Q. Okay.
25  A. And let me just be clear. With respect to

14 (Pages 50 to 53)

Page 54

1 the innersprung mattresses, right. Because there
2 were foam mattresses and innersprung mattresses.
3    Q. Were you ever -- let me back up.
4       Do you know who, if anyone, at Creative
5 Bedding would have played a role in trying to make
6 sure that the mattresses you tested met the same
7 specifications as the ones delivered to NHC?
8    A. I don't know specifically.
9    Q. Were you ever given any specifications or
10 any documents that showed you the characteristics of
11 the mattresses delivered to NHC?
12       Do you want me to try that again? Is
13 that --
14    A. Well, the only information I have associated
15 with that is Hollman's testimony.
16    Q. So you've not been given any internal
17 specifications that Medline or Creative Bedding
18 might have used back in the 1990s on how they
19 constructed mattresses then?
20    A. No.
21    Q. Have you been given any specifications on
22 how Medline has their mattresses manufactured in
23 2007?
24    A. No.
25    Q. Did you read any other depositions other

Page 55

1 than Mr. Hollman's deposition taken in 2007?
2    A. No.
3    Q. Do you know whether or not Creative Bedding
4 still makes mattresses for Medline?
5    A. I don't know.
6    Q. Have you ever spoken with anyone directly at
7 Medline, as opposed to one of their attorneys, about
8 the mattresses you were given?
9    A. No.
10    Q. I sort of asked this, but I'm not sure I
11 asked the right question. Did you ever speak to
12 anyone at Creative Bedding, as opposed to one of
13 their attorneys, about the mattresses you needed and
14 what you were given?
15    A. No.
16       (Documents marked as Kytomaa Exhibits
17       166A and 167A for identification)
18    Q. Doctor, I've handed you Exhibits 166A and
19 167A, which were photographs given to me by Mr.
20 Eldridge or Mr. Singer. Do you recognize those
21 photographs?
22    A. I do.
23    Q. Can you tell me what those are?
24    A. These are photographs that I took of the
25 innerspring array from the burn test that we

Page 56

1 performed at Inter-Tek.
2    Q. Do you know, from looking at those
3 photographs or from your recollection, whether those
4 were taken after the mattress that contained those
5 units had been burned?
6    A. Oh, clearly that is the case, that these
7 photographs were taken after the mattresses or, in
8 fact, in this case the one mattress was burned.
9    Q. Okay.
10    A. These two exhibits, 166A and 167A, come from
11 the same mattress.
12    Q. How can you tell that?
13    A. Just from the appearance of the debris. You
14 can see the debris is the same.
15    Q. Did you take pictures of the remaining
16 innerspring array from both innerspring mattresses
17 you burned?
18    A. Yes.
19    Q. Did they appear identical? And you're
20 welcome to look at your pictures.
21    A. Sure. I'm not sure I understand your
22 question. Did they appear -- that is, did the
23 innersprings from the two mattresses appear
24 identical, or did the multiple photographs of the
25 other mattress innersprings appear identical to one

Page 57

1 another?
2    Q. The two sets of photos from the two units,
3 did they appear to be identical?
4    A. I have photographs right here. These are
5 the others.
6       So essentially what you put in front of
7 me was Exhibits 166 and 167, which were photographs
8 that you printed out from my CD or DVD. And here
9 you can see additional photographs of the
10 innerspring array here being held up by one of the
11 technicians at Inter-Tek, and here you can see with
12 a degree that differs in appearance from Exhibits
13 166 and 167A.
14       But generally speaking, the innerspring
15 arrays look the same.
16    Q. Do you mind if I mark those so that when we
17 look at this later we'll remember what you were
18 talking about?
19    A. By all means.
20       MR. SINGER: We can take photocopies of
21 that, too. Would that be better?
22       MS. LISER: That would be fine.
23       MR. SINGER: There are people here who
24 can help us with that. Were there any others that
25 you wanted to have photocopied?