IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| EMPLOYERS INSURANCE COMPANY OF WAUSAU, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:06cv0611 |
| | ) | |
| MEDLINE INDUSTRIES, INC., AND | ) | Judge Thomas A. Wiseman, Jr. |
| CREATIVE BEDDING TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Employers Insurance Company of Wausau ("Wausau") brings this subrogation suit for damages arising out of a fire that occurred at a nursing home facility owned and operated by NHC Healthcare, Nashville, L.L.C. ("NHC") and insured by Wausau.  NHC made a claim, which Wausau paid, in the amount of $6,063,759.87 for property and business interruption damages sustained by NHC as a result of the fire, which occurred at NHC's Nashville, Tennessee facility on September 25, 2003.  Wausau alleges that the fire began in or near a defective mattress that was designed, manufactured and/or marketed and sold by defendants Medline Industries, Inc. ("Medline") and Creative Bedding Technologies, Inc. ("Creative Bedding") (collectively "Defendants") and that its damages resulted from the defects in the mattress—namely, that the mattress was not appropriately fire retardant, and when it burned it released a large amount of thick, toxic smoke which hampered efforts to put out the fire and increased the resulting damages.

From the inception of this case, the Defendants have consistently denied that they manufactured or sold the mattress in question.  They have now filed their motion for summary judgment in which they assert that the undisputed evidence in this case proves that point.  The motion has been fully briefed and oral argument held on Tuesday, December 18, 2007.

Having considered all the evidence proffered by both parties, as well as the arguments of counsel and the applicable legal standards, the Court concludes that the evidence is such that no reasonable jury

could find in favor of Plaintiff Wausau.  The Defendants' motion will therefore be granted and this matter dismissed.

## I.     STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Although all "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), summary judgment must be entered against the opposing party if it "fails to make a showing sufficient to establish the existence of an element essential to . . . [its] case, and on which . . . [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If "a reasonable jury could return a verdict for the nonmoving party," summary judgment must be denied.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It is insufficient, however, simply to show "that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In addition, "the mere existence of a scintilla of evidence in support of Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

## II.     APPLICABLE LEGAL STANDARDS

Wausau's Second Amended Complaint alleges five causes of action, each of which sounds in product liability and is therefore governed by the Tennessee Products Liability Act of 1978, Tenn. Code Ann. § 29-28-101 *et seq.*  The Act provides that only *a manufacturer or seller of a product* may be liable for injuries to a person or to property caused by the product if the product is determined to be in a defective or unreasonably dangerous condition at the time it left the control *of the manufacturer or seller.* Tenn. Code Ann. § 29-28-105(a).   Thus, in order to recover in this product liability action under the Tennessee Products Liability Act, Wausau must make a threshold showing that its injuries were *caused by* a product manufactured or sold *by these Defendants.  See, e.g.*, *Downs v. Perstorp Components, Inc.*, 26 Fed. Appx. 472, 477 (6th Cir. 2002) (affirming district court's conclusion that without admissible proof on the issue of causation, "no reasonable jury could find for plaintiffs because Tennessee law requires

proof of causation for both strict liability and negligence actions," and citing *Caldwell v. Ford Motor Co.*, 619 S.W.2d 534, 539 (Tenn. Ct. App. 1981), for the proposition that Tennessee's product liability statute requires a showing that the defendant's product caused the injury). *Cf. Warnick v. NMC-Wollard, Inc.*, 512 F.Supp.2d 318, 331 (W.D. Pa. 2007) (recognizing that, under Pennsylvania law, "in cases in which the allegedly defective product is not available, a plaintiff may prove identification through circumstantial evidence," but "if the identification evidence of the product or its manufacturer is questionable, the claim should not be submitted to a jury" (citations omitted)).

The sole issue raised by the Defendants' motion is whether Wausau can prove that the Defendants manufactured and/or sold the mattress on which the September 25, 2003 fire allegedly began. Here, as in every civil case, the plaintiff bears the burden of proving each element of its claim. Wausau's inability to establish that the Defendants manufactured, sold or had control over the allegedly defective mattress in question means that Wausau cannot prove the element of causation, which is fatal to Wausau's claims in this product liability suit.

## III.    DISCUSSION

### A.    Procedural Background

Plaintiff Wausau is an insurance company organized and existing under the laws of the state of Wisconsin with its principal place of business in Wausau, Wisconsin. At all relevant times, Wausau was the property insurance carrier for NHC for a nursing home facility located at 2215 Patterson Street in Nashville, Tennessee. Coverage was provided by Wausau to NHC under Policy No. MCC-491-526416-353. Wausau filed the present lawsuit as subrogee of its insured, NHC, and sues for the amount paid to NHC ($6,063,759.87) for property damage and business interruption damages sustained by NHC as a result of a fire that occurred at its facility on or about September 25, 2003.

Defendant Medline is an Illinois corporation with its principal place of business in Mundelein, Illinois. Defendant Creative Bedding is an Illinois corporation with its principal place of business in Crystal Lake, Illinois. This Court has diversity jurisdiction. At all relevant times, Medline sold and distributed mattresses manufactured or assembled by Creative Bedding.

Wausau filed suit in the United States District Court for the Northern District of Illinois on December 30, 2005. The matter was transferred to this Court on Medline's Motion to Transfer Venue under 28 U.S.C. § 1404(a) on June 16, 2006.

**B.      Wausau's Factual Allegations**

According to Wausau's Second Amended Complaint, on or about September 25, 2003, at approximately 10:30 p.m., a fire broke out at NHC's Patterson Street facility. Wausau alleges that the fire began in or spread to a mattress used by one of NHC's patients, Anna Tolston, and that the mattress used by Anna Tolston "rapidly became fully involved in the fire, engulfing the patient in flames. The rapidly burning mattress created a fire that discharged extensive heavy toxic smoke and flames." (Doc. No. 53-13, at ¶ 8.) Wausau alleged that the mattress was manufactured by Creative Bedding and sold or distributed to NHC by Medline in 1996 or 1997, and that it was defective because (1) it contained a polyurethane foam core and was not properly flame retardant, which prevented NHC's employees from extinguishing the fire, and (2) the burning polyurethane foam generated extreme amounts of thick, black smoke, which severely hampered the fire-fighting efforts of both NHC and the local fire departments and caused additional injuries and damages. The mattress in question was totally consumed in the fire and therefore cannot be physically identified.

**C.      The Parties' Summary Judgment Arguments**

After conducting extensive discovery, the Defendants have now filed their motion for summary judgment asserting that the mattress at issue could not have been manufactured by Creative Bedding or sold to NHC by Medline. The Defendants base their assertion on the undisputed facts that: (1) the only type of mattress sold to NHC during the relevant time frame (1996–97) was the "Nylex II Innerspring Mattress with Convoluted Foam"; (2) the Nylex II Innerspring Mattress, as the name suggests, contains an "innerspring array of steel coils" measuring 31 by 71 inches and made of 13.5 gauge steel Bonnell spring coil; and (3) the mattress occupied by Anna Tolston and consumed in the fire did not contain such an innerspring—if it had, the innerspring would not have been consumed by the fire and would have remained on the bed, as demonstrated by experiments conducted by the Defendants' expert. The Defendants also point out that NHC used some 100% foam mattresses manufactured or sold by companies other than the Defendants, and that one of these might have been on Anna Tolston's bed.

Wausau's theory of recovery in its original, first-amended and second-amended complaints was based on its claim that the mattress on Anna Tolston's bed was manufactured or sold by the Defendants and that the mattress was defective. Now, faced with the Defendants' motion and the incontrovertible proof that the only type of mattress ordered from the Defendants contained a steel innerspring while the mattress that burned on September 25, 2003 did not contain an innerspring, Wausau seeks to change its theory, and has in fact filed a motion to amend its complaint. In its response to Defendants' motion and in its proposed Third Amended Complaint, Wausau concedes that the mattress on Anna Tolston's bed did not contain an innerspring but continues to insist that the subject mattress was manufactured by Creative Bedding and sold by Medline. Wausau now maintains, however, that Creative must either have omitted to insert the innerspring core into one of the mattresses that was supposed to have an innerspring core, or erroneously delivered to NHC a 100% foam-core mattress that somehow got mixed in with the innerspring mattresses that were ordered and delivered. Wausau contends that there is at least a material issue of disputed fact as to whether Defendants mistakenly included one foam-core mattress in its shipment of innerspring mattresses to NHC, which ended up on Anna Tolston's bed, so that when it burned it did not leave behind its tell-tale innerspring.

In support of this theory, Wausau argues first that Creative Bedding manufactured two types of mattresses for Medline, the Nylex II Convoluted Foam Mattress and the Nylex II Convoluted Foam with Innerspring Mattress. Both mattresses have identical dark blue exterior ticking, and the innerspring mattress weighs only a pound or two more than the 100% foam mattress. The mattresses are therefore virtually identical to the naked eye. They differ externally only insofar as the identifying tags attached to them identify them by name (the product-identification tag) and by item number (the "law tag"). Largely on the basis of the visual similarity between the mattresses, Wausau argues that Defendants cannot "rule out" the possibility that a 100% foam mattress was mistakenly shipped to NHC and ended up on Anna Tolston's bed. Second, Wausau argues that the NHC employee charged with purchasing mattresses, Robert Hollman, testified that he put a Nylex II mattress on Anna Tolston's bed, that he saw the bare mattress on her bed within a week prior to the fire and believes unequivocally that a Nylex II mattress was on her bed at the time of the fire. Wausau's position is that Hollman's testimony, in conjunction with evidence regarding the exterior similarity between the Nylex II mattresses with and without springs, is

sufficient to give rise to an issue of fact as to whether a Nylex II mattress was on Anna Tolston's bed when the fire broke out.

There are two fundamental problems with Wausau's position:  First, Defendants do not have the burden of proving that they did *not* mix up mattresses—Wausau has the burden of proving by a preponderance of the evidence that they *did*.  Wausau's evidence in that regard, however, amounts to nothing more than conjecture and speculation, while the Defendants' evidence of Creative Bedding's process for filling orders for mattresses establishes that the likelihood of a mistake occurring of the type Wausau presumes is exceedingly slim.   Second, the testimony of Mr. Hollman is inconclusive at best.

### *(1)     Evidence of Creative Bedding's Manufacturing Process*

Pointing out that the Nylex II mattress with innersprings and without innersprings look identical to the naked eye, Wausau posits that "the only explanation for the failure to find innersprings after the fire is the reality that Creative Bedding must have shipped a fully foam mattress rather than an innerspring." (Doc. No. 145, at ¶ 19.)  Such a mistake, according to Wausau, is "easy to understand," since

> [t]he 'lead sewer' starts the [assembly] process by pulling what is called the law tag from a box on which is written the product identification number.  The product identification numbers for the fully foam and innerspring Nylex II mattresses are very similar.  For an 80 inch fully foam Nylex II Mattress the product identification number is MDT231180 and for the Innerspring Nylex II Mattress the product identification number is MDT231280.  As is evidenced, the product identification numbers for the two mattresses varied by only one number.   Debora L. Nystrom, current Plant Supervisor at Creative Bedding, acknowledge[d] that if the lead sewer were to attach the wrong law tag to a mattress then some number of mattresses would be mis-manufactured.
>
> Because of the similarity in the foam and innerspring Nylex II Mattresses and the ease with which the wrong mattress could be assembled, Ted Lazakis and Debora Nystrom, the Corporate Representatives of Creative Bedding *admitted* that during the 1996 and 1997 time frame, Creative Bedding *could have* shipped a Nylex II Convoluted Foam Mattress to NHC rather than a Nylex II Innerspring Mattress with Convoluted Foam.

(Doc. No. 145, at ¶¶ 20, 21 (emphasis added; citations to the record omitted).)

The actual evidence does not support Wausau's assertions.  In fact, neither Ms. Nystrom nor Mr. Lazakis ever "admitted" that Creative could have mistakenly shipped a Nylex II Convoluted Foam Mattress instead of the Nylex II Innerspring Mattress in 1997.  Rather, Nystrom conceded that because she was not employed by Creative until 1998, she did not have personal knowledge of whether a "Fully Foam Nylex II was shipped to NHC Nashville during 1996-1997"  (Doc. No. 143-2, at 11 (Nystrom Dep. at 41:1–20)); did not have "personal knowledge that every mattress that was manufactured by [Creative

Bedding] for Medline and delivered to NHC was an Innerspring mattress" (Doc. No. 143-3, at 2 (Nystrom Dep. at 47:3–13)); did not have "personal knowledge that another type of mattress wasn't at least inadvertently shipped" (*id.* (Nystrom Dep. at 47:23–48:6)); and no personal knowledge that the only type of mattress shipped was the innerspring mattress (Doc. No. 143-3, at 2–3 (Nystrom Dep. at 49:21–50:3)). Because of this lack of personal knowledge, Ms. Nystrom "could not testify under oath that mistakes were not made in regard to the mattress products that were shipped to NHC from Creative Bedding."  (Doc. No. 143-3 at 15 (Nystrom Dep. at 99:17–100:3).)  Similarly, Ted Lazakis testified that he was not employed by Creative in 1997 and therefore had no personal knowledge of whether mistakes might have been made at that time.  (Doc. No. 143-5, at 12 (Lazakis Dep. at 44:19–45:2).)

However, Wausau previously filed a motion, with good reason, to exclude the affidavit testimony of Ms. Nystrom that Creative "shipped no other product to NHC Nashville aside from the Nylex II Innerspring Convoluted Foam mattresses identified in these purchase orders" during 1996 and 1997, on the basis that Ms. Nystrom was not working for the company and therefore did not have personal knowledge to attest that no manufacturing errors occurred during that time frame.  It is ridiculous for Wausau to turn around now and attempt to rely on the same portions of Ms. Nystrom's testimony that it previously sought to exclude on that basis.   While it is clear that the referenced testimony from Nystrom and Lazakis would not be competent to establish that mistakes were *not* made, as Wausau previously argued in seeking to exclude the referenced testimony, it likewise cannot be used by Wausau to establish that mistakes *were* made.

Second, Wausau contends that Nystrom "acknowledged" that if a lead sewer attached the wrong law tag then that "could result in at least some number of mattresses being mis-manufactured."  Even if that statement were not purely speculative and hypothetical, all it would prove is that the mattress manufactured would match the item number specified on the law tag, not that an item would actually be mismanufactured.  The evidence presented by Wausau is therefore insufficient to establish the likelihood of a "mismanufacture" during Creative Bedding's manufacturing process

Finally, while the Defendants do not have the burden of disproving causation, their evidence regarding Creative Bedding's process of assembling mattresses negates any possible inference of mismanufacture that might be considered to arise from Wausau's proof.   With their Reply Brief,

Defendants have submitted the Affidavit of Robert Apitz, the head of manufacturing at Creative Bedding from 1995 through 2000. In his Affidavit, Mr. Apitz testified that he established and implemented a production process permitting Creative Bedding to manufacture, assemble and ship mattress products including the Nylex II Innerspring with Convoluted Foam mattress. The mattresses manufactured and assembled by Creative were all made to order, meaning that Creative did not store mattresses. Instead, when a purchase order was received from a customer, such as Medline, Creative would process that order on a schedule. Mattress orders were staged separately, so that a single purchase order was assembled and packaged for shipment before Creative began assembling the products in the next purchase order. (Doc. No. 47-2, at ¶ 5.) Mr. Apitz further stated:

> 6.      For example, if a purchase order for a quantity of Nylex II Innerspring Convoluted Foam Mattresses was received from Medline, all of these mattresses would be assembled on the production line together. All of the mattress cores, which would include foam layers and an innerspring component, would be assembled together. Once assembled, the mattress cores would proceed as a group to be stuffed into the mattress ticking (the covers). Once [that order was] fully assembled and packaged, [Creative] would begin production of the next purchase order down the line.

> 7.      The entire manufacturing and production process is determined by the "item number" on the purchase order. The "item number" is unique to a particular mattress type and informs the product assemblers as to the components of that mattress. For example, the "item number" for Medline's Nylex II Innerspring Convoluted Foam Mattress was MDT 2312(80). The last two parenthetical digits describe the length of the mattress, so there is potential variance between 75 inches, 80 inches, etc., depending on what the purchase order provides. Because of this potential length variance, product assemblers use the "item number" to guide the production process. They could not use the product description by itself, *i.e.*, "Nylex II Innerspring Convoluted Foam Mattress," because that would not tell them anything about the length of the mattress.

> 8.      The process described above was designed so as to avoid intermingling mattress types within a single order. Thus, Nylex II Innerspring Mattresses with Convoluted Foam were not assembled at the same time as Nylex II 100% Foam Mattresses. They have different "item numbers" and different components. Therefore, they are manufactured and assembled separately. Even if a purchase order called for a mixture of 100% foam and innerspring mattresses, the orders would be assembled and staged separately.

> 9.      This manufacturing process remained consistent from the Spring of 1995 through 2000 . . . .

> 10.      As head of manufacturing between 1995 and 2000, I do not recall ever receiving a call, complaint or product return on the basis that [Creative] shipped a Nylex II 100% Foam Mattress when the customer ordered a Nylex II Innerspring Mattress, or vice versa. Because I was the head of manufacturing during this time period, if any such complaint was made to [Creative], I would have been informed of it."

(Doc. No. 47-2, at ¶¶ at 6–10.)

In other words, based on this evidence, it appears exceedingly unlikely that one 100% foam mattress could have mistakenly been mixed into a batch of innerspring mattresses. Even if, pursuing Wausau's theory, the lead sewer inadvertently pulled a bunch of law tags from the wrong bin, then every mattress made as part of that batch would have matched the product identified in the law tags which, in theory, would not have been the product ordered by the customer. However, it is undisputed here that all of NHC's remaining Nylex II mattresses inventoried after the fire are correctly identified by product number as having innersprings and do in fact have innersprings.

In one further attempt to create a factual dispute as to whether a manufacturing error might have occurred in 1996 or 1997, Wausau points to a labeling problem that occurred when Creative manufactured mattresses to be used by the Defendants' expert, Dr. Kytomaa, in tests demonstrating that steel innersprings would not have been consumed in the fire. For comparison purposes, Dr. Kytomaa tested four Nylex II mattresses—two with innersprings and two that were 100% foam. Creative Bedding specially manufactured the mattresses to be used in this test and, in the process, mis-applied the product identification tags: Although the correct "law" tags were used, identifying the respective mattresses by product number as either having springs or not having springs, all of them had the same "product brand label" or "product identification" tags, which indicated that the mattresses were "Nylex II Convoluted Foam." As Defendants point out, however, the mattresses themselves were not mis-*manufactured*—they were simply mislabeled. The mattresses that were supposed to have springs had springs, and the mattresses that were not supposed to have springs did not have springs. Moreover, this type of error simply suggests that if one mattress in a batch was mislabeled or misidentified, then the entire batch would be similarly mislabeled, not just one of the batch. In this case, as previously stated, there is no evidence that any of the remaining mattresses stored after NHC's fire were mislabeled.

In sum, Wausau's claim that one mattress without springs might have inadvertently been mixed into a batch of mattresses with springs, been shipped to NHC, and ended up on Anna Tolston's bed is based upon conjecture and speculation. To posit that a mistake *might* hypothetically and theoretically

have occurred is not the same as producing evidence that it did occur—or even that it likely could have occurred—in this case.[1]

### (2)    Robert Hollman's Testimony

Robert Hollman was the Purchasing Manager for NHC responsible for purchasing mattresses in 1996 and 1997, the relevant time frame.  The purchase orders and invoices from that period indicate that Mr. Hollman ordered Nylex II Innerspring Mattresses with Convoluted Foam, and it is undisputed that Mr. Hollman believed that he was purchasing Nylex II Innerspring Mattress with Convoluted Foam.  The available documentation shows that on either March 11 or March 19, 1997, twenty-three Nylex II Innerspring mattresses were shipped by Creative Bedding to NHC.  All of those mattresses had a solid dark blue ticking.  NHC patient Anna Tolston was admitted to NHC on March 24, 1997.  Another shipment of twenty-three Nylex II Innerspring Mattresses was shipped to NHC in May 1997.

In his deposition, Mr. Hollman stated that he knew definitively that Anna Tolston had a Nylex II mattress on her bed, because he placed it there.   He did not remember when he placed the mattress on her bed, however; he only knew that he had placed it there sometime after her arrival in March 1997:

Q.     . . . [Y]ou said definitively toward the end of the examination that there was a Nylex II mattress that was on Anna Tolston's bed.

A.     Right, there was.

Q.     Okay.  Can you tell for me all of the bases, all of the reasons you know there was a Nylex –

A.     Cause I put it on there.

Q.     When?

A.     I don't know when I put it on there.  After she came to the facility.

Q.     All right.  Sometime after she was admitted in 1997?

A.     Right.

---

[1] In further support of its argument that the allegedly defective mattress must have been manufactured or sold by the Defendants, Wausau also relies upon a report made, apparently by Medline, to the FDA connecting a Nylex II mattress with the NHC fire.  According to Defendants, that report was voluntarily made by Medline based upon its policy of filing such a report whenever a complaint is made, and the report itself specifically states that it is based upon Wausau's claim that a Nylex II mattress was involved even though Medline itself had not determined who manufactured the mattress in question.  This report to the FDA is not evidence and does not support Wausau's position.

Q.     Are there any other bases for your opinion that there was a Nylex II mattress on that bed on the day of the fire?

A.     No.

(Doc. No. 143-10, at 12 (Hollman Dep. at 244:3–19).)  Mr. Hollman also stated that, while he was sure he put a Nylex II mattress on Ms. Tolston's bed at some point, he did not remember, or did not know, whether Ms. Tolston's mattress was ever swapped by anyone else.  (Doc. No. 143-7, at 10 (Hollman Dep. at 91:9–19); Doc. No. 143-10, at 6, 9 (Hollman Dep. at 217:4–14, 229:19–230:2).)  Mr. Hollman also testified that he knew that a "plan of care" for Ms. Tolston, originally dated January 8, 2003, called for a "Nylex II mattress for pressure reduction" (Doc. No. 143-15), which Wausau claims gives rise to an inference that Mr. Hollman must first have placed a Nylex II mattress on Ms. Tolston's bed shortly after January 8, 2003.  Ms. Tolston's plan of care is not competent evidence, however, and will not be considered.[2]

Regardless, Mr. Hollman testified unequivocally that he saw a Nylex II mattress on Ms. Tolston's bed within a week before the fire that resulted in her death.  He testified that he saw that the bare mattress cover was blue in color, and he knew it was a Nylex because that was what her plan of care called for.  (Doc. No. 143-10, at 4 (Hollman Dep. at 211:12–20).)  Mr. Hollman's supply closet was adjacent to or across from Ms. Tolston's room at the NHC facility (*Id.* (Hollman Dep. at 209:22–24)), so he apparently saw the bare mattress between sheet changings from the hallway.

Mr. Hollman also testified that Span America mattresses, which are 100% foam, look different from Nylex II mattresses because the Span America cover, which was dark blue (like the Nylex II's), was of different material than the Nylex II, "and it had the gray rough like material on the bottom to keep it from sliding. . . .  It zipped – the cover zipped on," while the Nylex II had "permanently attached covers."  (Doc. No. 143-10, at 3 (Hollman Dep. 207:9–15.).)  In addition, the Nylex mattresses, compared to the Span America mattresses were solid blue, and the covers were not wrinkled or loose-fitting like the covers on the Span America mattress.  (Doc. No. 143-10, at 3 (Hollman Dep. 207:18–20).)

---

[2] Mr. Hollman identified the page of Ms. Tolston's plan of care calling for a Nylex II mattress during his deposition.  He had never seen it before that day, however (Doc. No. 143-10, at 12 (Hollman Dep. 241:3–20)), and was not competent to attest to its authenticity or meaning.  The document is inadmissible hearsay.  Even if it were admissible, it would not change the outcome in this case.

As the Defendants point out, however, of the fifteen mattresses retrieved from the wing where the fire occurred, ten were Nylex II Innerspring mattresses (with innersprings, and all correctly labeled), while five were manufactured or sold by companies other than the Defendants. Of those five, four were 100% foam, and all four appear from photographs in the record to have dark covers. (See Doc. No. 147-3, Ex. A.) In fact, while Hollman only testified about Span America mattresses as compared to Nylex II mattresses, the photographs of the Tender Care mattresses indicate that the Tender Care mattresses have tightly fitted dark blue covers with gray or white bottoms. (Only one of the two Span America mattresses pictured has a dark blue, loose-fitting cover with a gray bottom; the other has a green, loose-fitting cover with a gray bottom. (*Id.*)) In other words, it appears that of the fifteen mattresses retrieved, at least thirteen of them had dark blue covers, regardless of whether they were Nylex II mattresses.

At most, Mr. Hollman's testimony establishes that (1) at some point between 1997 and 2003 he placed a Nylex II mattress on Ms. Tolston's bed in accordance with his understanding of her plan of care; (2) he saw a mattress with a dark blue cover on Ms. Tolston's bed sometime about a week before Ms. Tolston's death in the fire, and (3) based on those two facts, he sincerely believed the mattress he saw was a Nylex II mattress. That evidence alone is not sufficient to permit a reasonable jury to conclude that the mattress on Anna Tolston's bed was actually a Nylex II mattress manufactured or sold by the Defendants, given the incontrovertible facts that Defendants only sold Nylex II Innerspring mattresses to NHC, NHC purchased 100% foam mattresses from other providers, and at least some of those mattresses had dark blue covers and looked remarkably similar—particularly from a distance—to the Nylex mattresses.

As previously discussed, Wausau bears the burden of proving that the allegedly defective product at issue was actually manufactured or sold by the Defendants. At best, Wausau has shown "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, "the mere existence of a scintilla of evidence in support of Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. No reasonable jury could find for Wausau based on the available evidence, and Defendants are therefore entitled to summary judgment in their favor.

**IV.     CONCLUSION**

For the reasons set forth herein, Defendants motion for summary judgment will be granted and this matter dismissed.  An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge